UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH DIVISION
CIVIL ACTION NO. 05:09-CV-37

STEVEN GLEN TOON,                                              PLAINTIFF

VS            DEPOSITION FOR PLAINTIFF

THE CITY OF HOPKINSVILLE, JAY R. PHELPS,
MIKE FELTS, AND BRANDON TEDFORD,                               DEFENDANTS

\*\*\*\*    \*\*\*\*    \*\*\*\*    \*\*\*\*

DEPONENT:        **MICHAEL FELTS**
DATE:            May 3, 2010

\*\*\*\*    \*\*\*\*    \*\*\*\*    \*\*\*\*

JULIE P. RITTER
COURT REPORTER
397 REDBIRD TRAIL
BOWLING GREEN, KY 42101
(270) 843-3015

1

## I N D E X

PAGE

Direct Examination Questions by Mr. Cole......... 4

## E X H I B I T S

Felts Deposition Exhibit 1....................... 17

## O B J E C T I O N S

MS. BLANKENSHIP: I'm going to object............ 10

MS. BLANKENSHIP: I'm going to object............ 47

MS. BLANKENSHIP: Let me object.................. 58

MS. BLANKENSHIP: Let me lodge an objection...... 62

2

****  ****  ****  ****

The deposition of **MICHAEL FELTS**, taken pursuant to notice heretofore filed, in the offices of COTTHOFF & WILLEN, 317 West 9th Street, Hopkinsville, Christian County, Kentucky, on Monday, May 3, 2010, at 9:00 a.m., and to be used in accordance with the Federal Rules of Civil Procedure.

****  ****  ****  ****

### APPEARANCES

For the Plaintiff:   J. David Cole, Jr.
                     COLE & MOORE, P.S.C.
                     921 College Street- Phoenix Place
                     P. O. Box 10240
                     Bowling Green, KY  42102-7240

For the Defendants:  Stacy A. Blankenship
                     DENTON & KEULER
                     P. O. Box 929
                     555 Jefferson Street; Suite 301
                     Paducah, KY  42002-0929

Also Present:        Steven Toon

3

****  ****  ****  ****

MICHAEL FELTS, called on behalf of the Plaintiff, being first duly sworn, was examined and deposed as follows:

### DIRECT EXAMINATION
### QUESTIONS BY MR. COLE:

Q.  Officer Felts, my name is David Cole, Jr.  I think you and I have met before.  I want to ask you a few questions today.  If at any time I ask you a question that you do not understand, will you, please, tell me you don't understand it?

A.  Yes, sir.

Q.  Okay.  Would you state your full name for the record.

A.  Michael Aaron Felts.

Q.  What's your date of birth?

A.  [redacted]

Q.  Where were you born?

A.  Joliet, Illinois.

Q.  After being born in Joliet Illinois, where did you next live?

A.  Here. Hopkinsville.

Q.  How old were you when you moved to Hopkinsville?

4
JULIE RITTER          270.843.3015

A.  Three, four, somewhere around that age.

Q.  Okay.  Did you go to school in Hopkinsville?

A.  Yes.

Q.  Graduate from Christian County High School?

A.  Yes, sir.

Q.  What year did you graduate high school?

A.  1997.

Q.  I'm going to ask you some questions today that may seem a little silly.  Okay.  I want you to kind of bear with me.  They're standard questions we try to ask all the deponents.

How many family members over the age of 18 do you have living here in Christian County, Kentucky?

A.  Two.

Q.  Okay.  Do you have any living in Paducah or McCracken County, Kentucky?

A.  No.

Q.  Do you have any living in any counties within this federal district?

A.  My in-laws live here.

Q.  Okay.

A.  And my parents live in Hancock County. I don't know if that's in --

Q.  Okay.  Give me the names of your parents, please.

5
JULIE RITTER          270.843.3015

### Page 6

```
 1   A.  Melvin and Marilyn Felts.
 2   Q.  Okay. And they live in Hancock County?
 3   A.  Yes, sir.
 4   Q.  What town do they live in?
 5   A.  Pellville.
 6   Q.  Okay. And is your dad employed?
 7   A.  Yes, sir.
 8   Q.  Where is he employed?
 9   A.  Pellville Baptist Church.
10   Q.  What does he do for Pellville Baptist Church?
11   A.  He's the preacher.
12   Q.  Okay. Is your mother employed anywhere?
13   A.  Yes, she is. She works at Lacy Elementary
14  School here in Christian County.
15   Q.  Okay. Is she a teacher?
16   A.  She's a guidance counselor.
17   Q.  Guidance counselor. Okay. Do you have any
18  brothers or sisters?
19   A.  I have a sister.
20   Q.  All right. What's her name?
21   A.  Ashley.
22   Q.  Is she married?
23   A.  No. Not married.
24   Q.  Okay.
25   A.  She lives here in town, and she works for
```

### Page 7

```
 1  Pennyroyal Mental Health.
 2   Q.  Pennyroyal Mental Health?
 3   A.  Yes, sir.
 4   Q.  How old is your sister?
 5   A.  27.
 6   Q.  27. Okay. Do you have any first cousins?
 7   A.  I do.
 8   Q.  Okay. Do they live in Kentucky?
 9   A.  No.
10   Q.  All right. Do you have any aunts and uncles?
11   A.  Yes.
12   Q.  Do they live here in Kentucky?
13   A.  No.
14   Q.  Where do they live?
15   A.  Tennessee.
16   Q.  Okay. Do you have any nieces or nephews?
17   A.  Yes.
18   Q.  Any of them over the age of 18?
19   A.  Yes.
20   Q.  Where do they live?
21   A.  Here.
22   Q.  Okay.
23   A.  I have one niece that lives here in Christian
24  County.
25   Q.  What's her name?
```

### Page 8

```
 1   A.  Emily Grace.
 2   Q.  Okay. How old is she?
 3   A.  She's 20.
 4   Q.  Okay. Where is she employed or where does she
 5  go to school?
 6   A.  She goes to school at the community college.
 7  And I believe she's employed at Nova Dell --
 8   Q.  Okay.
 9   A.  -- the golf course, as a waitress.
10   Q.  All right. Any other family members that live
11  here in Kentucky that you've not told me about yet?
12   A.  My in-laws and --
13   Q.  Tell me your in-laws' names.
14   A.  Gary Grace and Linda Grace.
15   Q.  Okay. Where is Gary employed?
16   A.  Gary is a -- he's a coal miner in Hopkins
17  County. I don't know the name of the company.
18   Q.  Okay. And your mother-in-law?
19   A.  My mother-in-law is retired. She keeps my
20  son, so that's her job.
21   Q.  Okay. And so I assume she lives here in
22  Christian County?
23   A.  Yes. They live in Crofton.
24       MR. COLE: Hold on a second. Let's go off the
25  record.
```

### Page 9

```
 1       (Off-the-record discussion.)
 2  BY MR. COLE:
 3   Q.  After graduating from Christian County High
 4  School, where did you next go to school?
 5   A.  Murray State.
 6   Q.  Did you obtain a degree from Murray State?
 7   A.  No, I did not.
 8   Q.  How many years did you go to Murray State?
 9   A.  About three.
10   Q.  Okay. And what did you study at Murray State?
11   A.  Criminal justice.
12   Q.  Tell me how your training in criminal justice
13  at Murray State compared to your training at the police
14  academy.
15   A.  Totally different really.
16   Q.  That's what I was going to guess.
17   A.  Yeah.
18   Q.  A lot more hands-on application taught at the
19  academy?
20   A.  Yes.
21   Q.  Versus a lot of theory and law, I guess, at
22  Murray State?
23   A.  Yes, sir.
24   Q.  Okay. You've heard the testimony of Officer
25  Phelps; you read his last deposition, correct?
```

**Page 10**

1  A. Yes, sir.
2  Q. Do you believe everything he said in his
3  deposition was accurate?
4  A. Yes, sir.
5  Q. Okay. You wouldn't make any changes to any of
6  it, would you?
7  A. No, sir.
8  Q. Okay. In regard to the report that was
9  prepared following the arrest of Mr. Toon, do you know
10 who prepared that report?
11 A. Which portion of it, the actual criminal
12 report or --
13 Q. The uniform citation.
14 A. I believe Officer Phelps did the citation.
15 Q. Okay. Did you do another report?
16 A. I did the Use of Force Report.
17 Q. You did the Use of Force Report?
18 A. Yes, sir.
19 Q. Okay. And what did you indicate in the Use of
20 Force Report?
21 MS. BLANKENSHIP: I'm going to object. If you have
22 a copy of it --
23 MR. COLE: I'm looking for it.
24 MS. BLANKENSHIP: Okay.
25 BY MR. COLE:

JULIE RITTER   270.843.3015

**Page 11**

1  Q. I'm having a hard time finding it. I'm
2  assuming you indicated that you used only such force as
3  was reasonable and necessary, right?
4  A. Yes, sir.
5  Q. Okay. Who did the report on Mr. Shepherd?
6  A. Citation?
7  Q. I apologize. The citation.
8  A. I believe I did. I'm not positive.
9  Q. Okay. That's what I was thinking. (Passes
10 document.)
11 A. (Reviews documents.)
12 Q. Do you recognize that report?
13 A. Yes, sir. That's the citation I --
14 Q. I apologize. I keep calling it a report.
15 A. That's okay.
16 Q. Citation. There wasn't a Use of Force Report
17 done for Shepherd because you all didn't use any force
18 on him, right?
19 A. Correct.
20 Q. Okay. Have you had a chance to review that?
21 A. Yes, sir.
22 Q. Okay. All right. Thank you, sir.
23 MR. COLE: Have you had a chance to look at that?
24 MS. BLANKENSHIP: I haven't finished it.
25 MR. COLE: I'm sorry.

JULIE RITTER   270.843.3015

**Page 12**

1  MS. BLANKENSHIP: That's all right. (Reviews
2  documents.) (Passes document.) Okay.
3  BY MR. COLE:
4  Q. I want to read this to you and have you tell
5  me whether this is what occurred. Officers (sic) were
6  dispatched to Shively (sic) Road area in reference to a
7  red pickup truck driving recklessly. Does that sound
8  right to you thus far?
9  A. Yes, sir.
10 Q. Officer Phelps made contact with the vehicle
11 at 10- or (sic) 1827 Sivley Road. As Officer Phelps
12 approached the driver he ran (sic) toward the house; is
13 that true?
14 A. Yes, sir.
15 Q. How do you know that's true?
16 A. That's what Officer Phelps told me --
17 Q. Okay.
18 A. -- occurred. I wasn't there to see that part.
19 Q. You didn't see that --
20 A. No, sir.
21 Q. -- right? Okay. Shepherd opened the door,
22 allowing the driver to get away from Officer Phelps. Is
23 that what Officer Phelps told you?
24 A. Yes, sir.
25 Q. Okay. So you wrote that down. Shepherd then

JULIE RITTER   270.843.3015

**Page 13**

1  stalled Officer Phelps outside for several minutes
2  before going and getting the driver from inside. Did
3  Officer Phelps tell you that?
4  A. Yes, sir.
5  Q. When I made contact with Shepherd he had a
6  strong odor of alcoholic beverage on his breath and
7  person. He also had slurred speech and was unsteady on
8  his feet. Did you write that?
9  A. Yes, sir.
10 Q. You had a chance to watch the video last time
11 we were here, right?
12 A. Yes, sir.
13 Q. I didn't notice anywhere in the video where he
14 appeared to be unsteady on his feet. Was he unsteady on
15 his feet on the video as you saw it?
16 A. It's been awhile since I watched the video,
17 but not that I recall, sir.
18 Q. Okay. I heard him speaking on the video. Did
19 you hear him speaking on the video a couple of times;
20 Mr. Shepherd?
21 A. I believe so. I don't remember.
22 Q. Did his speech sound slurred on there?
23 A. I don't recall.
24 Q. Okay. Did you ever here Mr. Shepherd speak on
25 or about March 7th, 2008?

JULIE RITTER   270.843.3015

**Page 14**

1    A.   Yes, sir.
2    Q.   Okay. Was his speech slurred then?
3    A.   The evening that we were out with him, yes,
4 sir.
5    Q.   Okay. And he was unsteady on his feet?
6    A.   Yes, sir.
7    Q.   Okay. And he also hindered prosecution or
8 apprehension, first degree?
9    A.   No, sir.
10    Q.   Okay. Why did you write that down?
11    A.   It actually would have been second degree.
12    Q.   Okay.
13    A.   And mistake on my part entering the code.
14    Q.   Don't worry about that. I'm not worried about
15 it. Honest mistake on a code. I make them all the time
16 on citing a statute.
17       Let's talk about stuff that you were in control
18 of, though.
19    A.   Okay.
20    Q.   Tell me what you observed him do to hinder
21 apprehension.
22    A.   I didn't observe him. I'm basing it off of
23 the testimony that Mr. -- or that Officer Phelps gave me
24 about what occurred when he first arrived on the scene.
25    Q.   Okay. Tell me anywhere that night when you

JULIE RITTER     270.843.3015

**Page 15**

1 saw him that he was a danger to himself or others,
2 March 7th, 2000 --
3    A.   When he was outside --
4    Q.   Yeah.
5    A.   -- when he was manifestly under the influence
6 of alcohol. That's why I made the arrest for alcohol
7 intoxication.
8    Q.   Tell me what you saw. I understand the term
9 "manifestly under the influence".
10    A.   Right.
11    Q.   How was he a danger to himself or others?
12    A.   I didn't say he was a danger to himself or
13 others.
14    Q.   Okay. Do you know what the statute reads in
15 order to charge somebody with public intoxication or
16 alcohol intoxication?
17    A.   Yes, sir.
18    Q.   What does it read?
19    A.   Needs to be in public --
20    Q.   Okay.
21    A.   -- and manifestly under the influence of
22 alcohol.
23    Q.   And danger to himself or others, doesn't it
24 say that?
25    A.   I don't believe it requires that, sir.

JULIE RITTER     270.843.3015

**Page 16**

1    Q.   Okay. So they can just be under the influence
2 of alcohol in public and you can arrest them for that?
3    A.   If they're under the influence enough that
4 they don't need to be out in public, yes, sir.
5    Q.   And you made that determination?
6    A.   Yes, sir, I did.
7    Q.   Okay. You understand the difference between
8 telling the truth and telling a lie, right?
9    A.   Yes, sir, I do.
10    Q.   And you've taken an oath here today?
11    A.   Yes, sir.
12    Q.   Have you ever lied under oath before?
13    A.   No, sir.
14    Q.   Okay. Have you ever stolen anything before?
15    A.   A pen from work or something to that effect,
16 but...
17    Q.   Nothing else?
18    A.   No, sir.
19    Q.   All right. And you understand that when we
20 take a deposition, the idea is to get the most truthful
21 testimony we can from you, right?
22    A.   Yes, sir.
23    Q.   Okay. And you understand when you fill out a
24 report like this --
25       MR. COLE: And I'm referring to what we'll -- let

JULIE RITTER     270.843.3015

**Page 17**

1 me stop here and mark this.
2       (Felts Deposition Exhibit 1 was duly
3       received, marked, and is filed herewith.)
4 BY MR. COLE:
5    Q.   -- what we've premarked as Plaintiff's
6 Exhibit 1 -- and I apologize. I'm going to have to get
7 some bifocals they tell me. I've got to hold everything
8 far away to read it -- what's been dated here March 7,
9 2008, Uniform Citation, we've marked as Exhibit 1. You
10 prepared that report, right?
11    A.   Yes, sir, I did.
12    Q.   Okay. At any time, have you lied in any
13 reports you prepared as a police officer?
14    A.   No, sir.
15    Q.   Okay. Never made up something to protect
16 another officer?
17    A.   No, sir.
18    Q.   Okay. Never done anything dishonest to help
19 out a friend?
20    A.   No, sir.
21    Q.   Okay. Are you aware of this ever happening in
22 the Hopkinsville Police Department; one officer lying to
23 cover up for another?
24    A.   No, sir, not that I know of.
25    Q.   How long have you been with the Hopkinsville

JULIE RITTER     270.843.3015

Page 18:

Q. Police Department?
A. Ten years in December.
Q. Ten years. You're in a supervisory role, too, aren't you?
A. Not anymore, sir.
Q. Oh, you're not?
A. No, sir.
Q. All right. Sometimes I mix up my files here.
A. No. I was at the time of this incident --
Q. Okay. Okay.
A. -- but I'm in investigations now. So I'm no longer on patrol.
Q. I gotcha. What do you mean you're in investigations? You're a detective?
A. Yes, sir.
Q. That's a promotion, though, isn't it?
A. It was a lateral move.
Q. A lateral move?
A. Yes, sir.
Q. Okay. Same pay?
A. Yes, sir. Well...
Q. Go ahead and answer.
A. Roughly. Shift differential -- I don't get shift differential anymore --
Q. Okay.

Page 19:

A. -- for being on midnight shift. But hourly wage-wise, yes, sir, it's the same pay.
Q. Okay. And I apologize. I think you told me. But can you tell me again, when did you switch to detective?
A. December 15th, I believe it was, of '08. That would have been the second time I went to detective.
Q. Oh, okay. Tell you what I'm going to do. I'm going to kind of go back at the beginning. Okay?
A. Okay.
Q. We'll kind of work our way through. When you first came to work at Hopkinsville Police Department, what was your job title?
A. When I was initially hired, it would have been a police trainee.
Q. Okay. Very good. And had you gone to the academy yet?
A. When I was first hired?
Q. Yes.
A. No, sir.
Q. After you were first hired, then you became a police trainee, then you went to the academy?
A. Yes, sir. I got hired December of 2000, and I actually was there for three days before I was deployed and -- with the Reserves. I came back in September of

Page 20:

2001 and started the academy shortly after that.
Q. Okay. And how long is the academy; 13 weeks?
A. It's 18 weeks now.
Q. Okay.
A. It was 16 weeks at the time I attended.
Q. Is basic 13 weeks?
A. No. It's all basic. So...
Q. Not police, though. But military basic training is that 13 --
A. Six weeks.
Q. Six weeks?
A. Yes, sir.
Q. Okay. So you go to the academy. You graduate from the academy, right.
A. Yes, sir.
Q. Okay. When did you graduate from the academy?
A. Spring of 2002. I think it was May, roughly.
Q. Okay. And so you came back. You're no longer a police trainee. Are you a patrolman?
A. Yes, sir.
Q. Okay. I know you had a lot of training at the academy.
A. Yes, sir.
Q. But when you got out of the academy and you are now a patrolman, did you have what we call, like, a

Page 21:

field training officer?
A. Yes, sir.
Q. Tell me who that was.
A. I had several.
Q. Okay.
A. We rotate through. My first one was Paul Ray.
Q. Okay.
A. And, then, I believe I went to Michael Marszalek. And, then, I went -- it was Jeff Crawford and Mike Sandbrink. But I could get them backwards which was which.
Q. That's fine.
A. And I believe Mike Sandbrink was my last one. So he was my final.
Q. Okay.
A. So those four, I believe it was.
Q. And what did they do to train you?
A. Initially, with Paul Ray, first little bit, probably a week or so, I just kind of sat in the passenger's seat, observed what was going on, to get an idea of how things worked at the department.
And, then, slowly throughout the training, they exposed me to calls as they came out. And as I went further along, they were less involved in the calls and I was more involved. Until, by the time I got to the

**Page 22**

1 end of my training, it was -- my field training officer
2 was with me, but he was more or less just observing.
3   Q.   So you became primary after a certain point?
4   A.   Yes, sir.
5   Q.   That makes sense. Did they give you any --
6 forgive my lack of knowledge how to say it right -- but
7 any reviews after watching you do a traffic stop or an
8 arrest and say, good job on this, or, you can improve a
9 little bit on that?
10  A.   Yes, sir.
11  Q.   Okay. Was that helpful for you?
12  A.   Yes, sir.
13  Q.   And did they give reports of your performance
14 to some superior officer?
15  A.   Yes, sir.
16  Q.   Okay. And did you have a review and any type
17 of scoring of your performance?
18  A.   Yes, sir. There was a daily report, I believe
19 it was like a 1 to 7 scale, for several different
20 breakdowns and different things. And they scored me on
21 what pertained to that day. You know, some -- some
22 stuff wasn't observed --
23  Q.   Okay.
24  A.   -- may not have happened kind of deals. So...
25  Q.   Are you married?

JULIE RITTER            270.843.3015

**Page 23**

1   A.   Yes, sir.
2   Q.   How long have you been married?
3   A.   Since 2001.
4   Q.   Okay.
5   A.   October.
6   Q.   And what I'll tell you is, I'm not going to
7 bother anybody in your family. I just want to make sure
8 your wife and family isn't on the jury we have. Okay?
9   A.   Right.
10  Q.   Your wife's name, please?
11  A.   Tari.
12  Q.   Okay.
13  A.   T-A-R-I.
14  Q.   Does she have any sisters or brothers that
15 live in Kentucky?
16  A.   She has a sister that is in Owensboro. But in
17 the next 30 days, they're going to be moving to Destin,
18 Florida. So...
19  Q.   Okay. Go ahead and give me her name, if you
20 don't mind, just in case something were to happen where
21 she stayed.
22  A.   Tracy Mansfield.
23  Q.   Okay. And what's her husband's name?
24  A.   Mark.
25  Q.   And where is Mark employed?

JULIE RITTER            270.843.3015

**Page 24**

1   A.   I know he works in human relations for a
2 company in Owensboro, but I couldn't tell you the name
3 of it.
4   Q.   Fair enough. Now, back to your training.
5 What do they teach you at the academy about the use of a
6 TASER®?
7   A.   At the academy?
8   Q.   Yes, sir.
9   A.   Nothing at all.
10  Q.   All right. Fair enough. When you went from
11 the academy to Hopkinsville Police Department, you
12 didn't have any training in between there, did you?
13  A.   No, sir.
14  Q.   Okay. When you got to Hopkinsville Police
15 Department, what training did they give you in regard to
16 the use of a TASER®?
17  A.   At first, none. Because it was -- I graduated
18 in 2002. And I think it was 2005 -- 2004, 2005 before
19 the department started getting TASERS®.
20  Q.   Okay.
21  A.   But when we did receive the TASERS®, it was an
22 eight-hour block of instruction.
23  Q.   Okay. And have you been tased yourself?
24  A.   Yes, sir.
25  Q.   Where were you tased?

JULIE RITTER            270.843.3015

**Page 25**

1   A.   In the back.
2   Q.   Okay. What part of the back?
3   A.   I had one lead attached to my shoulder -- left
4 shoulder and the other was attached to my left -- the
5 backside of my hip.
6   Q.   Okay. Tell me how that works. Are there two
7 wires that go out?
8   A.   Yes, sir.
9   Q.   And does each wire have a prong?
10  A.   On a normal duty cartridge, so to speak --
11  Q.   Yeah.
12  A.   -- yes. On the cartridge that was used for
13 training, it's actually a permanent wire with the
14 alligator clips attached to the end of it -- small
15 alligator clips, so it can be reused because you can't
16 reuse prongs.
17  Q.   Gotcha. Because they're kind of dirty or at
18 least they have flesh on them --
19  A.   Exactly.
20  Q.   -- when they go in a person?
21  A.   Exactly.
22  Q.   Okay. So someone would attach it to your back
23 and, then, your lower back?
24  A.   Yes, sir.
25  Q.   And, then, would they use the same model that

JULIE RITTER            270.843.3015

1  you carry with you when you're on duty?
2    A.  Yes, sir.
3    Q.  Okay. And would they engage the TASER® and
4  would it go off like it would when you use it on a
5  subject?
6    A.  Yes, sir.
7    Q.  Okay. You got a full, five-second shock?
8    A.  No, sir. It was about three seconds.
9    Q.  Okay. Why only three?
10   A.  That's the training that they chose --
11   Q.  Okay.
12   A.  -- a three-second exposure. There were some
13 officers that volunteered to take the five-second
14 exposure with the actual shot, just to demonstrate --
15   Q.  Yeah.
16   A.  But not every officer did that.
17   Q.  Okay. You didn't do that?
18   A.  No, sir.
19   Q.  Okay. When they took those prongs off you, it
20 didn't tear out any flesh off the alligator clips,
21 right?
22   A.  No, sir.
23   Q.  Okay. That's normally what happens, though,
24 when you take the prongs out of somebody when you shoot
25 them, right?

26
JULIE RITTER    270.843.3015

1    A.  It can.
2    Q.  Okay. Were you the one who shot Mr. Toon?
3    A.  Yes, I was.
4    Q.  Okay. Did flesh come out of him when you
5  pulled the prongs out?
6    A.  I don't recall.
7    Q.  Okay. What did you do with those prongs?
8    A.  There were placed back inside the cartridge
9  upside down and put in a biohazard bag. And, then,
10 there's a biohazard box at the police department, and
11 they're disposed of in there.
12   Q.  Okay. Did you ever get a chance to look on
13 those prongs to see if his flesh was on them?
14   A.  No, sir, I didn't.
15   Q.  Okay. So when you got to Hopkinsville Police
16 Department, I assume they went over the Use of Force
17 Continuum; is that correct?
18   A.  Yes, sir.
19   Q.  Tell me, to your knowledge, what is the Use of
20 Force Continuum?
21   A.  The -- the steps of it or just in general?
22   Q.  In general. Just define that for me, in
23 general.
24   A.  It's the sum of the different levels of force
25 that author -- excuse me -- officers are authorized to

27
JULIE RITTER    270.843.3015

1  use, based on the force that's presented to them.
2    Q.  Okay. And tell me, what are the steps in the
3  Use of Force Continuum?
4    A.  First would be just verbal.
5    Q.  What about officer presence; would that be
6  one?
7    A.  Yes, sir. I mean...
8    Q.  So we've got officer presence. Next?
9    A.  Verbal.
10   Q.  Okay. Next?
11   A.  Soft hand techniques.
12   Q.  Okay. Tell me what soft happened techniques
13 are.
14   A.  Just touching somebody and --
15   Q.  Okay. Kind of maneuvering them?
16   A.  Just, like, taking a hand and putting it
17 behind their back kind of thing.
18   Q.  All right.
19   A.  Hard hand techniques would be, actually, like,
20 strikes; like common peroneal or brachial stuns,
21 something to that effect.
22   Q.  Oh, whoa. You're away ahead of me there.
23 Tell me what those last two words mean you said here.
24   A.  Both used at the academy or taught at the
25 academy. Common peroneal is the nerve running down the

28
JULIE RITTER    270.843.3015

1  outside of your leg.
2    Q.  All right.
3    A.  We're trained to use a knee strike --
4    Q.  Okay.
5    A.  -- to strike that nerve. Or the brachial
6  stun --
7    Q.  All right.
8    A.  -- the nerve on the side of your neck where
9  we're taught to use a forearm strike --
10   Q.  Okay.
11   A.  -- to hit that.
12   Q.  So --
13   A.  That would -- those would be --
14   Q.  I've heard about a knee strike officers use on
15 the outside of the leg. So there's actually a nerve
16 there? You're not just hitting muscle.
17   A.  No.
18   Q.  You're hitting a nerve?
19   A.  Yes, sir.
20   Q.  And what does it do when you hit that nerve?
21   A.  It pretty much makes the leg buckle.
22   Q.  Okay. So it takes them to the ground?
23   A.  Some people, it makes the leg buckle.
24   Q.  Sure.
25   A.  Some it makes the leg stiffen up. So...

29
JULIE RITTER    270.843.3015

**Page 30**

Q. Sure. Sure. I gotcha.
A. So just kind of depends; different reaction. Most people, I should say.
Q. And that's why they train you all, because it works on most people?
A. Yes, sir.
Q. And, then, the neck thing again, what's that called?
A. Brachial stun.
Q. Brachial stun. Okay. And, so, you use a forearm to hit that. And what does that do?
A. Kind of the same effect. It -- pretty much, it -- when it was demonstrated on me, I kind of just dropped. I was standing up, but I just -- I kind of dropped. It just made me weak-kneed, to be honest with you.
Q. Okay. I guess it's a way of getting somebody on the ground and to --
A. Yes --
Q. -- kind of stop them from moving?
A. Yes, sir, it can be.
Q. Okay. And that's hard hand technique, right?
A. Yes, sir.
Q. And, then, I guess, punches would also be a hard hand technique?

**Page 31**

A. I would say, no.
Q. Okay.
A. Because nowhere in my training was I ever taught to punch anybody.
Q. Okay.
A. So I would say, no, that's not a hard hand technique.
Q. But police officers punch people? I mean, I've got a book here, your Use of Force Reports here from Hopkinsville P-D. There's at least 20 mentions of having to strike somebody with a close fist.
A. Then I'll say that officers have struck people. I'm not going to say that I have.
Q. You've never struck anybody with a fist?
A. Not that I can I recall. No, sir.
Q. Okay. Even if somebody is fighting you and punching you, you've never hit them back with a fist?
A. I don't recall if I have. I may have, but I don't recall. I'm not going to say, yes, specifically, because I don't recall.
Q. What about fighting outside of police work. Have you ever struck anybody with a fist?
A. No, sir.
Q. Have you ever been in a fight before being a police officer?

**Page 32**

A. As a police officer, yes, sir.
Q. No. Before.
A. Before being a police officer?
Q. Yeah.
A. No, sir.
Q. Never been in a fistfight?
A. No, sir.
Q. Okay. Since being a police officer, have you ever been in a fight?
A. Yes, sir.
Q. Have you ever been in a fight where you felt it was necessary -- and I can't remember all those terms -- but to strike somebody in the side of the neck like we talked about?
A. I can honestly say I've never used a brachial stun.
Q. Okay. What about the leg stun?
A. Yes, sir, I have used the common peroneal.
Q. Okay. And was that effective?
A. Yes, sir, it was.
Q. All right. And was the person bigger than you that you used it on?
A. I don't recall who I used it on, sir.
Q. You're 5' 11" and 139-and-a-half pounds?
A. No, sir.

**Page 33**

Q. How tall are you?
A. I'm 6 foot and about 200 pounds.
Q. Okay. I might have the wrong -- is your name spelled F-E-L --
A. T-S.
Q. T-S, right?
A. Yes, sir.
Q. And when you filled out your application --
A. Yes, sir. I was a whole lot smaller when I filled out my application.
Q. All right. Okay.
A. That was ten years ago.
Q. Okay. How many times have you tased people?
A. I couldn't give you an exact number, sir.
Q. Well, let's just talk about in the last year, how many times have you tased somebody?
A. None.
Q. Let's talk about two thou -- and I apologize. When I say "last year", I'm saying 2010. Okay?
A. Okay.
Q. 2010, you haven't tased anybody?
A. No, sir.
Q. 2009, did you tase anybody?
A. No, sir.
Q. 2008, did you tase anybody?

**Page 34**

1  A. Yes, sir.
2  Q. Who?
3  A. At least one. Mr. Toon.
4  Q. Anybody else?
5  A. I'm sure I did. I couldn't tell you how many,
6  though.
7  Q. I mean, if the Use of Force Reports indicate
8  you did --
9  A. Yes, sir.
10 Q. -- you wouldn't remember?
11 A. Oh. If there's a Use of Force for it, then,
12 yes, sir, I'd remember it.
13 Q. Okay.
14 A. But off the top of my head, I can't give you a
15 number.
16 Q. Okay.
17 A. But I can tell you, if I did, there was Use of
18 Force done for it. So...
19 Q. It's required to be done each time, right?
20 A. Yes, sir.
21 Q. In fact, each time you have to use any force
22 at all, you're required to do a Use of Force Report?
23 A. Yes, sir.
24 Q. Okay. Where are those Use of Force Reports
25 maintained?

**Page 35**

1  A. Honestly, sir, we -- we sign them. If -- if
2  it's an officer, the first-line supervisor signs it,
3  passes it up to the next person. And I believe it's
4  maintained by the patrol major.
5  Q. Okay.
6  A. Honestly, I sign off on them and pass them up
7  to the next one in the chain and, I believe --
8  Q. You don't worry about it after that, do you?
9  A. No, sir. I believe they end up with the
10 patrol major, but honestly, couldn't tell you for sure.
11 Q. Your reviews look like you appear to be one of
12 the smarter, young officers on here. Communication
13 skills 4.5 out of 5; looks like you did pretty well on
14 that. Did these good communications skills help you to
15 get promotions?
16 A. I interview well. I mean, I guess, yes, sir,
17 they would.
18 Q. Because I'm reviewing your -- I'm not knocking
19 other officers, but yours were higher than anybody
20 else's in terms of communication skills.
21 A. Yeah.
22 Q. (Reviews documents.) Was there any particular
23 officer that gave you use-of-force training while you
24 were at Hopkinsville Police Department, other than the
25 ones you mentioned, some of the field training officers;

**Page 36**

1  any one of those, more than another, give you training
2  on it?
3  A. Not that I can recall specifically. Officer
4  Crawford was one of the TASER® instructors when we went
5  through the TASER® course. But as far as during field
6  training --
7  Q. Yeah.
8  A. -- I'm sure it was talked about. But no one
9  that I specifically remember talked about it more than
10 another.
11 Q. Did anybody show you how to properly take down
12 a subject using an arm-bar technique or using -- other
13 than at the academy? When you came to Hopkinsville P-D,
14 you already had your training on use of force, not
15 including the TASER®, right?
16 A. Yes, sir.
17 Q. When you got there, they talked to you about
18 TASER®, 2005, and showed you how to use it?
19 A. Yes, sir.
20 Q. Did anyone at Hopkinsville P-D show you any
21 techniques, soft hand or hard hand or anything like
22 that?
23 A. No, sir.
24 Q. Okay. You just employed what you learned or
25 utilized what you learned at the academy?

**Page 37**

1  A. Yes, sir.
2  Q. Since you've been at the Hopkinsville Police
3  Department, have you been disciplined for anything?
4  A. Yes, sir.
5  Q. What have you been disciplined for?
6  A. I have a couple of oral counselings in my file
7  for accidents -- vehicle accidents.
8  Q. Okay. Two accidents?
9  A. I believe it's two. Yes, sir.
10 Q. Okay. And what counseling did you receive?
11 A. The oral counseling, the lowest level.
12 Q. Is that where they tell you not to do it again
13 or something?
14 A. Yes, sir. And there is a written record of
15 it, even though it is an oral counseling. But it's just
16 a -- pretty much a written record saying that they told
17 me not to do it again kind of deal.
18 Q. Gotcha. So in April of '05, you were promoted
19 to corporal; is that right?
20 A. Yes, sir.
21 Q. Okay. Is that right after being patrolman?
22 A. Yes, sir.
23 Q. Okay. And, then, how long were you corporal
24 before you were promoted?
25 A. (No Response.)

**Page 38**

1 Q. Or were you promoted after corporal?
2 A. No. I'm still a corporal.
3 Q. Okay. And your job duty, I guess, in '05 as
4 corporal, was as being a street officer?
5 A. From April 'til mid-June, yes, sir.
6 Q. Okay.
7 A. And, then, a slot opened in detectives. And
8 it was opened to the patrol guys before they promoted
9 somebody into it. And I took it.
10 Q. Tell me, do you like being a detective better?
11 A. It has it's moments, I guess. It's a lot less
12 stressful, and I get a little more pleasure out of the
13 work --
14 Q. Okay.
15 A. -- because I get deeper into it, I guess.
16 So...
17 Q. You get to use your mind a little more, don't
18 you?
19 A. Yes, sir.
20 Q. And not just thinking on your feet, but you
21 get to plan things out, investigations, strategies --
22 A. Yes, sir.
23 Q. -- things like that?
24 A. Yes, sir.
25 Q. Tell me what your duties are as detective with

**Page 39**

1 Hopkinsville P-D.
2 A. I handle a variety of different cases. I
3 mean, pretty much just whatever. My specialty is sexual
4 assaults and child crimes.
5 Q. Okay.
6 A. So I get a lot of those. But, I mean, I do
7 burglaries and simple thefts and stuff like that as
8 well. So...
9 Q. Do you do any violent crimes?
10 A. Not really. I mean, well, if a sexual
11 assault --
12 Q. I apologize. Yeah.
13 A. -- is a violent -- I mean, if it's --
14 Q. Actually, it is. Yeah. I mean, other than
15 sexual assaults, do you do any, say, murders or --
16 A. I have not been assigned a murder yet.
17 Q. Okay.
18 A. And I've worked a couple of robberies, but
19 they were not violent-crime-type robberies.
20 Q. Okay.
21 A. So...
22 Q. Did you become a field training officer at
23 some point?
24 A. Yes, sir.
25 Q. When did you become a field training officer?

**Page 40**

1 A. February of '08, I believe it would have been.
2 Q. Okay. And as a field training officer, did
3 you report to anybody at Hopkinsville P-D?
4 A. I actually never trained officers as far as
5 being a primary. I simply did their midterm and final
6 evaluations on a couple of officers. I trained two
7 officers.
8 Q. Okay.
9 A. And actually only did their evals. I didn't
10 even actually do their training. It was just the
11 portion where, you should be good to go, let's see kind
12 of deal. I was the observer, more or less.
13 Q. Okay. Did you ever report to Major
14 Cunningham?
15 A. Major Cunningham was the -- he was in charge
16 of the field training program when I went through field
17 training; not when I was a trainer --
18 Q. Okay.
19 A. -- but when I went through training.
20 Q. When you were a field training officer, did
21 you report to him?
22 A. No. He was gone. He had already retired.
23 Q. Okay. Have you ever had any communication
24 with the mayor in regard to your function as a police
25 officer?

**Page 41**

1 A. The mayor knows I'm a police officer.
2 Q. Have you had any communication with him about
3 it?
4 A. No.
5 Q. Has he ever spoken to any of you police
6 officers about your job?
7 A. He's come down to the police department and
8 given the, you guys are doing a good job, keep up the
9 good work type speeches before --
10 Q. Okay.
11 A. -- that type of stuff.
12 Q. Let's say you have something that you need to
13 communicate to the city.
14 A. Okay.
15 Q. You have some issue, say, in regard to funding
16 or some issue in regard to some other matter that would
17 take the mayor or city government to be involved. Who
18 would you communicate to speak to the mayor?
19 A. I wouldn't speak to the mayor. I would put
20 whatever my request was or my idea was --
21 Q. Yeah.
22 A. -- going to be in writing, and I would send it
23 up my chain of command.
24 Q. Tell me what your chain of command is today.
25 A. Sergeant Rick McCormack's my immediate

1 supervisor.
2 Q. Okay.
3 A. Next in line is Major Leggaman was Captain.
4 He was the detective captain. But he was just promoted
5 to major. So we don't actually have detective captain
6 right now.
7 Q. Okay.
8 A. So Major Leggaman is the next in the chain of
9 command. And, then, Chief Howie is after him.
10 Q. Okay. And what's Chief Howie's full name?
11 A. Chief Guy Howie.
12 Q. Okay. So Guy Howie would be the one who would
13 probably talk to the mayor if any of you police officers
14 needed to communicate with him?
15 A. I would assume so. But that's above --
16 Q. Do you know any of your other officers, other
17 than Chief Howie, who's ever communicated with the mayor
18 in regard to any police matter?
19 A. I would have to say that probably Major
20 Leggaman or Major Patterson has in the chief's absence.
21 Q. Okay. When you were sworn in as an officer,
22 were you sworn in before the mayor?
23 A. Yes, sir.
24 Q. And city commission?
25 A. Yes, sir. Uh-huh. City counsel.

42

JULIE RITTER        270.843.3015

1 Q. City counsel. Did you take an oath at that
2 time?
3 A. Yes, sir, I did.
4 Q. Do you remember the oath included something
5 about dueling and about --
6 A. That's --
7 Q. -- not being a second?
8 A. -- about all I can remember about it.
9 Q. Just as we as lawyers do. And, then, I think,
10 they also tell you to do what we do as lawyers, which is
11 to uphold the constitution. Do you remember that?
12 A. Yes, sir.
13 Q. Have you ever been sued before?
14 A. No, sir.
15 Q. Have you ever had a complaint filed against
16 you by a citizen before?
17 A. If I have, I'm not aware of it.
18 Q. Okay. You know what I'm talking about?
19 Sometimes you see that different officers will get
20 citizen complaint forms?
21 A. Right. I can tell you that I know that I've
22 had people call the dispatch asking to speak to a
23 supervisor and my supervisor's come to me and said, hey,
24 this -- so-and-so didn't like the way you talked to them
25 or something to that effect. But as far as I know, I've

43

JULIE RITTER        270.843.3015

1 never had any formal complaint, like a written complaint
2 or anything like that.
3 Q. Okay. Have you ever had any traffic
4 collisions with civilians?
5 A. Yes, sir.
6 Q. Any damage done to their vehicles or their
7 person?
8 A. Minor damage to some of the vehicles.
9 Q. Did you run in the back of one of them?
10 A. Yes, sir.
11 Q. Why did that happen?
12 A. I was sitting at a red light and I was about
13 four cars back. The light turned green. And in a
14 moment of stupidity, if nothing else, I went before the
15 other four cars in front of me started going and hit the
16 car behind me (sic). Inattention would probably be the
17 best way to put it.
18 Q. Gotcha. You heard about Officer Phelps' many
19 disciplinary problems in his last deposition, didn't
20 you?
21 A. I think we actually stepped out for part of
22 it. But I did hear some of it. Yes, sir.
23 Q. You stepped out for one part. But you heard
24 other parts where he was disciplined multiple times at
25 the Paducah Police Department, correct?

44

JULIE RITTER        270.843.3015

1 A. Yes, sir.
2 Q. Disciplined multiple times at the Hopkinsville
3 Police Department, correct?
4 A. Yes, sir.
5 Q. Would you agree, based upon his own admission,
6 Officer Phelps has failed to follow the rules of being a
7 Hopkinsville City Police Officer?
8 A. No, sir, I wouldn't.
9 Q. Wouldn't agree with that? What about shooting
10 the TASER® off accidentally and shooting another
11 officer; would that be in compliance with --
12 A. No, sir, it would not be.
13 Q. -- the conduct required of a Hopkinsville City
14 Police Officer?
15 A. No, sir.
16 Q. Okay. That's one example, right?
17 A. Yes, sir.
18 Q. Would you agree that would be a violation of
19 department policy?
20 A. Yes, sir.
21 Q. In preparing for your deposition here today,
22 did you speak with anyone other than Ms. Blankenship?
23 A. Before the location was changed to here,
24 Officer Tedford and I discussed linking up on post
25 because we were going to drive together when it was in

45

JULIE RITTER        270.843.3015