UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH DIVISION
CIVIL ACTION NO. 05:09-CV-37

STEVEN GLEN TOON, PLAINTIFF

VS DEPOSITION FOR PLAINTIFF

THE CITY OF HOPKINSVILLE, JAY R. PHELPS, MIKE FELTS, AND BRANDON TEDFORD, DEFENDANTS

**** **** **** ****

DEPONENT: **BRANDON TEDFORD**
DATE: May 3, 2010

**** **** **** ****

JULIE P. RITTER
COURT REPORTER
397 REDBIRD TRAIL
BOWLING GREEN, KY 42101
270.843.3015

I N D E X

PAGE

Direct Examination Questions by Mr. Cole......... 4

E X H I B I T S

Tedford Deposition Exhibit 1.................... 56

Tedford Deposition Exhibit 2.................... 103

O B J E C T I O N S

MS. BLANKENSHIP: I'm going to object to......... the form of the question. 23

MS. BLANKENSHIP: I'm going to, again........... object to the form of the question. 24

MS. BLANKENSHIP: I'm going to object........... 41

MS. BLANKENSHIP: I'm going to object to the..... question. 43

MS. BLANKENSHIP: I'm going to object........... 72

MS. BLANKENSHIP: I'm going to object to......... argumentative. 97

MS. BLANKENSHIP: Let me just lodge an objection. 103

MS. BLANKENSHIP: Let me object................. 108



**** **** **** ****

The deposition of **BRANDON TEDFORD**, taken pursuant to notice heretofore filed, in the offices of COTTHOFF & WILLEN, 317 West 9th Street, Hopkinsville, Christian, Kentucky, on Monday, May 3, 2010, at 11:00 a.m., and to be used in accordance with the Federal Rules of Civil Procedure.

**** **** **** ****

**APPEARANCES**

For the Plaintiff: J. David Cole, Jr.
COLE & MOORE, P.S.C.
921 College Street- Phoenix Place
P. O. Box 10240
Bowling Green, KY 42102-7240

For the Defendant: Stacy A. Blankenship
DENTON & KEULER
P. O. Box 929
555 Jefferson Street; Suite 301
Paducah, KY 42002-0929

Also Present: Steven Toon



**** **** **** ****

**BRANDON TEDFORD**, called on behalf of the Plaintiff, being first duly sworn, was examined and deposed as follows:

**DIRECT EXAMINATION**

**QUESTIONS BY MR. COLE:**

Q. Officer Tedford, my name is David Cole, Jr. I'm going to ask you some questions today. If you don't understand a question, will you let me know?
A. **Yes.**
Q. Okay. Have you ever given a deposition before?
A. **No, sir.**
Q. Okay. There are certain rules to go by, and Stacey may have gone over them with you. What we want to do, though, is to have a clear record. If I ask you a question that can be answered with a yes or no, I would request you to say, yes or no. If you at any time need to explain your answer, go ahead and explain it after you say yes or no. If you don't know, say you don't know. Avoid uh-huh, huh-uh, or head nods or anything like that when asked a question. Would you state your full name for the record, please.
A. **Brandon Tedford.**



Q. And, Brandon, how old are you?
A. **28.**
Q. How long have you been a police officer?
A. **Almost five years.**
Q. Where were you born?
A. **Where?**
Q. Yes, sir.
A. **Charleston, South Carolina.**
Q. Okay. When did you move to Hopkinsville?
A. **I'd say -- I think it's in 2000 -- 2000.**
Q. Okay. And did you go to school here in Hopkinsville?
A. **No, sir.**
Q. What about Hopkinsville Community College?
A. **I did -- I got some college credits through them at Fort Campbell.**
Q. Okay. Did you live in Mississippi awhile?
A. **Yeah.**
Q. Graduated down there?
A. **Yes, sir.**
Q. Where is Caledonia?
A. **It is near Columbus, Mississippi. It's about mid-eastern part.**
Q. You're kind of near Starkville?
A. **Yeah.**

Q. Near Mississippi State?
A. **Yeah.**
Q. You ever hear of a place called The Landing?
A. **The Landing? No. Not that I know of.**
Q. Did you ever go to school at Mississippi State?
A. **No, sir.**
Q. Okay. You graduated from high school in Mississippi. You indicated you took some courses through Hopkinsville Community College while at Fort Campbell. Did you have any other education prior to going to the police academy?
A. **No, sir.**
Q. Okay. When did you go to the police academy?
A. **2005.**
Q. How long was your training at the police academy?
A. **It was 16 weeks.**
Q. Okay. Have you had any training since going to the police academy or education?
A. **Just the inservice classes.**
Q. Okay. Is that something you all do on an annual basis?
A. **Yes, sir.**
Q. When you became a police officer, what was

your rank?
A. **Patrolman.**
Q. Okay. Did you join the force prior to going to the academy?
A. **Well, we were hired.**
Q. Okay. You were a trainee then?
A. **Yeah. We were hired about a week, I think, before they sent us to the academy.**
Q. Okay. And, then, you went to the academy and came out and you were a patrolman?
A. **Yes, sir.**
Q. Okay. Did you have a field training officer or officers after you became a patrolman?
A. **I did.**
Q. Tell me what training you received from those officers.
A. **Just the basics; how to, you know, do the stuff we learned at the academy, but applying it to Hopkinsville, you know, just patrolling and domestic violence situations, emergency response, stuff like that.**
Q. Okay. Did you have any training in the military you were able to use as a Hopkinsville police officer?
A. **Well, leadership -- leadership,**

**responsibility, stuff like that.**
Q. Okay. Do you speak a little Spanish?
A. **Yes, sir.**
Q. Where did you learn that?
A. **High school.**
Q. Are you able to use that in your duties as a police officer?
A. **Sometimes.**
Q. Have you received any disciplinary actions while a police officer at Hopkinsville?
A. **The only thing that -- that I can think of is being late a couple of times coming into work.**
Q. Okay. Did you receive a verbal reprimand for that?
A. **Yes, sir.**
Q. Any written reprimands, other than the written documentation of the verbal reprimand?
A. **No.**
Q. Okay. Have you ever had to tase anybody while a police officer at Hopkinsville?
A. **Yes, sir.**
Q. When did you last tase somebody?
A. **(No Response.)**
Q. You can get approximate. I don't care the day, but give me a month and year if you can.

A. **I'm trying to think of the last person that was tased. Sometime last -- the middle of last year that I can recall.**
Q. Okay. And what was the circumstance under which you decided that it was necessary to tase somebody?
A. **I think the one that I'm thinking of was a -- he bailed out of a vehicle and another officer ran quite a bit -- quite a distance away. And, finally, I tracked him down to a yard. And he didn't listen to me.**
**I told him to stop, get on the ground. He took off running anyway. I jumped a couple of fences after him, chased him down the street, told him to get on the ground, get on the ground, didn't get on the ground, started to turn towards me like he might, you know, hit me, swing on me, or something like that. So I already had my TASER® out and I shot him with a TASER®.**
Q. Gotcha. And I guess you had already told him, given him a command, to get on the ground?
A. **Definitely.**
Q. Had you already told him he was under arrest?
A. **No, sir.**
Q. And like you said, he made a move toward you?
A. **He was turning towards me.**
Q. Okay. Turning towards you. So part of your

reason for tasing him was officer safety; would that be fair to say?
A. **Yes.**
Q. Your safety?
A. **Right.**
Q. Yeah. Do you have any family that live here in Christian County?
A. **Just in-laws.**
Q. Tell me their names, please.
A. **My wife.**
Q. Sure. Give me your wife's name, first.
A. **Jessica Tedford.**
Q. Okay. And her parents' names?
A. **Her parents -- her father is Mark Goodman.**
Q. Okay.
A. **Her mother is Sheila Goodman.**
Q. Okay. Where does Mark Goodman work?
A. **He doesn't.**
Q. Okay. Where does Sheila Goodman work?
A. **Pennyrile Rural Electric.**
Q. Does she have any brothers or sisters?
A. **She does.**
Q. Can you give me their names, please.
A. **Her oldest brother is Tim.**
Q. Goodman?

A. **No. No. Martin. Tim Martin.**
Q. Okay.
MS. BLANKENSHIP: Let me just make sure. Are you saying you want his mother-in-law's siblings or his wife's siblings?
MR. COLE: His wife's.
WITNESS: Oh, my wife's --
MS. BLANKENSHIP: Yeah. I think --
WITNESS: -- siblings?
MR. COLE: I may not have been clear. I'm sorry.
BY MR. COLE:
Q. Yeah. Let's go with your wife's brothers and sisters.
A. **My wife has two sisters.**
Q. Okay. And their names, please.
A. **Alicia Chism (phonetic), now --**
Q. Okay.
A. **-- is the last name and Gina Brownfield (phonetic).**
Q. Okay. And where do they work?
A. **Alicia works in Bowling Green. Gina works at Fort Bragg.**
Q. Okay. Do you have any brothers and sisters that live here in Kentucky?
A. **No, sir.**

Q. Do you have parents that live here in Kentucky?
A. **No, sir.**
Q. Do you have any cousins that live here in Kentucky?
A. **No, sir.**
Q. All your family lives in Mississippi?
A. **I wouldn't say all my family.**
Q. All right.
A. **I don't know -- family, you know --**
Q. Yeah. Your main family.
A. **-- is broad. Main, yes.**
Q. Okay. Let's talk about your mother- and father-in-laws' brothers and sisters. Do you have any of them that live here in Kentucky?
A. **My mother- and father-in-laws' brothers and sisters?**
Q. Yeah.
A. **Yes.**
Q. Can you give my their names, please.
A. **Tim Martin --**
Q. Okay.
A. **-- Tommy Martin and Jeff Martin are my mother-in-law's brothers.**
Q. Okay. Your father-in-law's brothers and

sisters?
A. **My father-in-law's brother is Forrest Goodman. And he's got, I think, a sister named -- I can see her face, but I can't think of her name.**
Q. That's okay. (Reviews documents.)
A. **And that's the only brothers and sisters that I know of for him.**
Q. One thing I noticed missing from your file was a polygraph that's been mentioned. Did you take a polygraph?
A. **Uh-huh. Yes, sir.**
Q. Do you have any understanding why it wouldn't be in your file?
A. **I have no idea.**
Q. But you took one, right?
A. **Definitely.**
Q. Okay. And there's no criticism on your part, okay, because I know you don't maintain your file --
A. **Right.**
Q. -- or put stuff in it.
MR. COLE: And, Stacey, if I could just re-request that.
MS. BLANKENSHIP: I've put a note.
MR. COLE: Can we go off the record for a second.
(Off-the-record discussion.)

Case 5:09-cv-00037-TBR Document 42 Filed 11/17/10 Page 5 of 29 PageID #: 449

MR. COLE: I have just spoken with counsel for the defendants. We have an agreement for Officer Tedford to come back and complete his deposition again if there's a polygraph exam missing from the file. If it's not missing from the file, if there's not one or something, then we won't come back. And, also, I'll agree, if it's not remarkable, I won't ask him to come back.
MS. BLANKENSHIP: Okay.
BY MR. COLE:
Q. Tell me about when you made application to be a Hopkinsville police officer. Tell me how it started. Did you come down here and go to the police station and ask for an application form?
A. **I don't remember the exact steps. I was on terminal leave from active duty, Army infantry, there at Fort Campbell. So while on terminal leave, I came down, I think, to the city offices and H-P-D and requested an application.**
Q. Okay. And they had you fill out, I guess, the application. And, then, did you have a meeting with some of the officers at the police department?
A. **I don't remember.**
Q. Okay. What happened after you filled out your application?
A. **I turned it in and waited for a reply. I**

**think it came in the mail.**
Q. Okay. What did they say in the reply?
A. **That my hire date would be, I think, August 8, 2005.**
Q. Did you take your polygraph before you received your acceptance letter?
A. **Not 100 percent sure, but I think I did.**
Q. I think you did, too. At least that's been my understanding of how it works.
A. **Yeah.**
Q. How did you do on your polygraph?
A. **Did fine.**
Q. Okay. There were no deceptions shown or anything like that?
A. **No.**
Q. Where did you take the polygraph?
A. **The -- it was either at the city offices or the police department.**
Q. Okay.
A. **I think it was the city offices, somewhere up there.**
Q. Did a lady named Pam give it to you?
A. **Yeah. Pam, the curly blond-haired lady.**
Q. Did you ever get a chance to review your polygraph exam?

A. **No, sir.**
Q. They just said you had passed it?
A. **I got the job.**
Q. There you go. It's like the bar exam; if you pass, you don't get to see the exam.
A. **Oh.**
Q. They just send you a letter. So I guess it's kind of like being a police officer, they say, you're okay. (Reviews documents.) When were you trained on the use of a TASER®?
A. **When I got -- after completion of the academy. Sometime after then. I don't know exact -- exact dates.**
Q. Okay. Did you take a course called Spanish For Law Enforcement?
A. **Yes, sir.**
Q. When did you take that?
A. **There was a -- I took Spanish For Law Enforcement 1, 2 and 3.**
Q. Okay.
A. **And 4, actually. And they were spread out over, I think, a couple of months in 2008, I think.**
Q. When you became a police officer, was Officer Phelps already a police officer at Hopkinsville P-D?
A. **No. I think I was here before he was.**
Q. Okay. And your rank in March of 2008 was

what?
A. **Patrolman.**
Q. And today it is what?
A. **Patrolman.**
Q. Okay. Have you had any citizens' complaints filed against you since you've been an officer at Hopkinsville Police Department?
A. **Not that I'm aware of.**
Q. Have you had any disciplinary action and counseling over complaints about your work as a police officer, other than being late for work or something?
A. **No, sir.**
Q. Do you recall testifying at Mr. Toon's trial?
A. **I -- yeah, I do.**
Q. Okay. And you testified truthfully at that trial; is that correct?
A. **Yes, sir.**
Q. Were you the officer that received a call or was it Officer Phelps or Felts that received a phone call of a red truck driving down the road without its lights on?
A. **I believe it was Officer Phelps that received the initial call or was dispatched initially.**
Q. Do you know what they reported saying they saw?

A. **A vehicle driving up and down the road with no lights on.**
Q. Okay. At any time prior to your arrival at the scene, did you have a report of anybody doing anything violent in association with this red pickup?
A. **No, sir.**
Q. Any kind of disorderly conduct associated with it?
A. **Not that I can recall.**
Q. Okay. When you arrived on scene on March 7th, 2008, tell me what you observed.
A. **I believe Officer Phelps was already administering the field sobriety test on Mr. Toon. So that's what I observed.**
Q. Okay. And was Mr. Toon doing the P-B-T, or was he doing the other field sobriety tests, or do you recall?
A. **I don't recall where he was at in the testing.**
Q. Okay. What did you do when you got on scene? Did you walk up there towards where Officer Phelps was?
A. **Yes, sir.**
Q. All right. Tell me what you did after that.
A. **I stood there and watched Officer Phelps administer the field sobriety test --**
Q. Okay.

A. **-- on Mr. Toon. Just kind of stand by.**
Q. During this field sobriety test at any time did Mr. Toon fail to follow a command?
A. **I -- it was 2008. I don't -- I don't remember.**
Q. But you saw the video last time we were here at the deposition of Officer Phelps. Did you notice during the field sobriety test any time Mr. Toon refusing to follow an order?
A. **I don't remember the video. I'd have to look at it again to refresh my memory. It's been awhile.**
Q. Okay. Would it be fair to say, it's possible, but you don't remember him refusing to follow any commands or orders?
A. **I don't remember.**
Q. Okay. Officer Tedford has testified that he does not believe Officer Phelps or anyone else --
MS. BLANKENSHIP: You said, Officer Tedford testified. This is Tedford.
MR. COLE: I apologize.
MS. BLANKENSHIP: Yeah.
MR. COLE: Forgive me. Yeah. If I make a mistake like that, just say, Dave, hey, you're talking; you've got it wrong.
BY MR. COLE:

Q. Officer Felts, F-E-L-T-S, testified today that to his knowledge, Officer Phelps never told Mr. Toon to put his hands behind his back prior to trying to handcuff him; is that consistent with your recollection?
A. **That he -- that Officer Felts told --**
Q. I'll do a better job. That's kind of a crazy question. Who cares what the other guy said. Do you recall whether Officer Phelps ever told Mr. Toon to place his hands behind his back prior to attempting to handcuff him?
A. **I don't recall him telling him to put his hands behind his back.**
Q. And you don't recall him saying he was under arrest, do you?
A. **I don't remember.**
Q. Okay.
A. **I can't say either way.**
Q. According to Officer Felts, Officer Phelps did not do either one of those things. Would you have any reason to doubt the memory of Officer Felts?
A. **I mean, yeah. Because it's been such a long time ago. So...**
Q. Okay.
A. **I'm not going to just go off of what he said, you know. I don't --**

Q. Gotcha.
A. **I don't remember for my personal self.**
Q. Fair enough. Do you have any reason to doubt the information provided by Officer Phelps that night when you arrived on the scene?
A. **I mean, it would be the, you know, same -- same thing; I -- I don't know.**
Q. Do you remember talking to Mr. Shepherd on March 7th and March 8th, 2008? Mr. Shepherd was Mr. Toon's friend.
A. **Uh-huh.**
Q. Do you remember him requesting you all to please look behind the pickup and see how there's no tracks because it had been back there for more than an hour?
A. **I think it -- I remember him saying something about, look behind the vehicle.**
Q. Yeah. And do you remember him saying, you know, look, we've been here for an hour. If we had just pulled up, you'd be able to see the tracks behind him?
A. **No. Now, I don't remember him saying an hour. I don't know --**
Q. Okay.
A. **-- what the time limit was.**
Q. Do you remember him saying, we've been here

for awhile?
A. **Maybe. The snow was coming down, so --**
Q. Yeah.
A. **-- it wouldn't take long for tracks to be covered up anyway. So...**
Q. Would you agree with me that if Officer Phelps is telling the truth, that he follows this red pickup truck up to the yard and that he sees Mr. Shepherd get out and Mr. Toon get out and run in the house and he parks his car and proceeds towards the house, if Mr. Shepherd was able to observe track marks behind Officer Phelps' vehicle, those same tracks should have been behind the pickup truck, shouldn't they, if they arrived at the same time or a second or two apart?
A. **If -- if Mr. Shepherd's telling the truth about the situation --**
Q. Yeah.
A. **-- and they arrived close to the same time on scene, then, yes, it would be true. I don't think any officer went to look --**
Q. Yeah.
A. **-- at the tracks, though.**
Q. It would have been a reasonable thing to do, though, wouldn't it?
A. **No. Not necessarily. I'm just there to do my**

**part, just a standby officer while Officer Phelps does his part.**
Q. I guess you're just there to backup the other officers, right?
A. **That's -- that's it.**
Q. Okay. You weren't there to do an investigation to determine what happened. That was up to Phelps?
A. **Yes. Phelps is the initial officer. It's only him at that point.**
Q. Okay. And you'll agree with me that he was found not guilty of all the charges at trial?
A. **I do, I think, remember that being the case at the trial.**
Q. Okay. Would you agree with me that it appears probably that the jury did not believe Officer Phelps?
MS. BLANKENSHIP: I'm going to object to the form of the question.
BY MR. COLE:
Q. Go ahead and answer it, unless she directs you not to.
A. **Can you say the question, again.**
Q. Yeah. Do you agree with me that it appears probable that the jury did not believe the testimony of Officer Phelps?

MS. BLANKENSHIP: I'm going to, again, object to the form of the question. It's proof beyond a reasonable doubt at criminal trial.
BY MR. COLE:
Q. Go ahead and answer it.
A. **I don't know if they didn't believe Officer Phelps or they felt sorry for Mr. Toon. I don't know.**
Q. Fair enough. Would you agree with me that Officer Phelps testified under oath at a motion to suppress and provided misinformation about when he turned on his blue lights; do you remember that?
A. **I don't -- I wasn't in the courtroom at the time.**
Q. You weren't there?
A. **No. Huh-uh.**
Q. I won't ask you about it then. Do you think Officer Phelps is reliable; if he says something that it's reliable?
A. **I would like to think so, being a police officer, yes.**
Q. Okay. What about Officer Felts -- I apologize. I'm using names so close.
A. **That's fine.**
Q. I want to make sure I'm pronouncing it right. What about Officer Felts, if he tells us something, can

we count on it?
A. **Like I said, I'd like to think so, being a police officer.**
Q. You take your duties seriously, don't you?
A. **I do.**
Q. You took an oath like I did to uphold the constitution, didn't you?
A. **Yes, sir.**
Q. And you do that, don't you?
A. **I try my best.**
Q. Okay. And you're not going to sell your honor to protect another police officer, are you?
A. **I'm going to try to do my best to answer the questions as best I can.**
Q. Okay. And if you discovered, for example -- let's say, I'm one of your fellow officers. Okay. And let's say you and I are working together. And let's say you find out that I lied under oath and you see me doing that, you're not going to rely on me in the future, are you, to tell the truth?
A. **I may be a little more hesitant in believing what that officer may say.**
Q. If you saw another officer lying under oath, what would you do, if you knew it to be a lie; if anything?

**A. I don't know. I never thought about that.**
Q. Okay. You didn't tell Mr. Toon to put his hands behind his back prior to Officer Phelps grabbing his hands when you saw him on the video, did you?
**A. Did I tell Mr. Toon --**
Q. Yeah.
**A. -- to put his hands behind his back?**
Q. Yeah.
**A. I don't really remember. I mean...**
Q. But nowhere in the video is there anybody saying, put your hands behind your back. No other officer recalls any other officer saying it, other than -- you're the last officer --
**A. Right.**
Q. -- to be deposed. No one else says anyone told him to put his hands behind his back. I'm asking you: Do you remember telling him to put his hands behind his back?
**A. I don't remember. No. I mean, the video -- we had the audio and the video. So I --**
Q. Okay. The video is whatever it is. It's okay. But that doesn't take away the video. If the video says it's on there, then --
**A. Right.**
Q. -- absent somebody doctoring the video --

which I don't think would happen --
**A. Correct.**
Q. -- I don't think we have a problem with that.
**A. Right.**
Q. You never told Toon he was under arrest, correct?
**A. No. I didn't.**
Q. Okay. When you got on scene, did Officer Phelps tell you he had been waiting outside 20 or 30 minutes?
**A. No, sir. He was up -- he was already doing the field sobriety test.**
Q. Okay. Did he tell you he had to wait before Mr. Toon came out of the house?
**A. He was doing his field sobriety test. He was --**
Q. Wasn't discussed?
**A. -- concentrated on Mr. Toon at that point.**
Q. Okay. Do you recognize that Officer Phelps has had significant self-control problems in the past?
**A. No, I don't recognize that.**
Q. Okay. Being disciplined -- I mean, you know, you ask an officer, have you ever been disciplined before, and he says, which time, isn't that kind of remarkable?

**A. It's not remarkable, I wouldn't say. I mean, I wouldn't say it's remarkable.**
Q. What about shooting another officer with a TASER®, would you consider that to be a bit reckless?
**A. I mean, accidents happen.**
Q. You were in the military?
**A. Yes, sir.**
Q. You were expected to have a certain conduct; were you not?
**A. Uh-huh. Yes, sir.**
Q. Did you ever discharge your weapon improperly?
**A. Never.**
Q. Do you know what would have happened to you if you did?
**A. In the military?**
Q. Yeah.
**A. It'd probably be a big deal.**
Q. Probably get court-martialed, wouldn't you?
**A. No. I don't think court-martialed, unless someone got injured or --**
Q. Yeah.
**A. -- seriously injured or something like that.**
Q. Yeah. What would they do to you? Would they bust you down in rank?
**A. A good possibility.**

Q. You would definitely receive a substantial discipline, wouldn't you?
**A. In the military, yes.**
Q. Okay. Do you know what kind of discipline Officer Phelps received after tasing another officer?
**A. I don't know.**
Q. Did you ever notice anything?
**A. I don't ask too many questions. I don't get in people's business.**
Q. That's a good way to live, isn't it?
**A. Yeah.**
Q. Do you recall any statements that Mr. Toon made on March 7th or March 8th of '08?
**A. I don't recall any statements. I just had -- I mean, I'd have to see the video again to refresh my memory. But, no, I don't -- I can't think of anything off the top of my head.**
Q. Counsel for defendants is contending that Mr. Toon said, quote, F no, I don't want to be tased.
MS. BLANKENSHIP: (Indicating.)
MR. COLE: Oh, I'm sorry. I'm sorry.
MS. BLANKENSHIP: Yeah.
MR. COLE: Let me get it right.
MS. BLANKENSHIP: Do you want me to quote it for you?

Case 5:09-cv-00037-TBR Document 42 Filed 11/17/10 Page 9 of 29 PageID #: 453

MR. COLE: Yeah. You go ahead and say it.
MS. BLANKENSHIP: If you want to fucking tase me, tase me.
MR. COLE: Okay. There you go.
BY MR. COLE:
Q. That's what they're saying Mr. Toon said. And there's something that sounds kind of like that --
A. **Uh-huh.**
Q. -- on the video. Mr. Toon denies saying what she said. I won't try to repeat it and get it wrong.
A. **Right.**
Q. Do you know whether Mr. Toon said that?
A. **I don't remember.**
Q. All right.
A. **I don't remember.**
Q. Is it quite possible that he said, fuck no, I don't want to be tased?
A. **If I don't remember, then I can't --**
Q. Yeah. But that's why it could be possible that he said something else since you don't remember. It's possible that he said something different than, fuck yeah, go ahead and tase me.
A. **Don't know.**
Q. Okay. You were there for a portion of his field sobriety test; is that correct?

A. **Uh-huh. Yes, sir.**
Q. Okay. During those field sobriety tests, did he ever attempt to escape?
A. **No, he did not.**
Q. Did he ever insult any of you all?
A. **(No Response.)**
Q. By "you all" -- I apologize -- police officers.
A. **Insult?**
Q. Yeah.
A. **Not that I can remember.**
Q. Okay. Did he ever threaten any of you all?
A. **No.**
Q. Did he ever use profanity?
A. **I don't know.**
Q. Okay. Did he ever do anything to make you feel like you were in danger?
A. **Not that I can remember.**
Q. Okay. Did he ever reach into his pockets in a way that might create some concern or alarm on your part?
A. **That's -- I don't remember if he reached in his pockets or not. I wouldn't think he would. Or actually, I think at one point, his hands were in his pockets on the video now that I'm thinking about it.**

Q. Uh-huh. But that wasn't to alarm you, like he was reaching for something. It looked like he was kind of cold, wasn't it?
A. **Well, yeah, it was --**
Q. Was it cold that night?
A. **Yes, it was cold.**
Q. Okay. Cold to the point where he looked like he was kind of shivering on the video?
A. **I don't know if he was shivering or not.**
Q. Okay. You all were dressed real warm that night, weren't you?
A. **Well, I had a jacket on.**
Q. Okay.
A. **Uh-huh. And a toboggan.**
Q. Okay. Mr. Toon didn't have any of that on, did he? He looked like a felt shirt or something?
A. **Like a flannel jacket.**
Q. Flannel shirt, yeah, or a jacket?
A. **Something like that.**
Q. No hat?
A. **I don't think he had a hat on. I don't remember.**
Q. Have you ever been on a call with Officer Felts where Officer Felts utilized a TASER®, other than the incident here with Mr. Toon?

A. **Felts spelled with a F?**
Q. Yeah.
A. **I don't remember. That -- I guess I remember his instance, because we've seen it on video before. But I can't recall any other. And it's -- I'm not saying it's not possible that I wasn't, but --**
Q. I agree.
A. **-- I don't remember.**
Q. Would you agree with me that if somebody lies under oath, that calls into question everything else they've said under oath?
A. **If someone lies under oath, would --**
Q. Yeah.
A. **-- it cause --**
Q. Like you've sworn to tell the truth here today.
A. **Yes, sir.**
Q. And would you agree with me that if you tell me a lie under oath, that that would call into question everything else you say under oath?
A. **I think it would either need some, you know, questions asked about what they really meant on the -- on the questions asked of them. But it's possible that --**
Q. And you have to presume that they understood

Case 5:09-cv-00037-TBR Document 42 Filed 11/17/10 Page 10 of 29 PageID #: 454

the question. Because I've asked you -- and by the way, I'm not accusing you of lying. I'm just saying this in general.

A. **Okay.**

Q. But you agreed at the beginning of the deposition that, hey, if I don't understand the question, I'll let you know, Mr. Cole?

A. **Right.**

Q. And you agree with me, if you understand the question and you knowingly lie under oath, that it calls into question everything else you've said under oath?

A. **I would agree that, yeah, it might ask -- draw some questions on it.**

Q. And even if you're not under oath. Let's just say you're a police officer and I'm a citizen.

A. **Uh-huh.**

Q. And you stop me in a traffic violation and you say, Mr. Cole, do you have any alcohol in the car and I say, no, I don't, but you see a tallboy Budweiser sitting there in the front seat, that's going to make you think maybe I'm lying to you, isn't it?

A. **Well, yes.**

Q. And so if you ask me another question, it might make you question the next one. Like, maybe, if I give you a name like Mark Smith, you might think I'm

lying about my name more than you would have had I been truthful, yes, sir, there's a beer there; would that be fair to say?

A. **Yes, sir.**

Q. Okay. Let's talk about use of force. What does the Use of Force Continuum mean to you?

A. **It's just a -- it's kind of like a guideline --**

Q. Okay.

A. **-- that law enforcement uses to -- to handle different situations when force is needed or -- or -- or used.**

Q. Okay. And you're taught about it at the academy, right?

A. **Uh-huh. Yes, sir.**

Q. And at the academy, were you taught about the use of a TASER® or was that later on?

A. **That was at the police department.**

Q. Police department. Okay. Tell me what the Use of Force Continuum is, based upon your training.

A. **(No Response.)**

Q. There's different steps. Can you tell me the different steps.

A. **Right. If I remember correctly, the first one is, you know, officer presence, then verbal direction,**

**soft empty hand techniques, hard empty hand techniques, intermediate weapons, and deadly force is final.**

Q. Okay. And would you agree with me that that Use of Force Continuum should be followed by not only you but by all Hopkinsville police officers?

A. **Yes, sir.**

Q. Okay. And would you agree with me that the intermediate weapons are typically O-C or pepper spray and the TASER® and the ASP?

A. **No, I wouldn't agree with you on that.**

Q. Okay. Tell me, what are the intermediate weapons?

A. **The ASP falls under intermediate.**

Q. Okay.

A. **I think -- I think O-C -- but not -- not in H -- Hopkinsville.**

Q. Okay.

A. **I think TASER® falls under either soft or hard.**

Q. Okay. Wouldn't you agree with me that TASER® is a lot more painful or harder on the subject than a soft-hand technique?

A. **No. I wouldn't say it was more painful. I mean, it gets their attention. It usually -- usually -- a lot of times, I've found, that I wouldn't even have to**

**use it; maybe just pull it out. The thought itself would encourage them to cooperate.**

Q. Okay. But you'll agree with me that you putting your hands on somebody and placing them under arrest is a lot less painful than tasing a person?

A. **Putting my hands on someone and putting their hands behind their back?**

Q. Yeah.

A. **If they comply --**

Q. Yeah.

A. **-- and do what I ask them to do, then, yes, it would be less painful, of course, than being tased.**

Q. Okay. And even an arm bar is less painful than being tased, correct?

A. **It is.**

Q. Okay. Even -- I don't know. I can't remember the formal terms -- even where you take your knee and clip somebody on the side of their thigh is less painful than being tased, right?

A. **I don't know. Because --**

Q. It hurts, doesn't it?

A. **When you're hitting the common peroneal there, in the side of the thigh, the motor nerve point, that can last a little while. It can give you a charley horse that can last awhile. Whereas the TASER®, it's**

**done and over with in a few seconds.**
Q. Have you been tased before?
A. **I have.**
Q. All right. It was painful, wasn't it?
A. **It was -- it hurt. It got my attention. But after it was done, it was done.**
Q. Did you have the alligator clips, is how you did it?
A. **Yes, sir.**
Q. You didn't get shot with the actual prongs shooting in you, right?
A. **No, I didn't.**
Q. Okay. And you didn't go the full five seconds, did you?
A. **No, sir.**
Q. And, then, afterwards, you didn't have somebody manually put it on you and shock you an additional few seconds, did you?
A. **I didn't, no.**
Q. Okay. You're aware that that's what happened to Mr. Toon, aren't you?
A. **I think what happened to Mr. Toon was a little bit different though.**
Q. Tell me what is your understanding of what happened to Mr. Toon on March 7th or 8th, 2008 in terms

of tasing.
A. **Well, when someone's shot with a good connection with a TASER®, the body locks up and they can't really control their -- their body. Mr. Toon, I think, after being shot initially with the TASER®, still was able to move around. And I believe it was due to the bad connection because of his jacket or maybe the prongs didn't get a good connection when they shot on his chest or came out, maybe. So he was still moving around. And --**
Q. What -- go ahead. I didn't mean to interrupt you.
A. **Okay. And it was obvious that it -- it didn't fully affect him the way a TASER® normally works.**
Q. Okay.
A. **And I think that's why the follow-up drive stun on the leg was applied. There's definitely a difference in the way his body locked up after the --**
Q. Dry tase?
A. **Right.**
Q. Did it lock up even more after the dry tase -- or I'm sorry. Hand tase? What do you call that?
A. **Drive stun.**
Q. Drive stun?
A. **Correct.**

Q. Okay. "Driving", you mean, like, driving the TASER® into you?
A. **They call it a drive stun. It's pressing the TASER® up against the body.**
Q. Okay. What reaction did Mr. Toon have after that?
A. **The body reacted differently; because, I guess, the TASER® had a -- made a good connection at that point.**
Q. Okay.
A. **So I could -- I could tell that there was a difference in the way his body act -- reacted --**
Q. All right?
A. **-- showing that he actually got a -- you know, made a good connection with the TASER®.**
Q. Tell me what Mr. Toon was doing to resist arrest sitting on his behind with his hands by his side when he was tased a second time. Is that what he was doing?
A. **What's that?**
Q. Okay. We've talked to Officer Phelps and we've talked to Officer Felts. And everybody agrees that when Mr. Toon was tased a second time, he's sitting on his butt on the ground with his legs straight in front of him and his hands to his side; is that correct?

MS. BLANKENSHIP: I'm going to object. I don't think anybody has agreed that his hands were just sitting to his side. I don't think that's been the testimony.
MR. COLE: Okay.
WITNESS: The body -- the exact body position, I don't remember or don't -- I don't know if he was sitting on -- I'm not sure if he was sitting on his butt. Seems like he may have been on his -- his side.
BY MR. COLE:
Q. Okay.
A. **So I'm not 100 percent sure of his body position.**
Q. He was laying on the ground -- at least his butt was on the ground, maybe his side was on the ground, too, when he was tased a second time; is that correct?
A. **I think -- I think he was on the ground when he was drive stunned the second time --**
Q. Okay.
A. **Or drive stunned. Not a second time, but the first.**
Q. Yeah. I gotcha. We've not taken the deposition of Mr. Shepherd yet to fully explore his testimony. But we have gotten to hear his testimony at

trial. Were you able to hear his testimony at trial?
A. **No, sir.**
Q. Okay. Have you reviewed his testimony that he gave at trial?
A. **I have not.**
Q. Okay. Do you have any reason to doubt Mr. Shepherd's ability to tell the truth?
A. **Yes, sir.**
Q. Okay. Tell me why.
A. **Just because he's -- he's, maybe, taking up for his buddy here, picking sides with him, which would be a normal reaction for a lot of people. They're going to side with their buddy.**
Q. Just like police officers?
A. **Well, you know, police officers are held to a higher standard.**
Q. But do you think there are police officers less likely to lie than a soldier?
A. **Yes, I do. A police officer should be less likely to lie.**
Q. Should be. Should, could and would are one thing. I mean, if ifs and buts were candy and nuts, we'd all have a merry Christmas. But we can't say police officers are less likely to lie than a lawyer or than a soldier, can we?

A. **Less likely to lie? You know, probably not, considering the world we're living in today.**
Q. Yeah. But I agree with you. They should. They should be less likely to lie.
A. **Uh-huh.**
Q. Because police officers are trusted, aren't they? They're given a trusted position?
A. **They are.**
Q. You guys have immunity, don't you?
A. **Immunity?**
Q. Yeah.
A. **What do you mean?**
Q. You guys, as police officers have qualified immunity. Meaning that you're given certain deference in your conduct.
MS. BLANKENSHIP: I'm going to object to the question. You're asking him to --
BY MR. COLE:
Q. Are you aware that you have qualified immunity?
A. **I need a --**
Q. Okay.
A. **-- definition of what that means. I don't...**
Q. Basically, in order to find you liable, what I have to show is, is that any officer under the same or

similar circumstances would know his conduct would be wrong and that it deprived a defendant of a constitutionally protected right versus -- you've heard the expression: Ignorance of law is no excuse?
A. **Right.**
Q. You all have a break on that, meaning that you can make a mistake and it's okay versus regular citizens. So I agree with you, you all should be held to a higher standard.
Let me ask you this: During your employment at Hopkinsville Police Department, have you ever witnessed another officer knowingly lie about a fact in issue?
A. **About a what issue?**
Q. A fact at issue.
A. **Not that I can remember.**
Q. Okay. You were the second police officer to arrive on the scene on March 7th, 2008, correct?
A. **Yes, sir.**
Q. Do you remember seeing Officer Phelps grab Mr. Toon's hands and push them behind his back?
A. **Do I remember seeing Officer Phelps do that?**
Q. (Nods head.)
A. **I think Officer Phelps -- and I -- and I don't remember him grabbing both hands. But I think Officer Phelps grabbed the right wrist.**

Q. Okay.
A. **And I believe I -- once he didn't turn around as requested or told to turn around -- he actually was turned the other way, instead of putting his hands behind his back like normal people would do -- that's when I came forward and grabbed his left wrist, I believe it was.**
Q. Okay. So when Phelps grabbed his right wrist, did you see on the video how Toon's feet kind of slid across the snow, how they kind of moved forward; did you notice that?
A. **When he did what now?**
Q. When Phelps grabbed Toon's wrist --
A. **Uh-huh.**
Q. -- did you notice how they kind of slid in the snow?
A. **No, I didn't.**
Q. Okay. Do you remember sliding in the snow a bit?
A. **No.**
Q. Okay. Do you remember Officer Phelps telling Mr. Toon to turn around?
A. **No, I don't remember that.**
Q. Okay. Do you remember Mr. Toon turning around?

A. **(No Response.)**
Q. And you can rely on the video you saw, too, okay, not just what you saw that night.
A. **Yeah. I was -- I don't want to conflict with what the video says if I don't remember. I'm just going off of memory.**
MS. BLANKENSHIP: Are you asking, after they grabbed the hands? That's what I'm confused about.
BY MR. COLE:
Q. No. I'm asking after Phelps grabbed the hand.
A. **What?**
Q. Whether you -- you already answered the question whether Mr. Toon slid. And you said, no, I don't recall that. Then I asked you, do you recall whether Mr. Toon turned around, and I don't think you've answered that one yet.
A. **I remember Mr. Toon -- now, you said that Officer Phelps a minute ago, did he ask Mr. Toon to turn around -- or tell him to turn around?**
Q. I think so. Even if I didn't, you're welcome to answer that.
A. **I think he did say, turn around.**
Q. Yeah.
A. **I think he did.**
Q. Uh-huh. I think he did.

A. **I don't think -- but I don't think I remember him saying, you're under arrest. I think I remember him saying turn around.**
Q. Yeah. And Mr. Toon turned around but turned the wrong way; isn't that fair to say?
A. **Mr. Toon turned towards the officer -- was turning towards the officer, facing -- to, like, face the officer.**
Q. Right.
A. **And normally , that's a sign that they're not willing -- or that they're not willing to cooperate or they've got questions or, you know, they don't agree with what's fixing to happen.**
Q. Yeah. But when Mr. Toon turned around, he didn't try to hit the officer or cuss the officer or attempt to fight or anything; did he?
A. **We didn't -- I don't think he was given the opportunity to...**
Q. Okay. But he was able to turn. I mean, the whole idea they're talking about resisting, I understand from Phelps is, is that when he told him to turn around, he said he resisted. But what I saw on the video was Mr. Toon turn around and, then, Officer Phelps said it was the wrong way.
At that point in time when he turned around, did

you observe Mr. Toon do anything to resist arrest?
A. **Mr. Toon was not listening to what he was told to do. He was told to turn around and put his -- I don't know if he was told to put his hands behind his back. Don't remember that.**
Q. He wasn't. But --
A. **Okay. If he would have turned around and put his hands behind his back in a normal position -- everybody's seen Cops, everybody's seen T-V. They know when an officer says, turn around, what the officer means.**
Q. Okay. That's kind of presuming that Mr. Toon understood that, isn't it?
A. **Well, I mean, I would think so. He speaks English, and he understands what we're saying.**
Q. In fact, he was in the military like you were, right?
A. **What's that?**
Q. He's in the military like you were, right?
A. **Right.**
Q. He's demonstrated quite a good ability to follow directions in the military, hasn't he?
A. **I don't know. I don't know his background.**
Q. Could you follow directions in the military?
A. **Oh, yes, sir.**

Q. Okay. And, perhaps, Mr. Toon just turned the wrong way.
A. **(No Response.)**
Q. Let me ask you this: You were there for everything up to this point; from the time you arrived when you saw a portion of the field sobriety test up until this point where he turned, right?
A. **Uh-huh.**
Q. At any time, did he refuse to follow a command?
A. **I don't remember him verbally refusing.**
Q. Okay.
A. **But you don't have to verbally refuse --**
Q. Fair enough.
A. **-- to resist.**
Q. We'll stop at the point we disagree on, okay -- we won't go there yet -- about the turn around part. Up until the part where he turned the wrong way or knowingly turned the wrong way, whatever it was, did he comply with the officer's orders?
A. **Up and to that point?**
Q. Yeah.
A. **Well, taking into consideration, I wasn't there for a good portion of the --**
Q. Just the part you saw. Just the part you saw.

**A. From whenever I got there, if I remember correctly, either the -- he wasn't blowing hard enough on the P-B-T or he wasn't blowing at all on the P-B-T. And the video, I think, reflects that, if I remember correctly. So that's right there, if that's the case, not following directions by blowing as the officer --**
Q. Okay.
**A. -- told him to do.**
Q. Again, that's subjective. You don't know whether he wasn't blowing hard enough or whether there was a problem with it or whether it was because it was cold or anything else?
**A. I'd have to see the video again.**
Q. Okay.
**A. I mean, I would know if he was intentionally not blowing.**
Q. Okay. Other than that, did he do anything to refuse a command up until the turn around part?
**A. Up until the turn around part?**
Q. I mean, you can say no or yes or whatever you want.
**A. I -- I don't know. I don't think he -- you know, not that I can remember.**
Q. Okay. So he turns around the wrong way when Officer Phelps has his right wrist. At that time, then,

Officer Phelps takes him towards the vehicle. And are you holding on to his left wrist at that time?
**A. At what point I grabbed the left wrist, I don't know if it's right when he told him to turn around or on the way to the vehicle. I think at some point in there, maybe, when he got to the vehicle, I grabbed ahold of the left wrist.**
Q. Do you recall seeing his face getting slammed against the hood of the car?
**A. No, I don't. I was behind him. I don't --**
Q. Do you recall seeing blood on his ear after his face was slammed on the car?
**A. No.**
Q. Okay. Do you recall on the video seeing his face and chest go towards the hood of the car?
**A. I remember seeing his upper body -- upper torso going towards the hood of the car. But never getting slammed against the hood of the car.**
Q. Okay. Do you recall seeing it come back up?
**A. I remember seeing him raise back up.**
Q. Okay. And, then, you recall seeing him put a hand out -- I'm not sure if it's a left or right -- when his head's going back down again and bracing his hand on the hood of the car?
**A. I remember seeing a arm come around in front**

**of him.**
Q. Okay. And --
**A. But I don't know if he touched the hood or not.**
Q. Okay. And at this point in time, there's still no commands to put his hands behind his back or no advisement that he's under arrest; is that correct?
**A. In the heat of the moment, I don't remember.**
Q. If no one else remembers it and the video doesn't show it, would you agree that's probably the case?
**A. Now, at one point on the video, I think the audio goes out. So I don't -- I don't know.**
Q. Okay.
**A. But if that's the case, then...**
Q. You didn't tell Officer Phelps to tase him, did you?
**A. No, sir.**
Q. You didn't tell Officer Tedford to tase him, did you?
**A. I'm Officer Tedford.**
Q. I'm sorry. Officer Felts to tase him?
**A. No.**
Q. Okay. Do you think it was really necessary that he get tased that day in order to arrest him?

**A. Necessary is a -- is a -- you know, necessary, I don't know. It's an option for us as police officers. Some officers are more confident in their -- their hands-on abilities. Some -- some may not be so confident and still within policy may decide to use the TASER®. As long as they're acting accordingly and doing what they're -- within policy, then, it's that option for them.**
Q. I gotcha. And I understand that you're telling me they have a right to do that; it's within policy. I just want to know your opinion. Was it necessary to tase them to arrest him? It wasn't really necessary to do that, was it?
**A. I -- you know, I don't know. Given the situation and, you know -- I'm not going to say either way.**
Q. Okay. And when he was on the ground sitting on his butt or laying on his side and he's being tased that second time, can you tell me what you observed about him, whether he was screaming and hollering in pain?
**A. I don't think he was screaming and hollering in pain at all.**
Q. Okay.
**A. I would have -- I think I might remember him**

**screaming and hollering in pain. That's...**
Q. Okay.
A. **But I don't remember that.**
Q. All right. Do you remember him screaming and hollering in pain after he was tased the first time?
A. **No.**
Q. Okay. Do you remember Mr. Shepherd being close by and watching this whole thing?
A. **From what I recall, I think Mr. Shepherd was standing near the front of the cruiser --**
Q. Okay.
A. **-- or on the other side of the cruiser.**
Q. Okay. If Mr. Shepherd says he was able to have a clear view and see it all, you wouldn't have any reason to doubt it, would you?
A. **Yeah. I mean, I would, because I don't know his exact position.**
Q. Okay.
A. **So I'm not going to say that he could -- he had a perfect view. I just --**
Q. You just don't know for sure, other than you saw him --
A. **I mean, he had three officers around one person.**
Q. Yeah.

A. **View is going to be obscured by that alone. Doing it in his position, from what I remember, was initially over on the other side of the vehicle away from where we were.**
Q. Uh-huh.
A. **And, then, I think he comes around the front of the -- of the vehicle, still -- if we're on the ground, he's still not going to have a good view from that point. So...**
Q. Did you have a good view from that point of Mr. Toon laying on the ground?
A. **Well, if I was right there with my hand on his wrist, then I would...**
Q. When he went to the ground after he was tased the first time, did you follow him to the ground?
A. **Yes, sir.**
Q. And were you still holding on to his wrist?
A. **If I remember correctly, I was. I don't think I let go of the wrist.**
Q. Was Officer Phelps still holding on to a wrist?
A. **I don't know for sure, because he had to get his cuffs out. So he had to let go of at least one hand.**
Q. Uh-huh.

A. **I mean, I'm assuming that that's what was going on. I don't -- I just remember the cuffs being on as I was helping put Mr. Toon's hand behind his back.**
Q. Okay. And you would agree with me that the cuffs were not taken out until after he was tased the first time?
A. **No. I wouldn't agree with -- I don't remember, so I can't agree with you.**
Q. All right. Do you recall the cuffs being taken out before he was tased the first time?
A. **I don't remember the cuffs being out. You know, I don't know when they came out.**
Q. Okay. Would it be fair to say --
(Knock on the door.)
MS. BLANKENSHIP: Can we go off the record.
MR. COLE: Sure.
(Off-the-record discussion.)
(Tedford Deposition Exhibit 1 was duly received, marked, and is filed herewith.)
BY MR. COLE:
Q. Officer Tedford, we have in front of us here today a polygraph report that's -- at least the first page of it. Do you recall whether you made any post-test admissions?
A. **Post-test admissions?**

Q. (Nods head.)
A. **Like, after the test was completed and all said and done?**
Q. Yes, sir.
A. **No, sir.**
Q. Okay. Don't recall?
A. **No, I don't recall.**
Q. I see you made certain admissions here prior to the test being given. And I guess I'm more concerned with the ones made afterwards. Do you recall seeing your polygraph report before?
A. **No, sir. This is the first time I've ever seen it.**
Q. Okay. We'll leave this. And we might get the second page later on. Okay? If we do, we'll come back to it.
Let's go back to March 7th and 8th, 2008. Do you recall testifying at the criminal trial about this occurrence, this arrest?
A. **Yes, sir.**
Q. Do you recall testifying that Mr. Toon said, why, when you all were grabbing him?
A. **I believe I remember hear -- saying that.**
Q. Turning his head and saying, why?
A. **Uh-huh. Yes.**

Q. Okay. And do you recall testifying that you thought he tightened up a little bit?
**A. Yeah. He did tighten up.**
Q. Okay.
**A. Uh-huh.**
Q. And, again, it was very cold out there, wasn't it?
**A. It was cold outside.**
Q. Okay. And, again, you all grabbed him without telling him why you were grabbing him, isn't that true?
**A. We never said, you're under arrest, no.**
Q. Okay. And you didn't say --
**A. That I can remember.**
Q. -- anything else to him other than you grabbed him, right?
**A. I'm not 100 percent sure. I -- you know, during the scuffle, you know, I don't remember if I said, put your hands behind your back or whatever.**
Q. Okay. But you don't recall telling him that?
**A. I don't remember. No.**
Q. And you're aware that no one else recalls you saying that?
**A. Okay.**
Q. It says, Phelps put him on the hood and that you maintained control of the left wrist behind him;

does that sound right?
**A. Yes.**
Q. Okay. It said, put his hand behind his back, and he tried to stand up; does that sound right?
**A. He did what now?**
Q. You say you put his hand behind his back -- he's at the hood of the car now.
**A. Uh-huh.**
Q. Head's already gone down. And, then, you testified, he tried to stand up; does that sound right?
**A. Yes.**
Q. Okay. You testified at the criminal trial that Phelps said, stop resisting or I'm going to tase you. And, then, you say that Toon still continued not to comply; does that sound right?
**A. That sounds -- from what I can remember, yes --**
Q. Okay.
**A. -- that sounds right.**
Q. It says, Felts tased him, and I maintained you; meaning, I maintained wrist control as we went to the ground; does that sound about right?
**A. I think so. Yes, sir.**
Q. Okay. And, then, placed cuffs on him. But there's actually another tasing before the cuffs were

placed on him, right?
**A. The drive stun?**
Q. Yeah.
**A. Yes.**
Q. Okay. You testified that you don't remember whether he jerked away from you or whether he jerked away from Phelps; is that true?
**A. That's correct.**
Q. Okay. You also testified that Mr. Toon used no physical force on you or any of the other officers at trial. Is that true?
**A. As in pushing away or pushing off of us punching, kicking?**
Q. You just said no physical force. I just wrote down exactly what you said. Is that true or not?
**A. Resistance is, I guess, a kind of force. I guess it would be a force.**
Q. Okay. Again, he resisted by moving his arm?
**A. Moving his arm? He -- he tensed up and kind of pulled away, you know.**
Q. Okay.
**A. So --**
Q. This is while you're holding him at the hood of the car we're talking about?
**A. Whenever we were both at the front of the car**

**-- at the side of the car.**
Q. Okay. You and Phelps behind him?
**A. Right.**
Q. We're not talking about where he turned around the wrong way, right? We're talking about where he's already at the hood of the car?
Okay. Remember, like, I think Phelps told him to turn around. And, apparently, instead of turning like this (indicating), he turned like this. And that's not where you're talking about where he resisted, right? You're talking about where you're at the hood of the car where he moved his arm?
**A. Well, you said physical force, right?**
Q. Yeah.
**A. Your question was about physical force?**
Q. Yeah.
**A. That's not considered physical force.**
Q. Okay.
**A. So, no.**
Q. All right.
**A. Not at that point. Whenever we got over to the car and we got our hands on him --**
Q. Okay.
**A. -- then, yes.**
Q. He used physical force?

**A. Well, the resistance.**

Q. Okay. You testified at trial, no physical force, no violence, no verbal threats. Do you remember saying that?

**A. If that's what it says. I mean, I don't remember verbatim what it says.**

Q. Okay. But you wouldn't disagree with that, would you?

**A. Disagree with what?**

Q. With my statement as to what you said.

**A. If that's what you documented --**

Q. Yeah.

**A. -- that I said?**

Q. And based on your memory. I mean --

**A. Yeah.**

Q. Okay. You also testified that he, quote, could have gotten aggressive. Do you remember testifying to that at trial?

**A. I think so.**

Q. Okay. Do you remember that when he's leaned over the hood -- I guess how you all characterize it versus slammed. I'll use your words for now -- leaned over the hood and he comes back up and you see a hand come out and he's leaned back over again, that shortly after that is when he's tased. Does that sound accurate

to you?

**A. Yes.**

Q. Okay. And after he's tased, he goes to the ground; is that fair to say?

**A. Yes.**

Q. Okay. And he doesn't get up off the ground or try to escape or roll away prior to being drive stunned?

**A. I don't remember him trying to push off of anything. I mean, we had his arms, as far as I can remember. I know I had -- I think I'm pretty sure I had control of the left wrist the whole time.**

Q. Right. That's what you said earlier. Yeah.

**A. Yeah. Okay. And I'm not -- I can't say what Officer Phelps had control of.**

Q. Okay. And that's fair. I won't ask you to. But he was there with you? You were both on him?

**A. Uh-huh.**

Q. Both kind of behind Toon when he was sitting on the ground or laying on the ground; is that right?

**A. Yeah. We were in that general area.**

Q. Okay. And that's when he was tased again by Officer Felts?

**A. Drive stunned.**

Q. Drive stunned?

**A. Uh-huh.**

Q. Are you aware that there are two holes in his chest that were documented on post at Blanchfield Hospital?

**A. No. I'm not aware.**

Q. Okay. Would that make sense to you that there would be two of them from the TASER®?

**A. There would be -- you know, if it -- if they made good connection and the TASER® worked as it was supposed to, then there would be marks.**

Q. What about a drive stun, will that make a mark?

**A. Not sure. Don't know.**

Q. Have you ever been drive stunned?

**A. No.**

Q. Am I saying it right? D-R-I-V-E?

**A. Yes.**

Q. Drive stunned?

**A. Uh-huh.**

Q. Okay. If you're drive stunned, it's just two prongs, right?

**A. (No Response.)**

Q. Or what does it look like?

**A. It's just, like, two pieces of metal.**

Q. Okay.

**A. And the arc goes in between those two pieces**

**of metal?**

Q. Are they sharp?

**A. No. Not at all.**

Q. They're dull; like little knobs or something?

**A. They're flat surfaces.**

Q. Flat surfaces. Okay. Tell me what you observed from Mr. Shepherd. Did you ever observe Mr. Shepherd try to stop you all from making an arrest?

**A. He never physically got in -- in our -- he never physically came over and tried to put hands on us. No.**

Q. Did you ever see him where he was a danger to himself or others that day?

**A. Mr. Shepherd?**

Q. Yeah.

**A. Was he a danger to himself --**

Q. Yeah.

**A. -- or others?**

Q. (Nods head.)

**A. I don't know Mr. Shepherd. So I don't know what his intentions are. I don't know his background. I don't know his criminal history. I don't --**

Q. And I apologize. I'm going to ask a good question. Let me kind of break it down in terms of charges. He was charged with felony interference with

apprehension -- I'll get the charge right here -- and he was also charged with A-I. Do you remember those being his charges?
A. **No.**
Q. Let me get it right. I'll -- (Reviews documents.)
A. **I'm not aware of his charges.**
Q. He was charged with hindering prosecution or apprehension, first degree, a felony charge. Which was an improper charge. But do you recall him doing anything to hinder the prosecution or apprehension of Mr. Toon?
A. **I think what you're discussing there is prior to my arrival.**
Q. Okay.
A. **So I wouldn't --**
Q. This is when Phelps said that he saw him running in the house, right? And --
A. **I'm assuming that's what that's referring to, whenever he went into the house. And I think I remember hearing Officer Phelps say that --**
Q. Shepherd opened the door, allowing the driver to get away from Officer Phelps. So he says. That's what he said. But you don't know anything about the charge, so I'll go on with it.

Alcohol intoxication, what constitutes alcohol intoxication? If you see somebody, what do you need to see to charge him with that?
A. **Out in a public place or where public --**
Q. Yeah. Yeah.
A. **-- public is -- can be -- you know, they can be seen from the public and under the influence of alcohol.**
Q. Well, it's got to be more than under the influence.
A. **Well, manifestly, I think, is what the K-R-S states. Manifestly under the influence.**
Q. Was he manifestly under the influence that night?
A. **I don't know. I wasn't really focused on him.**
Q. Okay. But you didn't observe him staggering or falling down or having any difficulty controlling himself, did you?
A. **He didn't fall down. He -- I didn't see him stagger. He may have been swaying a little bit. I don't know.**
Q. But you didn't see him swaying either.
A. **Well, I don't know.**
Q. Okay.
A. **I just said --**

Q. All right.
A. **-- I don't know.**
Q. It's also possible he was not under the influence at all, correct?
A. **Either way, I don't know. I didn't really pay attention to him.**
Q. Gotcha.
A. **I didn't really go up and get in his face and ask him questions and stuff.**
Q. All right. Are you aware that being faced with a felony charge, he pled guilty to A-I, Mr. Shepherd did?
A. **He did? No, I didn't know.**
Q. Are you aware that he was improperly charged by Officer Felts with hindering prosecution or apprehension, first degree?
A. **You said he was un --**
Q. Improperly. There was no factual legal basis for that charge?
A. **Not aware. I don't know.**
Q. Let me show you what's Plaintiff's Exhibit 1 from the deposition of Mr. Felts and ask you whether you've ever seen that before.
A. **Have I ever seen this before?**
Q. Yeah.

A. **(Reviews documents.) No. I don't remember ever reading over this or looking at it.**
Q. Have you ever heard of a term called "exigent circumstances"?
A. **Yes, sir.**
Q. What are you allowed to do under exigent circumstances?
A. **A lot of times that refers to hot pursuit. You know, if I'm --**
Q. Warrants, things like that? Yeah.
A. **Can be warrants. If I know the person's inside for a fact, you know.**
Q. If you see me running in a house under exigent circumstances and you watch -- exigent circumstances meaning, you pull me over. I pull up to the house and run in -- you don't have to get a warrant to go in there; do you?
A. **I mean, that's -- that's a touchy situation. I guess, in Officer Phelps's case, he might not know what he had. He don't -- he probably was just trying to handle it the best way he could by asking them to come out of the house.**
Q. Yeah. Let's don't conjecture what his mentality was.
A. **Okay.**

Q. I appreciate you trying to do that. But you don't know what his mentality was that night, do you?
A. **Who?**
Q. Officer Phelps. You don't know what he was thinking when he approached there. He hasn't told you that, has he?
A. **No.**
Q. Okay.
A. **Huh-uh.**
Q. So you don't know what it was, do you?
A. **No, I don't know.**
Q. Okay. But you do know what exigent circumstances are, don't you?
A. **Yes.**
Q. Okay. If someone's committed a crime, is fleeing and runs into a house, whether it's their house, you don't have to wait and get a warrant. You can go in there after them, can't you?
A. **Depends on the crime.**
Q. Okay. What crimes can you do it on?
A. **Don't know all of them.**
Q. Okay.
A. **The ones that I can think of is, maybe, for example, a vehicle pursuit, chasing them, failing to yield, endangering, possibly, people's life by the**

**driving.**
Q. Okay.
A. **They bail out of a vehicle. I'm right behind them. They run into a house. That's a little bit more serious. Officer Phelps, I don't -- he didn't have all that, I don't think. He wasn't in hot pursuit of the vehicle.**
Q. Okay.
A. **Shots weren't fired. Nobody was hit, you know. So...**
Q. Again, you haven't talked to Officer Phelps about his thoughts when he approached the house, have you?
A. **Huh-uh. No.**
Q. Okay. (Reviews documents.) Did you ever observe any injuries on Mr. Toon on March 7th or 8th, 2008?
A. **I didn't. No. I didn't look.**
Q. Do you know whether, now, he had any injuries?
A. **Do I know, now, of any injuries?**
Q. Yeah.
A. **You stated that he had marks on his chest. I don't...**
Q. A cut ear?
A. **I don't know where that could have came from.**

**I don't know.**
Q. Okay. Is it possible it came from his head hitting the hood of the car?
MS. BLANKENSHIP: I'm going to object to the extent that I don't think you produced to me any medical records that showed the cut ear. Are there some records I'm missing?
MR. COLE: No. I just have his testimony to it.
MS. BLANKENSHIP: His testimony at my deposition was that he got his ear cut?
MR. COLE: I think he talked about it. Maybe you didn't ask him. He's told me about it.
MS. BLANKENSHIP: Well, there's no evidence in this case of that. Let me just say that.
BY MR. COLE:
Q. Go ahead and answer the question. Is it possible he cut his ear when his head was slammed on the hood?
A. **I doubt that.**
Q. Okay.
A. **I don't even remember his head hitting the hood actually.**
Q. You don't?
A. **Huh-uh.**
Q. But you remember his torso rapidly touching

the hood, don't you?
A. **No. I don't remember his torso touching the hood. I remember his hip area rapidly going to the side of the car.**
Q. Okay.
A. **And being pushed forward to expose his wrist for the officer, Officer Phelps, to get better hold of the wrist.**
Q. And, again, it was three or four inches of snow on the ground at this point? How many inches?
A. **I don't know.**
Q. Would you say there was snow on the ground; would that be fair to say?
A. **There was snow on the ground.**
Q. Okay. And it was snowing at the time?
A. **Yes, sir.**
Q. Okay.
MR. COLE: And just to address the issue of that, I think you've asked me for that -- I'm talking to you, Stacey -- for that report.
MS. BLANKENSHIP: What report?
MR. COLE: From Blanchfield Hospital. And I told you, I don't have it.
MS. BLANKENSHIP: You've given it to me now.
MR. COLE: Okay. All right.

MS. BLANKENSHIP: Yeah. I've got it.
MR. COLE: But, initially, I told you I didn't have it.
MS. BLANKENSHIP: Right.
MR. COLE: Then, I think we talked to Ken or somebody and got it from Ken, right?
MS. BLANKENSHIP: Right.
MR. COLE: Okay. I don't know whether the ear thing is mentioned in that report. But I wanted to mention it to you. That, from what he's told me, he cut hit ear. Again, whatever the report says, it says.
MS. BLANKENSHIP: Okay.
BY MR. COLE:
Q. Do you know whether Mr. Toon was ever shown the arc on the TASER® before it was applied to him on March 7th, 2008?
**A. I doubt that very seriously. I mean, I really -- I don't think he was at all. Because in order for that to happen, he would -- Officer Felts would have had to take the cartridge off and, then --**
Q. Yeah.
**A. -- show him the arc.**
Q. Okay. And he didn't do that, did he?
**A. No.**
Q. Okay. Would you agree with me that your

policy says that should be done whenever possible, in an attempt to do what you talked about earlier, which is to intimidate the person into compliance?
**A. No. I don't think it says that in the policy.**
Q. Okay.
**A. Maybe I haven't read that portion. But I don't -- I don't think that is what we should do per H-P-D policy. Do you have a copy of the policy?**
Q. I'll read it here to you. When practical, the arc of the E-I-D should be displayed and the subject given the opportunity to submit to control prior to administering a shot firing the probes. (Passes document.) It's the one in the little square box up there.
MS. BLANKENSHIP: There.
WITNESS: (Reviews documents.)
BY MR. COLE:
Q. Do you remember reading that before?
**A. No. I think that -- from what I hear recently, that it's not recommended that that's done.**
Q. Okay.
**A. I think that, actually, TASER® recommends that you go ahead and don't waste time taking that off.**
Q. Sure. Are you aware of some recent other changes in policy where they tell you not to tase people

in the upper torso, or at least in the chest area?
**A. You said recent changes?**
Q. Yeah.
**A. Is this after --**
Q. Yeah.
**A. -- after Mr. Toon's tasing?**
Q. Oh, no, no, no. After several people have been killed by them, there was a TASER® use policy change. I'll give you -- it's an article from October 26, 2009 *Daily News*. TASER® International released a training bulletin on October 12, 2009 against discharging TASER®'s electric control device in a person's chest. Are you aware of that?
**A. Like I said, the chest, I don't think, is the aim point anymore with the -- the laser. I think it's more of the abdomen area is the aim point.**
Q. Okay. And are you aware that TASERS® kill people, correct?
**A. I wouldn't say the TASER® killed anyone.**
Q. Okay.
**A. I -- I think it is more of a -- the person -- the individuals have already been highly -- blood flowing already, they're stressed -- their heart's already stressed prior to being tased.**
Q. Okay. Would you agree, it's sometimes

stressful just to be in an encounter with three police officers and being pushed around?
**A. Say that again.**
Q. Would you agree with me it would be stressful for a person to be in an encounter with three police officers and being pushed around?
**A. If a person was encountered by three police officers?**
Q. And pushed around?
**A. And pushed around.**
Q. Would you agree that would be stressful?
**A. If a police officer's pushing them around, then -- then, yeah, it may be a little stressful for them.**
Q. It may be stressful for you if three guys came up behind you and started pushing you around, wouldn't it?
**A. Definitely. I would probably listen to what they told me to do, though.**
Q. Remembering what you told me earlier in regard to your prior testimony, I want to ask you a few more questions. Would you agree that Mr. Toon was not combative at any time during his interaction with you on March 7th or March 8th, 2008?
**A. He was not actively combative, no.**

Q. Okay. Would you agree with me that you all -- or at least Officer Felts -- utilized a TASER® prior to hard hand techniques being applied?
**A. TASER®, like I said, either falls into soft or hard.**
Q. Okay.
**A. I think it's hard empty hand technique. So it is a hard empty hand technique.**
Q. It is a hard empty hand technique?
**A. The TASER® is.**
Q. Okay. Would you agree with me that there could have been other uses of force, other than the use of the TASER®, which would have effectively caused the arrest of Mr. Toon on March 7th?
**A. There's a number of options that could have been. I mean, we could have -- you know, there's just so many options you could have done.**
Q. Like -- I'll give you an example.
**A. Leg sweep, peroneal take down.**
Q. I've got a book here that's got, I don't know, over 100 use of force reports in there. And we have fleeing felons, we have people who have struck officers, we have people who have almost run over people with their cars, we have people who have endangered other people's lives, who have recently assaulted people,

numerous cases in there where they were never tased, where they were never struck with a baton, where O-C was never used. Where simply one officer, one on one, grabbed the person and put him on the ground with an arm bar and arrested him. Would you agree with me that Mr. Toon could have been arrested simply with an arm bar technique?
**A. I can't say that I would agree. I don't know that for a fact. We -- a lot of times the TASER® takes the fight out of people.**
Q. It took the fight out of him, didn't it?
**A. Well, eventually.**
Q. Okay. But there was really never any fight in him to begin with, was there?
**A. We weren't going to stay around and wait to find out.**
Q. Okay. Did you fill out a Use of Force Form?
**A. Did I?**
Q. Yeah.
**A. For this?**
Q. Uh-huh.
**A. I don't think I did.**
Q. Who did, to your knowledge.
**A. I believe it was Officer Felts.**
Q. Would you agree with me that at no time did

Mr. Toon place any of you officers in danger on March 7th or March 8th, 2008?
**A. We don't know what he was capable of. So I don't know how to answer it.**
Q. So it's foreseeable he could have put you in danger?
**A. It's always -- it's always possible that it could escalate. We don't want it to escalate.**
Q. I mean, it's possible right now, if you said, Mr. Cole, you're under arrest, it's possible that you could be in danger from me, right?
**A. Yes, sir.**
Q. Okay. So it's always possible with anybody; would that be fair to say?
**A. Especially police officers doing their job.**
Q. Did you all have any reason on March 7th or 8th to believe that Mr. Toon was a danger to anyone other than you all?
**A. (No Response.)**
Q. Was he a danger to Mr. Shepherd?
**A. They got out of the house together, out of the vehicle together. I don't...**
Q. Right. Wasn't a danger to him, was it?
**A. I wouldn't think.**
Q. He never did anything that you can state here

today that would cause you to believe he was a danger to you, did he?
**A. Say that again.**
Q. He didn't do anything that you can name here today that caused you to believe he was a danger to you on March 7th or March 8th?
**A. Any time anyone resists, there's a danger.**
Q. Okay. And, again, his resistance was turning the wrong way and moving a hand after he was leaned over the car? That was his resistance?
**A. The tightness -- if he would have stuck his hand behind his back, we wouldn't be here today. If he had listened and just, you know, put his hands behind his back, like normal, everyday people do.**
Q. But he was never told to put his hand behind his back.
**A. He was told to turn around. It's kind of a -- you know, a given. You're told -- you're told to turn around, you know the next step from there. Most people do.**
Q. It's also a given that you all are trained to tell somebody they're under arrest before you're arresting them, isn't that right? When practicable. I understand you can't always do it.
**A. Right.**

Q. But isn't that a given as well, that you all are told to tell somebody they're under arrest before you place them under arrest, if practicable?
A. **It -- yeah. Yes, sir.**
Q. Okay. Isn't it also a given that you all are told to tell somebody, in a clear and authoritative voice, what you want them to do?
A. **Yes, sir.**
Q. That's right there in the training, right?
A. **Uh-huh.**
Q. And in this case, to your memory, Mr. Toon was never told to put his hands behind his back and he was never told he was under arrest until after he was tased twice; is that fair?
A. **I don't know. Like I said, in the scuffle earlier, I don't know what was said. I don't remember. I don't know if he was told to put your hands behind your back during the scuffle, you're under arrest during the scuffle. I don't remember.**
Q. Okay. You'd agree with me if those things weren't done, they should have been done?
A. **To be honest, I hardly ever tell someone directly, you're under arrest. It's -- you know, it's -- they pretty much know at that point, you know. If I'm there for a reason, investigating something, the**

**next point after telling them to turn around is, you know what's going to happen from there.**
Q. Do you think that before a TASER® is used, that the police officer with the TASER® should consider use of lower forces before deploying the TASER®?
A. **To consider it?**
Q. Yeah.
A. **You can always consider it. You can always consider using --**
Q. Not can you. But do you think they should?
A. **With me, I -- I would think I would. I would rather go hands-on with somebody and just try to use soft empty hands, hard empty hands if necessary, to put them in cuffs.**
Q. You would rather do that, wouldn't you? In fact, you do do that.
A. **I do.**
Q. And you don't use a TASER® unless you think it's really necessary, do you?
A. **Me personally?**
Q. You personally.
A. **And it's personal preference, too, you know.**
Q. I understand.
A. **I don't.**
Q. I understand he's got a right to make his own

decision. And we've got to give him credit. We've got to say, this officer had to make a -- we can't use hindsight. We have to look at it as he did that night. Sometimes I need to make split-second decisions.
A. **Right.**
Q. So how you do it doesn't affect the right of Mr. Felts to make his own decision. I just want to know how you do it as a police officer.
A. **So what's your question?**
Q. My question is, is that you would not use a TASER® unless you thought it was really necessary to effectuate an arrest or to protect yourself or a third party; is that true?
A. **No. I wouldn't say I wouldn't.**
Q. You say you would?
A. **No, I wouldn't say I wouldn't.**
Q. Okay.
A. **Would not.**
Q. Okay.
A. **You know, every situation is -- is different.**
Q. Would you use a TASER® if you didn't think it was necessary?
A. **If I didn't think it was necessary? No. Then I wouldn't use it.**
Q. Okay. And so you prefer to use a soft hand or

hard hand techniques, correct?
A. **Situation dependent.**
Q. Don't you think it's remarkable that you had three officers there and that he was still tased; that three officers weren't able to just handcuff him?
A. **(No Response.)**
Q. Why is that?
A. **I think that we actually minimized possible injuries in case Mr. Toon would -- did get combative with us -- actively combative. We may have -- we didn't know what his plans were. When the TASER® was used, I think it does take the fight out of people, where they don't want to continue resisting, so they com -- usually comply. If we just would have tried to wrestle him and wrestle him into cuffs, injuries are more prone to us, injuries are more prone to Mr. Toon.**
Q. But that's not the standard for use of the TASER®, is it?
A. **What?**
Q. To reduce risk of injury to you or Mr. Toon; that's not the standard, is it?
A. **I -- the TASER® does reduce risk of --**
Q. I understand that. But that's not the standard they teach you to use it by, is it?
A. **(No Response.)**

Q. When are you supposed to use a TASER®?
**A. It falls into the hard empty hand on the Use of Force Continuum.**
Q. All right. When are you supposed to use it?
**A. Whenever you feel like it's necessary or whenever you feel like...**
Q. Necessary to do what?
**A. To effect the arrest or...**
Q. Or protect you or somebody else, right?
**A. Right.**
Q. Tell me why it was necessary with three cops and one Mr. Toon.
**A. Don't know. I didn't -- I didn't tase. I just was there to do, you know -- to make sure that none of my fellow officers got hurt and to help effect the arrest.**
Q. Based upon what you saw that night, you wouldn't have tased him, would you?
**A. I don't know. Don't know.**
Q. Okay. You would agree with me that it would be wrong to tase somebody if it was not reasonably necessary to effectuate the arrest or protect officers or protect somebody else; would you agree with me on that?
**A. That it's not necessary unless those reasons?**

Q. I'm sorry. Yeah. You would agree with me, it would be wrong to tase somebody unless it was necessary to make the arrest, protect officers, or protect somebody else?
**A. I can't say. You're saying necessary? It's situation dependent. Every situation is different. I don't know.**
Q. Okay. Isn't that what they train you on; you don't do it unless it's necessary?
**A. (No Response.)**
Q. We just talked about it, and you named them out for me, the reasons why you use the TASER®. Didn't they teach you that; that you don't do it unless it's necessary?
**A. If you feel like -- I don't know about necessary. But if you feel like that you can use it and you're justified in using it --**
Q. Okay.
**A. -- then, I think that's -- that's...**
Q. Wouldn't you agree with me that it's wrong to use one to punish somebody?
**A. Say that again.**
Q. Wouldn't you agree with me that it's wrong to use a TASER® to punish somebody?
**A. If you -- if you're just trying to punish**

**them, I mean, yeah. What's -- you've got to -- why are you tasing them?**
Q. Because, say, you think they're being disrespectful or not listening or you've had enough or you're frustrated or whatever else. It says right here, no excessive, punitive, or coercive use will be tolerated. So you would agree with me that type of use is wrong, right?
**A. Yes, I do.**
Q. Okay. You'd agree with me that it would be a violation of someone's constitutional rights to tase them if they were not combative or resisting arrest, correct?
**A. If it falls into the hard empty hand control tactics -- their actions; if we're at that point -- then I feel that it is justified in using the TASER®.**
Q. But if you're at that point, they're resisting arrest, aren't they, or they're combative? You don't go to hard empty hands unless somebody is resisting arrest, correct?
**A. No.**
Q. Okay. So you'll agree with me that if Mr. Toon was not resisting arrest, it was wrong to tase him?
**A. If Mr. Toon wasn't resisting arrest --**

Q. Right.
**A. -- then he probably wouldn't have been tased.**
Q. Okay. You're close. All right? I'm not trying to be a jerk here. I've just got to get the answer to my question. You heard my question last time. And sometimes, maybe, I don't speak too well.
Would you agree with me that if Mr. Toon was not resisting arrest that night, that it would be wrong to tase him? You would know that, correct?
**A. Right.**
Q. Is that right?
**A. Well, I would know that?**
Q. Yeah. That it would be wrong to tase him if he was not resisting arrest.
**A. If he was complying to what we said and we tased him, then we would be wrong.**
Q. Okay. Let's give another example here. Little ole me, okay? And let's say you all came to the officer here and we're in the deposition and you're on duty. And Mr. Cole decides he just doesn't want to leave the office. He's sitting here in the chair. And you've come in and said, Mr. Cole, you need to leave. And I say, I don't want to leave. Would it be okay to tase me then?
**A. No, sir.**

Q. Okay. If you told me to turn around, and I turned around, and you tell me to put my hands behind my back but I don't put my hands behind my back right away, would it be okay to tase me then?
**A. No.**
Q. Okay. It would be okay just to grab my arm and put it behind my back and see if this would work, right?
**A. I would try that, yes.**
Q. Okay. You'd agree with me that to use more force than is necessary under your perception at the time -- not my hindsight 20/20 looking after it happened -- but if you, as a reasonable officer, go to make an arrest and you use more force than is necessary, you'd agree with me that that violates somebody's constitutional rights, right?
**A. If I used more force than necessary --**
Q. Yeah.
**A. -- yes.**
Q. Okay. Was Mr. Toon ever given a chance to put his hands behind his back before his hands were grabbed?
**A. Was he given an opportunity to put his hands behind his back before his hands were grabbed? Yes, I believe he was.**
Q. Okay. Would you agree with me that, to your

recollection, no one told him to put his hands behind his back. So how would he know to put his hands behind his back?
**A. Like I discussed earlier, you know, that's the next step in the process. Done did all the investigative field sobriety test. He was told to turn around. Most people know to put their hands behind their back without having to be told.**
Q. So he should have known to put his hands behind his back when he was told to turn around?
**A. I would think so.**
Q. So since he didn't know that, it justifies him being tased?
**A. That was a big jump.**
Q. Okay. Does it justify him being tased?
**A. Just because he didn't turn around?**
Q. Does that justify him being tased?
**A. If he didn't turn around when I told him to turn around, that's not --**
Q. You wouldn't tase him?
**A. Not at that point.**
Q. No. No. And would you agree with me that if Mr. Toon was tased by Officer Felts the second time, the drive tase, and Mr. Toon was not resisting, that would be wrong?

**A. If he was not resisting.**
Q. Yeah. If he was laying there crying on the ground after being tased the first time -- or not crying but squealing in pain and he was laying on the ground on his side or he was sitting on his butt with his legs out, and you all -- or maybe he was laying on the side, he's in pain, he's hollering out, you all tell him to sit up and put his hands behind his back, if he has his feet out and his legs out in front of him sitting on his butt and got his hands to his side, you would agree with me, there would be no reason to tase him, correct?
**A. If he was compliant at that point, then there would be no reason. If he did what you just said --**
Q. Right.
**A. -- then, no, there wouldn't be a reason for a drive stun.**
Q. And you don't know whether he was compliant or not when he was tased the second time, do you?
**A. (No Response.)**
Q. You didn't make the decision to tase him the second time, did you?
**A. No.**
Q. Okay. And you don't know whether he was compliant at the time he was tased or not, do you?
**A. I do remember that after, I think, the drive**

**stun, he relaxed his arms and we were able to cuff him.**
Q. Okay. But you don't remember whether he was resisting arrest prior to the drive stun, do you?
**A. Oh, he was still resisting, I believe, because --**
Q. How was he resisting sitting on his butt?
**A. I mean, he still wasn't putting his hands behind his back.**
Q. Okay. If Mr. Shepherd says that he wasn't resisting, that he put his hands behind his back and sitting on his butt, Mr. Shepherd would be lying?
**A. I would say so, I mean, because Mr. Shepherd, I don't think, had a great view. And he --**
Q. Well, how could he not have his hands behind his back if you were holding his hand the whole time? Tell me that.
**A. Because he -- you can't hold someone's hand behind their back -- and I would have to follow him around to his butt. It's just --**
Q. That's what you said. You never lost control of the wrist.
**A. If he was on his side, though.**
Q. But you said you never lost control of the wrist.
**A. Not that I remember. I don't think I did.**

Q. But how could he not have his hand behind his back if you never lost control of the wrist and it was behind his back when he went down?
A. **I'm not saying it was behind his back when he went down.**
Q. Okay. Well, where was it?
A. **I think that if he went down on his right side, the his hand would be on his left side.**
Q. Okay. But you never lost control of it, right?
A. **Not that I remember.**
Q. Okay. And if you never lost control of it, how is he resisting?
A. **Because he wasn't complying.**
Q. And what was he supposed to do?
A. **Put his hands where they were supposed to go and stop resisting.**
Q. But you had them under control already, so how could he be resisting?
A. **I had control of his wrist.**
Q. Okay. But his butt's on the ground and you've got his wrist.
A. **If he fell on his right side, that means I would have to be laying on my side to be directly behind him.**

Q. You're not saying he resisted when the TASER® hit him and he lost all control, are you?
A. **(No Response.)**
Q. Because that's when he landed on his side is when he lost all physical control after being tased.
A. **Say that again.**
Q. All right. He was tased, right, the first time?
A. **Uh-huh.**
Q. And he fell on his side, you're telling us, right?
A. **Right.**
Q. Okay. You're not saying --
A. **What I remember.**
Q. All right. You're not saying that he was resisting from the point where he was tased until he was on the ground, are you, where he had no control?
A. **If -- if he didn't -- when he went down to the ground, I think he fell on his right side. I had control of the wrist on the left side. From what I remember, I don't know at what point -- you're asking, was he still resisting while he's being tased on his way to the ground.**
Q. (Nods head.)
A. **I don't -- he didn't have control of his body**

**at that point.**
Q. That's my point. He couldn't be resisting then, could he?
A. **Unless, like we discussed earlier, the leads didn't get a good connection on his body.**
Q. Right. But if he was being shocked, if he was hollering out in pain --
A. **I don't remember him hollering out in pain.**
Q. Okay. But you may not remember several things from that night --
A. **Right.**
Q. -- right?
A. **Right.**
Q. Okay. I still don't understand, though, I mean, if you never lost control of his wrist, how he was resisting you. Can you explain that to me? You're in control. How is he resisting? How are you losing control?
A. **I didn't lose control if I had control of his wrist with both of my hands.**
Q. Okay.
A. **If I would have let go, he might have pulled away from me. And I think that's what he was trying to do was pull away from me.**
Q. Okay.

A. **Of course, I don't know what his intentions are.**
Q. And, of course, he's got 50,000 volts going through his body at this time, doesn't he; at least for a few seconds, according to --
A. **Well, that was after he was given the opportunity to comply and put his hands behind his back.**
Q. Without being told to do so. After he's being thrown against the car without ever being told --
A. **After we --**
Q. -- to put his hands behind his back.
A. **After we put the --**
MS. BLANKENSHIP: I'm going to object to argumentative.
WITNESS: After we pushed him up against the car --
MR. COLE: Yeah.
WITNESS: He had the opportunity --
BY MR. COLE:
Q. To put his hands behind his back?
A. **He knew at that point, it's getting serious. Go ahead and -- you know, you need to go ahead and put your hands behind your back.**
Q. He had the opportunity but was never told, right?
A. **Not that I remember.**

Q. Okay.
MR. COLE: That's all I've got.
MS. BLANKENSHIP: Okay.
(Short break taken.)
BY MR. COLE:
Q. Have you not ever seen those documents before?
A. **That's correct. I've not seen these before.**
Q. Do you remember getting a test by Pam somebody? What's her last name on there? Pam...
A. **(Reviews documents.)**
MS. BLANKENSHIP: The next page.
WITNESS: Pam Shaw.
BY MR. COLE:
Q. Do you remember getting a polygraph by Pam Shaw?
A. **Yes, sir.**
Q. Okay. Do you remember making those pretest admissions?
A. **I do.**
Q. Do you remember making any post-admissions, like her saying, hey, there's some deception here on this or deception here on that?
A. **No, sir, I don't.**
Q. Okay. May I see that again.
A. **Uh-huh. (Passes document.)**

Q. (Reviews documents.) Tell me about this theft of property they've got mentioned on here.
A. **That was whenever I worked in the motor pool -- or was injured, was in the motor pool working for a while with the vehicles. And one of my buddies got stuck out in the mud on Fort Campbell. We were off-roading. So I went to go back to that motor pool; got a strap; took it out there to him; tried to pull him out that way. And it got late; never took the strap back.**
Q. Okay. And so you felt like it was a good idea to go ahead and admit this prior to taking the test?
A. **Yeah.**
Q. Do they ask you whether you've stolen anything before, things like that?
A. **Yes.**
Q. Okay. And you never returned the strap, so you wanted to admit to that; is that right?
A. **That's correct.**
Q. Okay. And you still haven't returned the strap?
A. **No, I did.**
Q. You eventually did?
A. **Yes.**
Q. Sometime after this?

A. **Yes. After this. She just recommended that I did, so I did.**
Q. Okay. Where was it when you returned it?
A. **Where was what?**
Q. The strap.
A. **In my truck.**
Q. How long had it been there since you took it?
A. **How long had it been in my truck?**
Q. Yes.
A. **Oh, I don't --**
Q. A couple of years?
A. **I don't -- I don't know. I don't know.**
Q. Were you still on active duty when you returned it?
A. **No. I was off.**
Q. How did you return it?
A. **Just took it back and dropped it off at the motor pool and -- just put it inside the motor pool and just left.**
Q. Okay. Didn't admit to doing something wrong; you just put it back?
A. **Correct. Didn't tell nobody. Just, you know, took it back.**
Q. How did you get on post if you were no longer active duty?

A. **I've still got -- I'm still in the national guard.**
Q. Okay. So they'll let you on for that?
A. **Right.**
Q. So you go on post. Do they ask you why you're coming on post?
A. **No.**
Q. You just come on if you want to?
A. **Correct.**
Q. You go to the motor pool. Does anybody see you put the strap in there?
A. **I don't think so.**
Q. Does anybody know now that you put the strap in there? Did you call anybody and tell them?
A. **No. That's been so long ago.**
Q. Was this a situation where you did something wrong and would rather not admit to it to the people that you took it from?
A. **Yes, sir.**
Q. Okay. Employment history, fired from -- and I may say it wrong -- AKAL Security?
A. **Was -- was released from there because it's on-the-job training. I was still on on-the-job training.**
Q. Okay.

**A. Probation period. And they did have a zero tolerance policy for being tardy.**

Q. But it says in your thing that you wrote on there that it was later excused or later justified. Do you remember that?

**A. Well, it's -- yeah. Because of getting -- drawing unemployment.**

Q. But that wouldn't really be accurate, would it? If you said it was -- don't hold me to it. I've got to look it up.

**A. Okay.**

Q. It takes me -- (Reviews documents.) I apologize for me taking time to go through here. I'm not the most organized.

Before we go to that, let me go to something else. You understand when it's important to tell the truth, right?

**A. Uh-huh.**

Q. And you understand that when you filled out the Police Candidate Questionnaire, you were doing so under oath to tell the truth, correct?

**A. Police Candidate Questionnaire?**

Q. Uh-huh.

**A. I don't know when -- I don't know if I was under oath.**

Q. Okay. Would you agree with me that if you filled out the City of Hopkinsville Police Candidate Questionnaire, you should tell the truth whether you were under oath or not?

**A. Yes.**

Q. Okay. Would you agree with me that if you lied on that, that's something to be concerned about in terms of your ability to tell the truth?

**A. I don't know.**

Q. Okay.

MS. BLANKENSHIP: Let me just lodge an objection. You already said you didn't have any more questions. We came back in here to talk about the polygraph test. And now, you're moving on to other stuff.

MR. COLE: Because it's related to the polygraph test.

MS. BLANKENSHIP: If it relates to the polygraph, then that's fine. But I'm not here to open it back up.

MR. COLE: You're exactly right. You're right. I'll get right to the good part here in a second. I'm going to -- let's go off the record for a second.

(Off-the-record discussion for clarification.)

(Tedford Deposition Exhibit 2 was duly received, marked, and is filed herewith.)

BY MR. COLE:

Q. Your lawyer has a document that says, City of Hopkinsville Police Candidate Questionnaire on it. Do you recognize that?

**A. Yes.**

Q. Okay. You indicate there that you've never used illegal drugs; is that right?

**A. Correct.**

Q. Have you ever used marijuana?

**A. No, sir.**

Q. Okay. But you were around it?

**A. Yeah. Concerts.**

Q. Okay. Any other times you were around it?

**A. No, sir.**

Q. Okay. Are you sure about that?

**A. No, I'm not -- you know, growing up, I'm not 100 percent sure. I don't like to -- you know, but not that I can remember.**

Q. All right.

**A. Never.**

Q. All right. Do you remember saying on your polygraph report that the last time you were around marijuana was four years ago while hanging out at a friend's house?

**A. At a friend's house?**

Q. Uh-huh.

**A. Can I see it? I don't...**

Q. Yeah. Do you remember saying it? I'll be glad to show it to you. (Passes documents.)

MS. BLANKENSHIP: I've got it. (Passes documents.)

WITNESS: Where's it at?

MS. BLANKENSHIP: (Indicating.)

WITNESS: (Reviews documents.) I don't remember who I was talking about then. I really don't.

BY MR. COLE:

Q. Okay. (Reviews documents.) All right. I'm going to refer you -- and I'm going to share with you my paperwork I have here that says, Personal History Statement, Kentucky Law Enforcement Counsel, Peace Officer Professional Standards. On page 7, paragraph 24, if you've ever been discharged or requested to resign from any position because of criminal or personal conduct or rules violations, give details.

You wrote down there, tardiness during on-the-job training, but deemed for acceptable reasons, A-K-A-L Security. Did you put that down?

**A. Yes, sir.**

Q. Okay. But, in reality, you indicated that you were fired for tardiness during training, right? And you didn't ever mention on there that it was for acceptable reasons, right?

**A. I don't know if I said it and she didn't put it in there.**
Q. Okay. So you think she might have left it out?
**A. It's possible. I don't think I said, fired, either. I don't remember. It's been so long.**
Q. Okay.
**A. But, yes, it was. Because I talked to the -- I called the security boss or whatever he was at the time -- I think his name was Nick -- and they approved the paperwork, so I could draw unemployment between them and getting picked up with Hopkinsville.**
Q. Okay. And that's where you worked right before you went to Hopkinsville?
**A. Correct.**
Q. Underneath Criminal Activity on your polygraph report, it says you fought with a soldier in Iraq in 2003. What was that over?
**A. That was over him pulling my chair out from underneath me.**
Q. Okay.
**A. Thinking it was funny.**
Q. That seems fair.
**A. And me busting my tail on the ground.**
Q. Okay. Age 18, punched a car in a club parking



lot out of anger. It states you'd been drinking, got mad about something; is that right?
**A. Yes, sir.**
Q. You said the car was a junker; did not cause any damage?
**A. Correct.**
Q. Well, how would that be criminal, then? I guess you just hit it and it caused damage? It's probably still criminal, isn't it? What were you mad about?
**A. I think we had got kicked out.**
Q. What club were you at?
**A. I believe that was Silverado's, Nashville.**
Q. Did you ever get arrested in Nashville?
**A. No, sir.**
Q. Ever been arrested before at all?
**A. Yes, sir.**
Q. What have you been arrested for?
**A. For minor possession of alcohol.**
Q. Anything else?
**A. That's it.**
Q. Says here, you did not believe that the car belonged to anyone; is that right?
**A. Yeah. From what I recall, I think it was parked at the back of the business, and it looked like a**



**junker, I guess, from what I remember. I mean, it could have. I'm sure it did. I'm sure someone owned it.**
Q. Okay. Why did you put down that you believed it did not belong to anyone if you were sure somebody owned it?
**A. Well --**
MS. BLANKENSHIP: Let me object, first, to the extent that you're suggesting he wrote this. He didn't write this. You said, when you put down.
MR. COLE: All right.
BY MR. COLE:
Q. Why did you provide information that suggests -- this says that he also believed it did not belong to anyone, and now you tell me that you're sure someone did own it.
**A. Because, now, I know that you have to have vehicles registered --**
Q. Okay.
**A. -- since I'm a police officer and someone has to pretty much own...**
Q. Next line, we're talking about criminal activity: Tell me if you seriously said this to the lady. At age 21, you unintentionally punched a hole in a wall of a nightclub. Did you tell that to Pam Shaw?
**A. I might have told her that I unintentionally**



**punched a hole in the wall.**
Q. Unintentionally?
**A. Yeah. I probably did -- I probably did say that back then.**
Q. How do you unintentionally punch a hole in the wall?
**A. Because I didn't think my -- my intent was not to punch a hole in the wall. It was just to punch the wall.**
Q. All right.
**A. I didn't think it was going to go through.**
Q. I gotcha. Why were you hitting the wall to begin with?
**A. Woman problems.**
Q. Okay. (Reviews documents.) Let's go down to Pretest Admissions Continued, second page. It says, Traffic Violations, Careless Driving, 12/02. Were you a police officer then?
**A. No, sir.**
Q. Improper use of blue lights, 8/02.
**A. Uh-huh.**
Q. You had a blue light?
**A. Those were the -- the neon undercarriage lights underneath the vehicle.**
Q. No problem. Okay. (Reviews documents.)

MR. COLE: That's all I've got. Thank you.

MS. BLANKENSHIP: Okay.

FURTHER AFFIANT SAITH NOT

STATE OF KENTUCKY)
) SS.
COUNTY OF WARREN )

I, Julie P. Ritter, a Notary Public, within and for the State of Kentucky, do hereby certify that the foregoing deposition of **BRANDON TEDFORD**, was taken before me at the time and place and for the purpose in the caption stated; that the said witness was first duly sworn to tell the truth, the whole truth and nothing but the truth; that the deposition was reduced to shorthand writing by me in the presence of the witness; that the foregoing is a full, true and correct transcript of the said deposition so given; that there was no request that the witness read and sign the deposition; that the appearances were as stated in the caption.

I further certify that I am neither of kin nor of counsel to either of the parties to this action, and am in no wise interested in the outcome of said action.

WITNESS MY SIGNATURE, on this the 26th day of May, 2010.

JULIE RITTER, NOTARY PUBLIC
My commission expires: 05/24/12
Kentucky State at Large