1

1
2
3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 05:09-CV-37

4   STEVEN GLEN TOON                                    PLAINTIFF

5
6   vs.              DEPOSITION FOR PLAINTIFF

7   THE CITY OF HOPKINSVILLE;
    JAY R. PHELPS, MIKE FELTS;
8   and BRANDON TEDFORD                                 DEFENDANTS

9

10      The deposition of OFFICER JAY R. PHELPS, taken

11   by the Plaintiff pursuant to Notice on Thursday, the

12   17th day of December, 2009, at the hour of 1:05

13   p.m., at the law offices of Denton & Keuler, 555

14   Jefferson Street, Suite 301, in the City of Paducah,

15   County of McCracken, State of Kentucky, before me,

16   Amy S. Caronongan, RPR, CSR (IL), and Notary Public

17   in and for the State of Kentucky at Large, to be

18   used for the purpose of discovery and/or evidence

19   and all other purposes allowed under the Federal

20   Rules of Civil Procedure.

21

22   *****************************************************
     Registered Professional Reporters

23
             WEST KENTUCKY REPORTING SERVICE, INC.

24
                          Certified Shorthand Reporters
25   *****************************************************

2

1                         A P P E A R A N C E S

2

FOR THE PLAINTIFF:

3
            MR. JOHN DAVID COLE, JR.
4           of the law firm of
            COLE & MOORE, P.S.C.
5           921 College Street - First Floor
            P.O. Box 10240
6           Bowling Green, KY   42102-7240

7

8   FOR THE DEFENDANTS:

9           MS. STACEY BLANKENSHIP
            of the law firm of
10          DENTON & KEULER
            555 Jefferson Street, Suite 301
11          P.O. Box 929
            Paducah, KY   42002-0929
12

13  ALSO PRESENT:

14          MR. MIKE FELTS
            MR. BRANDON TEDFORD
15          MR. STEVEN TOON

16

17

18

19

20

21

22

23

24

25

Toon v. City of Hopkinsville, et al                                    Jay Phelps

3

1                           I N D E X

2    OFFICER PHELPS              DIRECT              CROSS

3     BY MR. COLE:                  4

4     BY MS. BLANKENSHIP:                            187

5

6    CERTIFICATE OF REPORTER:   193

7

8                         E X H I B I T S

9    NUMBER              DESCRIPTION                 PAGE

10    *1          Public Safety Disciplinary          47
                 Action Form

11
12     2          Disciplinary Action Form            52

13     3          Transcription of Hearing            98

14     4          Use of Physical Force in            110
                 Law Enforcement

15                    * * * * * * * * * * * * * * * *

16    *Exhibit No. 1 has been placed under seal

17    **Page 40, Line 3 through Page 49, Line 19 have been
      placed under seal

18

19

20

21

22

23

24

25

Toon v. City of Hopkinsville, et al                                    Jay Phelps

---

**4**

1    The witness, OFFICER JAY R. PHELPS,
2    first having been duly sworn, testified as
3    follows:
4    DIRECT EXAMINATION BY MR. COLE:
5    Q. Sir, my name is David Cole, Jr. I want to ask
6        you a few questions today. The rules are
7        basically the same as it was for Mr. Toon.
8        If you don't understand my question, will you
9        please let me know?
10   A. Yes, sir.
11   Q. If you answer my question, can I rely on your
12       answer?
13   A. Yes, sir.
14   Q. Would you state your full name for the record,
15       please?
16   A. Randy J. Phelps, Sr.
17   Q. Senior?
18   A. Senior, yes, sir.
19   Q. Mr. Phelps, what is your current address?
20   A. 1688 Bend Road, Clarksville, Tennessee.
21   Q. And how long have you lived there?
22   A. Approximately six months.
23   Q. What was your address prior to that?
24   A. 836 North Elm Street, Apartment 202,
25       Hopkinsville, Kentucky.

**5**

1    Q. And how long did you live there?
2    A. Approximately two years.
3    Q. Where are you currently employed?
4    A. With the Hopkinsville Police Department. And --
5    Q. And how long -- I'm sorry.
6        And here's something, too. If I ever
7        interrupt you and you're trying to get an answer
8        out, just say, hey, Mr. Cole or David, I didn't
9        finish my answer. I'll make sure you get to
10       finish it. Go ahead. I'm sorry I interrupted
11       you.
12   A. Yes, sir. I was employed with Hopkinsville
13       Police Department and also the U.S. Marine Corps
14       Reserves.
15   Q. Gotcha. How long have you been employed by the
16       Hopkinsville Police Department?
17   A. Three and a half years.
18   Q. Prior to working for the Hopkinsville Police
19       Department, where were you employed?
20   A. Paducah Police Department.
21   Q. And prior to that?
22   A. U.S. Marine Corps.
23   Q. Were you employed anywhere else?
24   A. Prior to that?
25   Q. Yes, sir.

**6**

1    A. Yes. Warren County Sheriff's Department, Warren
2        County Regional Jail. And I had a couple
3        part-time jobs in college.
4    Q. Okay. Tell me about your education. You went
5        to Warren East?
6    A. Warren Central.
7    Q. Sorry, I got that wrong. Graduated from Warren
8        Central.
9    A. Yes, sir, 1989.
10   Q. And then you went to college?
11   A. Yes, sir.
12   Q. Where did you go to college?
13   A. Western Kentucky University.
14   Q. How many years did you go?
15   A. I just went there for a semester.
16   Q. Did you go to college anywhere else?
17   A. Yes, I did.
18   Q. After that, where did you go to college?
19   A. I went to Berea for two and a half years, and
20       then Kentucky Christian for a year.
21   Q. While at Berea College, did you obtain any
22       degrees?
23   A. No, sir.
24   Q. After leaving Berea College, have you had any
25       education other than the education you received

**7**

1        in the Marine Corps and/or as a police officer?
2    A. Yes, I have.
3    Q. What education have you received?
4    A. Online courses through the Saint Petersburg
5        College, law enforcement courses.
6    Q. Okay. Is that part of your continuing education
7        as a police officer, or is that something you're
8        doing on your own?
9    A. It was something on my own.
10   Q. Gotcha. When did you go to the police academy
11       at Richmond?
12   A. The date I enrolled or date I graduated?
13   Q. When you went. I'm sorry. I'll do a better job
14       asking the question.
15       When did you go there to begin your studies?
16   A. I believe it was January 16th, 2005.
17   Q. And when did you graduate?
18   A. If I recall correctly, May 25th, 2005.
19   Q. Okay. And when did you become a police officer
20       at Hopkinsville Police Department?
21   A. September 4th, 2006.
22   Q. And so you've been a police officer a couple of
23       years, maybe a little less than a couple of
24       years -- well, 2006 you went to Hopkinsville;
25       right?

4  (Pages 4 to 7)

Toon v. City of Hopkinsville, et al                                          Jay Phelps

8

1  A. Correct.
2  Q. And the day of this arrest of Mr. Toon was on
3     March 8th, 2006; right?
4  A. No, sir. It was May 8, 2008.
5  Q. 2008. Okay, I'm sorry. That's right. I was
6     looking at the date wrong in terms of how we put
7     the numbers.
8        So you'd been a police office for a couple of
9     years almost; is that right?
10 A. That is correct.
11 Q. Okay. When you began as a police officer in
12    2006 at Hopkinsville what was your rank?
13 A. Patrolman.
14 Q. And what is your rank today?
15 A. Patrolman.
16 Q. Have you received any promotions while at
17    Hopkinsville Police Department?
18 A. No promotions, no, sir.
19 Q. Have you received any sanctions or disciplinary
20    measures?
21 A. Yes, sir, I have.
22 Q. Did you receive sanctions or disciplinary
23    measures for failure to follow procedures or the
24    rules of being a Hopkinsville police officer?
25 A. I do not -- I can't answer that question without

9

1     looking at the prior ...
2  Q. Without looking at the what?
3  A. Without looking at the actual sheets and how it
4     was worded.
5  Q. Gotcha. Would it be fair to say that
6     Hopkinsville Police Department has certain
7     standards and procedures?
8  A. Yes, they do.
9  Q. Okay. And when you became a police officer
10    there, I would assume you had an orientation; is
11    that fair?
12 A. That's correct.
13 Q. And as a part of that orientation, did you have
14    a field training officer that went with you when
15    you first started working as a law enforcement
16    officer?
17 A. Yes, sir.
18 Q. Tell me about that, your training with the field
19    training officer.
20 A. You want that at Hopkinsville, or you want that
21    at Paducah, or you want both?
22 Q. There you go. Good -- that's a better answer
23    than it was a question. Let's just talk about
24    Hopkinsville, when you went to Hopkinsville.
25 A. In fact, I was a lateral transfer or come from

10

1     another department. I'd already been through
2     the academy and the FTO program there. I was on
3     an abbreviated FTO program at Hopkinsville.
4  Q. Okay.
5  A. So if I recall correctly, I did a total of six
6     weeks.
7  Q. All right. And during that period of time, did
8     they teach you about their procedures and
9     policies and what they expected of you?
10 A. Yes, sir.
11 Q. After -- and maybe when you went there, you
12    knew, but certainly after you had your
13    orientation for the six weeks, you knew what was
14    expected of you, and you knew how to act
15    appropriately as a law enforcement officer?
16 A. I had a fair understanding of it, yes, sir.
17 Q. And I assume you had a fair understanding of it
18    when you were at Paducah?
19 A. Yes, sir.
20 Q. Any disciplinary problems while at Paducah?
21 A. Couple of them, yes, sir.
22 Q. Tell me about your disciplinary problems while
23    at Paducah.
24 A. I'd have to look at them to give you the
25    specifics on them, sir.

11

1  Q. Okay. I understand -- I have a hard time
2     keeping up with details and stumble around. But
3     I want to -- we'll get all that later on, but I
4     want to know what you recall -- I assume there's
5     not so many that it's difficult to remember
6     them; right?
7  A. Right, sir.
8  Q. Let's talk about at Paducah, first time you got
9     in trouble for violating any police policy or
10    procedure, tell me what that was for generally.
11 A. First time, I believe it was -- you want the
12    whole situation, or do you just want a synopsis?
13 Q. Tell me what they alleged you did and whether
14    you did it or not.
15 A. I did not put evidence in a proper container.
16 Q. Okay. All right. What year was that?
17 A. '05.
18 Q. Okay. Can you remember the month?
19 A. No, sir.
20 Q. Can you remember whether it was fall, spring,
21    summer, winter?
22 A. It was after September.
23 Q. Okay. Next sanction or disciplinary action you
24    received while being a police officer at
25    Paducah.

5 (Pages 8 to 11)

Toon v. City of Hopkinsville, et al

Jay Phelps

12

1   A. Like I said, I'm trying to -- going back four
2      years, I'm trying to recall.  One was I
3      didn't -- I believe I completed a report -- or
4      didn't return a report in on time.
5   Q. What was the next one?
6   A. I'd have to look at the sheet, sir.
7   Q. Okay.  You mentioned two.  I think you indicated
8      a third, but you need to look at the sheet.
9         How many sanctions or disciplinary actions
10     did you receive while a police officer at
11     Paducah?
12  A. See, you're going to have to clarify
13     disciplinary actions, I guess, is the best way,
14     because they had five levels of disciplinary
15     action.
16  Q. Start off with the very first --
17  A. Very first one is what's called EIN, employee
18     improvement notice, which is just a basic simple
19     counseling.  This is a deficiency and correct
20     it.
21        Now, they had a policy that if you received
22     five EINs or higher disciplinary matters within
23     a certain time frame, it automatically warranted
24     a suspension, no matter what the EINs were for
25     or what levels of disciplinary action were

13

1      taken.
2   Q. Did you ever get a suspension?
3   A. Yes, I did, because of those -- I had five EINs.
4   Q. And, again, I know just a little bit about this
5      stuff, not much.  You try to educate me here, if
6      you will.  We start off with an EIN.
7         What comes after that in terms of the scale
8      of disciplinary action as a police officer at
9      the City of Paducah Police Department?
10  A. To be honest with you, exactly which ones,
11     because it's totally different from the ones in
12     Hopkinsville.
13  Q. Okay.
14  A. I got the ones, obviously, the Hopkinsville
15     imbedded in my brain.  So if I told you, I don't
16     know if that would be correct or the incorrect
17     next step for them.
18  Q. Okay.  Somewhere in the range of disciplinary
19     actions for a police officer in Paducah, verbal
20     warning would be one of them?
21  A. Well, that's the EIN.  Nothing is ever verbal.
22     There's nothing there to say, "Hey, you did this
23     wrong."  It's all put on paper.
24  Q. All documented?
25  A. Yes, sir.  That's the same way with our

14

1      department.
2   Q. And that would be maintained in your personnel
3      file at Paducah; right?
4   A. Yes, sir.
5   Q. Okay.  Did you ever receive any complaints in
6      regard to excessive force while a police officer
7      in Paducah?
8   A. No, sir.
9   Q. Did you ever receive complaints in regard to
10     excessive force while acting as an enforcement
11     officer at any time?
12  A. No, sir.
13  Q. Did you receive complaints against you while you
14     were employed at the Warren County Regional Jail
15     for excessive force?
16  A. No, sir.
17  Q. How long were you suspended from the Paducah
18     Police Department?
19  A. I believe it was five days.
20  Q. Without pay?
21  A. Correct.
22  Q. While at the Hopkinsville Police Department,
23     have you ever been suspended?
24  A. Yes, I have.
25  Q. What were you suspended for at the Hopkinsville

15

1      Police Department?
2   A. Safety violation.
3   Q. What's the safety violation?
4   A. Taser incident.
5   Q. Who did you tase?
6   A. A police officer.
7   Q. Purposely?
8   A. No, sir.
9   Q. Okay.  Accidentally?
10  A. Yes, sir.
11  Q. Tell me what happened -- first, let's start off,
12     what year was it?
13  A. This year.
14  Q. Okay.
15  A. Roughly end of June time frame.
16  Q. 2009?
17  A. Yes, sir.
18  Q. What officer did you tase?
19  A. Officer DeArmond.
20  Q. Can you spell his last name for me, please?
21  A. D-E-A-R-M-O-N-D.
22  Q. And what was the circumstance under which you
23     tased him?
24  A. Every day in roll call we -- not every day, but
25     the majority of the time in roll call, we will

6  (Pages 12 to 15)

Toon v. City of Hopkinsville, et al                                    Jay Phelps

```
                                    16
1    take the cartridges off our tasers, hold them
2    out and dry-run them to make sure that
3    one -- and he's our instructor, he can explain a
4    little bit better.  But to ensure the battery
5    life is still good in it and that the charge is
6    still good in it.
7        And a couple months prior to this, the extra
8    cartridge, spare cartridge I had had broken
9    doors on it, which makes is unserviceable.  So I
10   had taken it off, put it into a box, and was
11   waiting to get a new one.
12       That morning when I got up, the door on my
13   primary was broken, also.  So I had taken it
14   off.  And I guess instinctively, I put it back
15   on before I put it back in my holster.
16       In roll call, took out my taser, assuming
17   that the cartridge was still off of it.  And
18   went to charge it, and it shot across the room,
19   and there was an officer standing there.
20 Q. Where did it hit that officer?
21 A. I think one went in the chest, and I'm not sure
22   what the other one -- where it connected at.
23 Q. What is the model of taser that you used that
24   day or accidentally used that day that -- I
25   assume there's a manufacturer and there's a
```

```
                                    17
1    model.  Are you familiar with the --
2  A. X26.
3  Q. Who's the manufacturer?
4  A. That I do not know.
5  Q. Okay.  How many volts does it utilize?
6  A. I believe it's 50,000.
7  Q. Do you know how many amps?
8  A. No, sir.
9  Q. You're trained in this weapon; correct?
10 A. Yes, sir.
11 Q. How often are you trained with this weapon?
12 A. Once a year we get recertified.
13 Q. You train in regard to the safe use of it?
14 A. That's correct.
15 Q. Train in regard to not having accidents happen,
16   like what happened when you accidentally shot
17   Officer DeArmond?
18 A. That's why they call it an accident, sir.
19 Q. Okay.  Were you trained in how to avoid those
20   accidents?
21 A. Yes, sir.
22 Q. Were you trained in its proper use?
23 A. Yes, sir.
24 Q. And by "proper use," let me kind of define that
25   by saying, what I mean by that, when is it
```

```
                                    18
1    proper to deploy one or to purposely use one on
2    an accused person?  You've been trained about
3    that; right?
4  A. You have to define "accused person," sir.
5    Accused of what?
6  Q. Let's just say any person.  Let's say you're on
7    duty.  Are you trained when it's appropriate to
8    use your taser?
9  A. That is -- I mean, that's part of use of
10   continuum force, yes, sir.
11 Q. How long were you suspended from Hopkinsville PD
12   for accidentally tasing another officer?
13 A. Four days.
14 Q. Did you have counseling or re-education after
15   that?
16 A. Like I said, we get recertified once a year.
17 Q. Did you meet with a supervisor or anybody after
18   this before you returned to work?
19 A. In regards to?
20 Q. Accidentally shooting off the taser?
21 A. Yes, sir.
22 Q. What -- I'm just --
23 A. From the chief all the way down.
24 Q. -- thinking logically here.
25 A. Yes, sir.
```

```
                                    19
1  Q. Who did you meet with, and what were you told?
2  A. From the chief all the way down.
3  Q. Okay.  What did the chief tell you?
4  A. One, to explain conduct that's expected at HPD.
5    And the fact that I am a marksmanship
6    instructor, that those safety kind of things are
7    not going to be tolerated.  And pretty much
8    don't ever let it happen again or you're going
9    to be gone, so ...
10 Q. Have you had a meeting with the chief in regard
11   to Mr. Toon's case?
12 A. No, I have not.
13 Q. Have you had a meeting with any other officers
14   in regard to Mr. Toon's case?
15 A. Not except for here.
16 Q. And, again, I'm not asking you any questions
17   about any statements --
18 A. I understand that, sir.
19 Q. -- with your attorney.  I'm not asking about
20   that at all.
21       In terms of preparing for your deposition
22   here today, what did you do, other than what you
23   did with your attorney?  Did you talk, say, to
24   Officer Felts?
25 A. No, sir.
```

7 (Pages 16 to 19)

Toon v. City of Hopkinsville, et al                                                    Jay Phelps

---

20

1  Q. Did you talk to Officer Tedford?
2  A. No, sir.
3  Q. After this incident occurred, I assume you-all
4     had some discussions about it. That would seem
5     natural.
6  A. We had a discussion about it, but nothing in
7     reference to the actual facts of the case, but
8     the actual verdict, and then how we are going to
9     proceed with this case.
10 Q. Okay. Let's go back. Bear with me here.
11    Sometimes I read my dates wrong, but I think
12    with -- was it March 6th, 2008?
13 A. Should be March 8th, 2008.
14 Q. March 8th?
15 A. If I'm not wrong.
16 Q. Okay. March 7th, I'm sorry. I'm bouncing
17    around here. March 7th, 2008. Maybe it was
18    March 8th. I guess it was right around
19    midnight, so it was kind of close as to when it
20    was, wasn't it?
21 A. Yes, sir.
22 Q. March 7th, March 8th, somewhere right around
23    there, around midnight, after you-all had
24    Mr. Toon cuffed, did you-all have any
25    discussions, you and Officer Tedford?

---

21

1  A. No, sir.
2  Q. You and Officer Felts?
3  A. No, sir.
4  Q. Did you have any discussions with them later
5     that early morning of the 8th?
6  A. I can't recall. I'm sure, because Corporal
7     Felts is my supervisor, so I'm sure he reviewed
8     my paperwork, if I had any discrepancies or
9     errors in there. But as far as any specifics,
10    no, sir.
11 Q. And you-all -- I mean, I assume that when you
12    have a use-of-force report, your supervisor has
13    to sign off on that; right?
14 A. He's the initial one, yes, sir.
15 Q. And in this case, Officer Felts was the one who
16    actually deployed the taser; correct?
17 A. That's correct.
18 Q. Tell me what other disciplinary actions you've
19    had while a police officer at Hopkinsville?
20 A. I violated the MBT policy, so I got written
21    counseling for that.
22 Q. And that's improper use for un- -- not lawful,
23    but --
24 A. That was just simply accessing Internet on MBT.
25 Q. Which you knew was wrong?

---

22

1  A. At the time I wasn't 100 percent sure it was
2     wrong because I -- just to be honest with you, I
3     wasn't 100 percent knowledgeable with it.
4  Q. You knew it was wrong to dip at the hospital?
5  A. Yes, sir.
6  Q. You did that --
7     Go ahead and finish your answer.
8  A. Twist on that one. The thing was tobacco, okay?
9     Yes, I got a letter for that, but that was
10    because I had tobacco in my mouth. And once I
11    was made aware that dipping was not allowed, at
12    that point, I removed it because I was under the
13    understanding that it was cigarettes. But I
14    took the dip out of my mouth, and at that
15    point --
16 Q. You received a disciplinary action because of
17    that; right?
18 A. Yes.
19 Q. And, in fact, your supervisor told you that you
20    should have known that dipping wasn't allowed
21    either, it's tobacco.
22 A. Right. Mix of words, yes, sir.
23 Q. That's what he told you?
24 A. That's what she --
25 Q. I'm sorry. She?

---

23

1  A. Yes, sir.
2  Q. Yeah, what she told you; right?
3  A. Yes, sir.
4  Q. Okay. What other disciplinary actions have you
5     had against you while a police officer at
6     Hopkinsville?
7  A. Right off the top of my head, I believe there's
8     one more, but what it is, I don't remember right
9     off the top of my head.
10 Q. And if you get a disciplinary action, I would
11    assume that's something that you think about and
12    try to avoid making the same mistakes; right?
13 A. Right. I guess it's the state of mind you're
14    in. I mean, if you realize what your
15    discrepancy was, you correct it, you move on.
16    You don't sit back and dwell upon what you did
17    wrong in the past.
18 Q. You can't recall what that other incident was?
19 A. I was going to the EOC when I wasn't supposed to
20    be there.
21 Q. Do you recall that you were told not to do it
22    again and that you went back there?
23 A. I was -- we can get into that, but that was --
24    it's a lot more to the story than that, sir.
25 Q. Okay.

---

Toon v. City of Hopkinsville, et al                                        Jay Phelps

24

1  A. And it's still being addressed.
2  Q. Still being addressed?
3  A. Yes, sir.
4  Q. It's an ongoing investigation?
5  A. It's not an ongoing investigation. It's ongoing
6     looking into the other party's issues, not mine.
7     MR. COLE: I'm going to hand it to you and
8     ask if you can hand it to him and ask him to
9     review it. I apologize, my highlights are on
10    it. Don't pay attention to those.
11 A. I'm extremely familiar with it.
12 Q. I thought you didn't remember this incident?
13 A. Well, that's why I just brought it. It wasn't a
14    matter I didn't remember. I said I didn't
15    remember specifically which one it was.
16 Q. But you're extremely familiar with this
17    incident?
18 A. Absolutely.
19 Q. Officer Phelps was involved in an off-duty
20    incident in which he was accused of a crime
21    perpetrated upon a female dispatched [sic]. Is
22    that true?
23 A. According to that, yes, it is.
24 Q. Don't worry about this, okay. That's just words
25    on a piece of paper, all right. I'm

25

1     not -- whether that's written down doesn't make
2     it true or not. I'm asking you did that happen.
3  A. Can you ask the question again?
4  Q. Yes, sir. Did you commit a crime against a
5     female dispatcher?
6  A. No, I did not.
7  Q. Okay. What were they alleging you did?
8  A. They alleged sexual misconduct.
9  Q. And what was the specific nature of the alleged
10    sexual misconduct?
11 A. Can you ask a more specific question?
12 Q. Sometimes I don't ask good questions.
13 A. Okay.
14 Q. What did they say you did exactly?
15 A. What she said. They didn't say. She said --
16 Q. I apologize.
17 A. -- that I raped her.
18 Q. And what is her name?
19 A. Charis Ford.
20 Q. Charis Ford? Can you spell that for me?
21 A. C-H-A-R-I-S.
22 Q. Last name?
23 A. Ford, F-O-R-D.
24 Q. Where is she currently employed?
25 A. ECC.

26

1  Q. And ECC stands for?
2  A. Emergency control center, our communications
3     center.
4  Q. And that's like a dispatch place?
5  A. That's our dispatch, yes, sir.
6     MS. BLANKENSHIP: Do you mind if I see that
7     for just a second?
8     MR. COLE: Sure. I don't mind if you want to
9     make a copy of it.
10    MS. BLANKENSHIP: Did you get this from me?
11    MR. COLE: Yes, ma'am.
12    MS. BLANKENSHIP: All right. I thought you
13    did. I just wanted to make -- that's why I was
14    curious when you said, "Make a copy of it."
15    That's okay.
16    MR. COLE: I'd like to tell you I'm a great
17    investigator and do all this work, but,
18    basically, everything I got now, I got from you.
19    And if you don't have it, I'll be glad to make a
20    copy of it.
21    MS. BLANKENSHIP: No. I've got my own.
22 Q. Did you go back into the ECC -- I'm sorry, ECC
23    office after you were told not to?
24 A. Yes. However, okay, there was a memo sent out.
25    It wasn't specifically Officer Phelps cannot go

27

1     in there. There was a memo sent out where after
2     this incident, no officer could go in there
3     unless on official business.
4  Q. Okay.
5  A. Okay.
6  Q. That makes sense.
7  A. Over time, if you look at the time on there,
8     compared to when the incident occurred and when
9     the memo came out that no officer -- it kind of
10    lapsed because of the working relationships, I
11    guess you can put it, through ECC and the HPD
12    kind of fluctured [sic] and it was behind us.
13    So officers started -- were allowed to go back
14    in there. Okay.
15 Q. Okay.
16 A. Well, I was asked by one of the dispatchers to
17    bring food, stop by and pick up food, which we
18    kind of normally do on midnight. So I did.
19    And when I went in to get the food, then it
20    was specifically brought out that all of a
21    sudden the memo is good again, that it ain't,
22    oh, other officers ain't allowed, it's just you
23    are not allowed.
24    However, I was never specifically told myself
25    at that point that I was not allowed in there.

9 (Pages 24 to 27)

Toon v. City of Hopkinsville, et al                                      Jay Phelps

```
                                            28                                              30
 1    But it said, all officers were not allowed in    1    A. Correct.
 2    there unless on official business.               2    Q. Okay. But this is different than that?
 3    Q. So you were getting food there rather than    3    A. But no one specifically came up to me and said,
 4    bringing food there.                             4       "Do not go into EOC." They highly advised that
 5    A. Say again.                                     5       I stay away from her, which for obvious reasons.
 6    Q. You were getting food at the ECC?             6       Okay.
 7    A. I was bringing food there --                   7       Which, on the night that this occurred, where
 8    Q. That's what I thought you said at the beginning. 8     I went into the EOC, she was not to come on
 9    A. -- for the dispatchers.                        9       shift until later but had showed up early, so I
10    Q. Earlier I thought you said you went there to get 10   was not aware that she was there in the first
11    food. Maybe you said you were bringing it.      11       place.
12    A. Correct.                                      12    Q. I gotcha. But you weren't even aware of this
13    Q. Okay. What dispatchers were you bringing food 13     order saying not to be there when she was there.
14    to and what day was it?                         14       You were just aware of the order that says --
15    A. I don't remember the date, but it was Stephanie 15   A. For all officers to stay away.
16    and Reshetta Leggs. I don't know Stephanie's   16    Q. -- none of you-all to be there; right?
17    last name.                                      17    A. Correct.
18    Q. And what month was it?                        18    Q. So what difference would it make whether she was
19    A. That I don't know, sir. It was a good year and 19     there or not?
20    a half or longer ago.                           20    A. I just -- I think it was just most importantly
21    Q. Okay. When is this alleged rape supposed to  21       because -- like I said, incidents kind
22    have occurred?                                  22       of -- it's an ongoing thing, but there was a
23    A. September of '07.                             23       thing put out that she was not even supposed to
24    Q. September of '07, okay.                       24       work the same shift as I was. And for a couple
25    A. And if you are going to, sir, if you don't mind 25    months, that was adhered to, then she was back
```

```
                                            29                                              31
 1    for the record, if you are going to say I was    1    on my shift again.
 2    accused, if you would, read the second line on   2    Q. Tell me, what do you mean "ongoing"?
 3    there where it said I was completely exonerated  3       MS. BLANKENSHIP: Do you need to talk to me?
 4    of that also.                                    4       THE WITNESS: Yes.
 5    Q. Absolutely, I'll read it for you. And I want to 5     MS. BLANKENSHIP: Maybe if it's ongoing and
 6    be fair to you. Even though we're on different   6       he's accused of a crime, maybe we need to speak
 7    sides of this case, I want you to feel like I'm  7       outside for a second.
 8    being fair to you or at least giving you an      8       MR. COLE: And I'm comfortable with -- and,
 9    opportunity to state that, and I'll be glad to   9       obviously, anytime you want to talk to your
10    state it.                                       10       lawyer ...
11       "Although he has since been exonerated by an 11      MS. BLANKENSHIP: All right.
12    independent investigation and cleared, Officer  12       (A brief recess was taken.)
13    Phelps was instructed initially to avoid contact 13    BY MR. COLE:
14    with the dispatcher, to include refraining from 14    Q. Sir, I asked you earlier what you meant when you
15    entering the EOC when she was working."         15       said it was ongoing. You had an opportunity to
16       Is that fair?                                16       speak to your attorney. Tell me what you meant
17    A. Somewhat, yes, sir.                          17       when you said it was ongoing.
18    Q. Were you instructed that way?                18    A. Okay.
19    A. Not -- okay, when it says "instructed," I go  19       THE WITNESS: Do I start at the very
20    back to what I stated a while ago. There was a  20       beginning?
21    memo sent out to all officers department-wide to 21      MS. BLANKENSHIP: However you feel
22    not go in there unless they're on official      22       comfortable telling it.
23    business.                                       23    A. Roughly July, August of '07, become friends with
24    Q. Okay. You told me about that, and I remember 24       this female.
25    that part.                                      25    Q. And this female?
```

32

1  A. Ms. Ford.
2  Q. Okay.
3  A. And at the time, she was allegedly dating
4     another police officer in another jurisdiction.
5     And we were friends, and that was it.
6     Communicated, texted her once in a while. Okay.
7     Then I come under the understanding that
8     those two had broken up. So at that point, we
9     started going out, I guess is a good way to put
10    it. Started seeing each other, dating.
11 Q. What year would this have been?
12 A. Same year, '07.
13 Q. Okay.
14 A. And for about three weeks we dated. We did have
15    intercourse. And then one week I get a phone
16    call on my phone from the same prefix as hers
17    from the city she lives in. She doesn't live in
18    our city.
19 Q. Okay.
20 A. And when I answered the phone, click. Hung up
21    on me. So roughly 30 minutes later, this female
22    calls me and says, "If my ex calls you, he got
23    ahold of my phone today and went through phone
24    numbers."
25 Q. Gotcha.

33

1  A. Okay. So less than a week later, I have the
2     Kentucky State Police at my door and -- saying,
3     "We need to interview you."
4     So they do an investigation based off the
5     allegations that she had made.
6  Q. Help me go back in time a little bit. Because
7     all I'm aware of right now, you got a phone call
8     from her saying, "My ex may call you."
9  A. Yes.
10 Q. At that point in time, you had no knowledge of
11    any rape allegation; right?
12 A. No, no, none at all.
13 Q. You just thought she's going to be in trouble or
14    something like that?
15 A. No. Because I -- at that point, I'm still under
16    the assumption that they're not together.
17 Q. Were they married?
18 A. No. They were just dating. Had been dating --
19 Q. Got a phone call. Next thing you know, state
20    police are at your door, and they tell you what?
21    Do they say she's alleging you raped her?
22 A. No. They're there with my supervisor and asked
23    if I could come down to the sheriff's
24    department. I said okay.
25    So I get dressed and go down to the sheriff's

34

1     department. At that point, they asked me a
2     couple of questions and they just come out and
3     said, "Hey, do you know this female?"
4     I'm like, "Well, yes."
5     They're like, "Well, this is how -- she's
6     alleging you did this."
7     And at that point, I'm like, "Whoa. Okay.
8     When did this allegedly happen?"
9     They told me the date. And, luckily, I save
10    text messages and stuff on my phone.
11    And I'm like, "Well, if that's the case, why
12    is this?"
13    I show it to them. So they did their
14    investigation for however many more days, and
15    they come back to myself and the chief and was
16    like, pretty much they found the story had been
17    unfounded. So I was cleared of all allegations,
18    cleared, and I was at no fault and nothing.
19 Q. Okay. Who made -- did she actually make the
20    allegation?
21 A. This is hearsay.
22 Q. Yeah. That's okay. For a deposition, it's
23    okay.
24 A. What I was told was she was sitting next to a
25    dispatcher and made a comment or something. And

35

1     the other dispatcher asked her if she had been
2     or she felt like -- I don't know the exact
3     words. So at that point, they contacted state
4     police, and, like I said, the next thing I know
5     they're knocking on my door.
6  Q. State police investigated it?
7  A. Yeah. They have to.
8  Q. I'm sure. Yeah, once the allegation is --
9  A. Criminal act within a police department has to
10    be handled by state police.
11 Q. I gotcha, yeah. Okay. Once that allegation is
12    made, any of us are probably going to be
13    investigated.
14 A. Right.
15 Q. Where does -- Charis?
16 A. Charis.
17 Q. -- Charis Ford live?
18 A. I know where she used to live.
19 Q. Where did she used to live?
20 A. Princeton, Kentucky.
21 Q. What's her phone number?
22 A. I have no earthly idea.
23 Q. Do you maintain a cell phone?
24 A. I've changed my number.
25 Q. Okay. What was your old number?

11 (Pages 32 to 35)

Toon v. City of Hopkinsville, et al                                    Jay Phelps

36

1    A. XXX-XXXX. (Redacted by agreement.)
2    Q. Area code 270?
3    A. Yes, sir.
4    Q. And your current number?
5    A. XXX-XXXX. (Redacted by agreement.)
6    Q. XXXX? (Redacted by agreement.)
7    A. Yes, sir.
8       MS. BLANKENSHIP: I'm going to ask that that
9    information be redacted. Obviously, a police
10   officer's cell phone number doesn't need to be
11   in public record.
12      MR. COLE: That's fine with me.
13   Q. I promise you I won't be calling you.
14   A. If you do, that's fine. You won't find her
15   number on any of my -- ever since this
16   situation.
17   Q. Sure, sure. And that's not what I'm concerned
18   about. Since, I wouldn't think you -- go ahead
19   with your story.
20   A. Anyway, I was told that based upon what they had
21   found out was she had not broken up with him.
22   And she was actually either having an affair or
23   something with -- I believe it was two deputies
24   and myself and two city officers and a deputy.
25   And he pretty much found out and they were

37

1       saying got caught with her pants down. And
2    since my number had the most calls and texts on
3    it and she had actually been in my residence,
4    and it just --
5    Q. What about the other officers, did she accuse
6    them of rape, too?
7    A. No. I was the only one.
8    Q. Who was the other officers she was allegedly
9    sleeping with?
10   A. I can't divulge that.
11   Q. Okay. I think you can. She can direct you not
12   to answer.
13      MS. BLANKENSHIP: That -- will you agree to
14   redact that information, black it out?
15      MR. COLE: I will.
16   A. I don't know what the county was. But
17   I -- speculation was that it was XXXXXX.
18   (Redacted by agreement.)
19   Q. First name?
20   A. XXXXXX, I believe. (Redacted by agreement.)
21   Q. And he's with who?
22   A. HPD. I know badge numbers and last names.
23   Q. And who was he? The sheriff?
24   A. I do not know that. I do not know.
25   Q. Who was the other city officer?

38

1    A. That was him.
2    Q. There's two though.
3    A. Yeah. Me.
4    Q. Oh, I thought there was three in addition to
5    you.
6    A. No.
7    Q. I'm sorry. Two other officers and the
8    boyfriend?
9    A. There were two city officers, one county.
10   Q. Two city, one county. Okay.
11   A. And that was alleged.
12   Q. Sure, sure. She could have made the whole thing
13   up about all of it; right?
14      What's her boyfriend's name, the one who
15   called you? I'm sorry. The one she called you
16   about?
17   A. And that I don't know either.
18   Q. Where is she currently employed?
19   A. ECC.
20   Q. And C-H-E-R-A-S?
21   A. C-H-A-R-I-S, I believe.
22   Q. So one of the dispatchers asked her whether she
23   had been raped, and she said, "Yeah, I think I
24   have"?
25   A. Like I said, that was ...

39

1    Q. Was it forcible rape they're alleging or drunk
2    rape?
3    A. Neither nor. I think -- like I said, the story
4    that -- and this is according to what the
5    detective was telling me. She told one story.
6    And then they interviewed me and went back to
7    talk to her. And for two or three straight
8    days, she was, "I'm sick," or "I got an
9    appointment, I can't meet with you."
10      I mean, it was -- especially after they got
11   my text messages and all this stuff after the
12   alleged time frame this happened or alleged
13   incident.
14      So when they started counteracting this with
15   her to validate her statement, then all of a
16   sudden, her statement started getting holes
17   punched into it and everything. And then it got
18   to the point she's just like forget it.
19   Q. Did anybody try to blackmail you over it?
20   A. Oh, no, sir. No, sir. But, I mean, based upon
21   what happened the last couple of days, wouldn't
22   be blackmail, but it was terroristic
23   threatening, basically what it boils down to.
24   Q. Tell me what happened in the last couple of
25   days. And this is specifically going to

12  (Pages 36 to 39)

40

1   redacted.

3
4           THIS PORTION OF THE TRANSCRIPT (PAGE 40, LINE
5   3 TO PAGE 49, LINE 19) HAS BEEN PLACED UNDER
6   SEAL

50

1   Q.  But that's the date the form was --
2   A.  That's the day I was counseled.
3   Q.  Okay.  And you already gave them the date that
4       it happened -- that it did not happen, but
5       alleged to have happened before; right?  That's
6       a terrible question.
7           MS. BLANKENSHIP:  I think he gave an
8       approximate date.  I don't know that he knows.
9   Q.  When did she allege this event occurred?
10  A.  September '07.
11  Q.  September '07, okay.  That's all I have to ask
12      you about that.
13  A.  Also, if I --
14  Q.  Sure.
15  A.  On here, I know they have uncooperative marked.
16      Actually, conduct is marked, not uncooperative.
17  Q.  All right.  Thank you.
18  A.  Because the X's go in front of it.
19  Q.  Thank you.  And you feel free to correct me if I
20      -- because you're more familiar with these forms
21      than me.
22  A.  And that supervisor can -- counseling is the
23      lowest form of counseling.
24          THE WITNESS:  Is that correct?
25          MR. FELTS:  (Nods head up and down.)

49

3
4           THIS PORTION OF THE TRANSCRIPT (PAGE 40, LINE
5   3 TO PAGE 49, LINE 19) HAS BEEN PLACED UNDER
6   SEAL

20      (A brief recess was taken.)
21  Q.  The last incident we talked about, there
22      was -- the date of the disciplinary action form
23      was April 1st, 2008; is that right?  It says,
24      "Date of Incident"?
25  A.  Yes.

51

1   A.  Like I said, it's oral counseling, me telling
2       you you did something wrong, but they just have
3       to put it on paper to show that they've given
4       it.
5   Q.  This is more than oral, this is written?
6       Everything is written; right?
7   A.  Even orals are written.
8   Q.  Orals are written?
9   A.  There's an oral counseling, and there's a
10      written counseling that's on top of it.
11  Q.  There's written/oral and written/written.
12          MS. BLANKENSHIP:  Thanks to their lawyers,
13      everything is written, even though it's an oral.
14          MR. COLE:  We'll blame Ms. Blankenship for
15      all this.
16          MS. BLANKENSHIP:  Yeah.
17  A.  If your uniform wasn't squared away, and I said,
18      "Don't come back in tomorrow with your uniform
19      not squared away," go in there, writes it down,
20      so -- even though it's the lowest level, if
21      there's a continuous problem, they've got
22      something to go back to.
23  Q.  Great way to run a business.  It'll all be
24      documented.
25          Did you also have trouble -- you may have

Toon v. City of Hopkinsville, et al

Jay Phelps

---

52

1     mentioned this to me. I see a disciplinary
2     action form dated February 23rd, 2008. What
3     was that for?
4  A. That you'll have to -- I'm not familiar with
5     that one. Is that the tobacco?
6  Q. Let me see here. That's correct, the tobacco
7     incident. It says disobedience on that. Was
8     there a finding that you were disobedient?
9  A. It was just lack of attention to detail is what
10    it boiled down to.
11 Q. Have you read the memorandum?
12 A. Not recently.
13 Q. Okay. Says it was apparent and that you were
14    told and knew that the facility was
15    tobacco-free. If you were unsure, you as a
16    reasonable person would be expected to and
17    should have asked for clarification, either from
18    hospital staff or your supervisors.
19       Do you recall being counseled by Mr. Holland
20    consistent with this memorandum?
21 A. Captain Holland, yes.
22 Q. And, in fact, it was con- -- I'm tired. My
23    speech is down.
24       In fact, your conduct was contrary to a
25    specific Hopkinsville Police Department policy,

---

53

1     Policy 3-6.
2  A. I'm assuming that's in reference to tobacco use.
3  Q. Yes, sir. And that's just from this memo here.
4  A. Okay.
5  Q. It says, "In accordance with accepted officer
6     safety, officers will not smoke while in contact
7     with public in their official capacity."
8        And it says -- to your defense here, it says,
9     "This does not include officers who are on
10    location" -- sorry, "public location while on
11    break."
12       It does not specifically cover dipping. That
13    is what they would reasonably expect compliance
14    with.
15       What was your punishment for this, if
16    anything?
17 A. That right there.
18 Q. Just something in your file?
19 A. Yes, sir.
20 Q. Were you accused of giving a smirk to somebody
21    in regard to this incident?
22 A. That was what was alleged.
23 Q. Who alleged that?
24 A. I believe the --
25 Q. People at the hospital?

---

54

1  A. You'll have to speak to them directly because --
2  Q. This is what it says here. It says that people
3     at the hospital said you smirked.
4  A. According to -- what instigated the whole thing
5     was the lab director contacted and left a
6     voicemail on one of our major's answering
7     machine. And by the time it got back down to
8     us, some of the things were distorted, but --
9  Q. Okay.
10 A. There was no smirk given nor, once the tobacco
11    was asked to be removed, it was removed.
12 Q. Caught spitting inside the foyer?
13 A. There was no spitting inside the foyer.
14 Q. It says -- my handwriting is awful, so I may be
15    misreading yours.
16       It says, "Only trash can I remember spitting
17    specifically into was in the foyer."
18 A. Okay. I spit in the trash can, but I thought
19    you said in the foyer.
20 Q. Oh, no. I'm sorry. Not in the floor of the
21    foyer but inside the building.
22 A. Was inside of a trash can, yes.
23 Q. Is that where the person saw it and complained
24    about it?
25 A. The person who actually complained didn't see

---

55

1     any of it.
2  Q. Really? Okay.
3        Then on August 20th, 2007, we have the MDT
4     violation of policy, which was where you were
5     accessing your personal e-mail while on duty
6     with police equipment?
7  A. That's what it boils down to, yes, sir.
8  Q. And they didn't even know you could access that
9     stuff with the police equipment, did they?
10 A. I didn't know I could access it either.
11 Q. But they didn't think you could; right? I mean,
12    you're the only officer they've ever heard of
13    doing this; right?
14 A. You'd have to ask them on what they believe or
15    didn't believe.
16 Q. You're the only officer that you're aware of
17    that's even done this; right? That's what you
18    put in the response.
19 A. Correct.
20 Q. Are you good on computers?
21 A. No. It just -- the little -- if you get -- just
22    like now, if you take a computer out and there's
23    an Internet source available, pops up -- the
24    little window pops up at the bottom.
25 Q. Okay.

---

14  (Pages 52 to 55)

Toon v. City of Hopkinsville, et al                                    Jay Phelps

---

56

1    A. And I clicked on it, and there we had it.
2    Q. Again, when you went to Hopkinsville PD, you had
3       already been a policeman at Warren County
4       Sheriff's Department?
5    A. Yes.
6    Q. Were you POP certified at Warren County
7       Sheriff's Department?
8    A. No.
9    Q. You were getting ready to go to the academy?
10   A. Correct, sir.
11   Q. Went to the academy, then you went to Paducah?
12   A. Went to Paducah and then went to the academy.
13   Q. Why did you leave Warren County Sheriff's
14      Department?
15   A. I was making $400 every two weeks.
16   Q. All right. Good reason.
17   A. I could get paid more.
18   Q. Any other problems? Problems with Peanuts?
19   A. Peanuts was a good man, and Jackie Strobe.
20      (phonetic)
21   Q. Yeah. So when you came to Hopkinsville, you
22      knew what the rules were; right?
23   A. Yes, sir.
24   Q. And you knew that it was clearly a violation of
25      Policy 2-24a-1, subpart A4, for you to access

---

57

1       the Internet for personal use while on duty?
2    A. I would state that I signed a memo stating that
3       I was aware of it.
4    Q. But you're not sure you read it?
5    A. Correct.
6    Q. I gotcha. Fair to say you had an opportunity to
7       and you were supposed to read it?
8    A. I said that I read a whole lot of the policy all
9       up front. And this was approximately, I
10      believe, close to a year later, so I had not
11      refreshed my memory on -- the policy on the MDT
12      once I got my MDT. Because I don't have an MDT
13      for almost a year until after I was there.
14   Q. MDT, tell me what that stands for.
15   A. Mobile data terminal.
16   Q. Which is --
17   A. It's a laptop.
18   Q. -- computer in the vehicle?
19   A. Inside the vehicle, yes, sir.
20   Q. And as a punishment for that, you lost privilege
21      of this car, computer, and reports have to be
22      completed on post by you now; right?
23   A. Correct.
24   Q. Loss of his take-home vehicle for one year;
25      correct?

---

58

1    A. Correct.
2    Q. Placed on bottom of the list for a new vehicle.
3    A. Correct.
4    Q. Have you reviewed -- and by the way, sir, if at
5       any time you want to look at what I'm looking
6       at, I'll be glad to hand it to you.
7          You were warned that you'd have a stiffer
8       penalty if you continued to have violations of
9       department policy on or about August 20, 2007,
10      shortly after this computer incident; right?
11   A. That was in relation to the same -- I mean,
12      that's all in one.
13   Q. Okay. "Further infraction of this nature will
14      carry a stiffer penalty"; right?
15   A. I'm saying that was all in one. What you're
16      reading is all a combination.
17   Q. I gotcha. All arising out of the computer?
18   A. Yes.
19   Q. Okay. You got an evaluation on October 31st,
20      2007. Well, let me ask you this first.
21         The rating scale: 1 not acceptable. 3
22      acceptable, kind of a C area. B is superior,
23      like an A level; right? I'm sorry. 5 is
24      superior, like an A level; right?
25   A. I wish it was. 5, yeah, your max.

---

59

1    Q. Yeah, okay. Have you ever received a
2       performance evaluation where you're found to be
3       not acceptable in any category?
4    A. I would have to see that to answer that
5       question.
6          MS. BLANKENSHIP: We're going to let the
7       officers go out. We'll go off the record for
8       just a second.
9          (Off the record.)
10   BY MR. COLE:
11   Q. Without talking about your evals, who does the
12      evals if your supervisors don't know about them?
13      Or if -- say, Mr. Felts, he's up in rank --
14   A. If I'm not wrong, the sergeant above is supposed
15      to do the evals. And remember, this is before
16      we went to a one-supervisor shift. Usually we
17      had three supervisors.
18         So either the sergeant or captain would do
19      them, but the corporals would put their input in
20      because they would see us more on a daily basis
21      in our performance. It could be a combination
22      of all three.
23   Q. Okay. Now, have you told me about all the
24      problems you had while at Hopkinsville in regard
25      to disciplinary matters?

15  (Pages 56 to 59)

Toon v. City of Hopkinsville, et al                                           Jay Phelps

---

60

1   A. Best I can recall, yes, sir.
2   Q. Do you recall ever having any self-control
3      problems before in regard to dealing with
4      defendants?
5   A. No, sir.
6   Q. Do you recall ever violating procedure when
7      handling the investigation or detention of a
8      defendant?
9   A. Not off the top of my head, no sir.
10      MS. BLANKENSHIP: Let me make sure we
11   understand who you're talking about. When you
12   say "defendant," they usually use "arrestee."
13   To them, that's not a defendant yet.
14      MR. COLE: There you go. Let me do a better
15   job. I'll use your terms. Thank you very much.
16   Q. You-all call them arrestees?
17      MS. BLANKENSHIP: Arrestees or detainees or
18   whatever.
19   Q. I'm walking down the street and throw a beer
20      bottle across the thing and break it, and you
21      come up to me and speak to me, what am I at that
22      point? Suspect?
23   A. A suspect or subject.
24   Q. Subject, okay. Can I use the term "subject" to
25      refer to somebody that you may believe has

---

61

1      committed a crime and somebody that you may be
2      arresting? Can I use that same term, and can we
3      communicate like that?
4   A. Yes, sir.
5   Q. Okay. Do you recall while a police officer at
6      Hopkinsville ever arresting a subject and
7      violating company policy when arresting that
8      subject or in regard to doing an investigation
9      in regard to that subject?
10   A. No, sir.
11   Q. Do you recall destroying evidence while a
12      Hopkinsville police officer?
13   A. Destroying evidence?
14   Q. Yeah.
15   A. The only thing would be I tore up a DUI card.
16   Q. Okay. And you consider that to be evidence;
17      right?
18   A. At that time, no, sir, but I was counseled on
19      it. But that was in --
20   Q. Could you not remember that a little while ago
21      when I was asking you about the other
22      disciplinary problems?
23   A. Well, you asked if I had any disciplinary
24      action. That was a counseling that I never --
25      that was not supposed to be still in there. I

---

62

1      guess they're supposed to go away after a year.
2      MR. COLE: I'll have this marked as
3   Plaintiff's Exhibit 2.
4      (Plaintiff's Exhibit No. 2 marked for
5      identification by the reporter.)
6   Q. On December 16th, 2006, you stopped a guy by
7      the name of Cortez Salvador; correct?
8   A. That's correct.
9   Q. And it says here, what we have marked as
10      Plaintiff's Exhibit 2 on the top of this form in
11      regard to the stop of Mr. Salvador -- can you
12      tell me what it says on the top of that form
13      there?
14   A. Above my -- I'm assuming above my name?
15   Q. Yes, sir.
16   A. "Disciplinary Action Form."
17   Q. Okay. And I was asking about disciplinary
18      actions earlier, wasn't I?
19   A. Okay. That is not a disciplinary action form of
20      the Hopkinsville Police Department.
21   Q. Who was it created by?
22   A. I'm assuming created by Corporal Schneider
23      because that's not a disciplinary action.
24   Q. Who is he employed by?
25   A. By Christian County Sheriff's Department. At

---

63

1      the time he was with HPD.
2   Q. All right. When he drafted this document,
3      Corporal Schneider, he was with Hopkinsville
4      Police Department.
5   A. I guess the key to that is you do not see my
6      signature on there at all. So it is not a --
7      any disciplinary forms have to be signed off by
8      my supervisor, and I believe another immediate
9      supervisor.
10   Q. So it's a matter of semantics. A disciplinary
11      form might be different than a disciplinary
12      action?
13   A. I'm just saying that form is not in our
14      disciplinary action forms.
15   Q. But they call it one, disciplinary action form;
16      right?
17   A. That could be something that he has in his own
18      folder. You can ask another supervisor. I
19      don't know.
20   Q. Here's what I want you to do for me in the
21      future. I will inevitably mess it up. I may
22      say "disciplinary action," "disciplinary action
23      form."
24      When I ask you whether you've had any
25      disciplinary actions while at Hopkinsville

---

16  (Pages 60 to 63)

Toon v. City of Hopkinsville, et al                                    Jay Phelps

64

1   Police Department as an officer, I want you to
2   tell me about them whether or not you got to
3   sign for them or not.
4   A. Okay, sir.
5   Q. All right.
6       MS. BLANKENSHIP: Let me just lodge an
7   objection just to the extent, I believe when you
8   asked him earlier if he recalled any more, I
9   believe he qualified that by saying, "Not that I
10  can recall." So it's not that he said that's
11  it.
12      MR. COLE: I think that's fair.
13      MS. BLANKENSHIP: He said, "I don't recall
14  without looking at anything."
15      MR. COLE: Yes, ma'am. If my memory serves
16  me, I think you're exactly right.
17      MS. BLANKENSHIP: All right.
18  BY MR. COLE:
19  Q. But you recalled it right away when we talked
20  about --
21  A. I remembered the incident when you said
22  "evidence" because I remember it was drilled
23  into my brain at the time.
24  Q. Okay.
25  A. But as far as receiving a counseling sheet on

66

1   A. That is correct.
2   Q. And that you wrote down there on another report,
3   which actually -- apparently, went to the jail,
4   that he passed all of his field sobriety tests,
5   except for the horizontal gaze nystagmus test,
6   and yet you took him to the jail anyway, and
7   charged him with DUI so you could, quote, see
8   who he blew.
9   A. If that's what it says.
10  Q. I'm asking whether that's true or not.
11  A. I don't recall.
12  Q. This is Corporal Schneider talking here, okay?
13  He says, "I noticed the citation had no charge
14  of DUI and narrative said Salvador had passed
15  all field sobriety tests except HGN. When I
16  asked Officer Phelps what had happened, he said,
17  'I wanted to see what he would blow on the BA,
18  but he only blew a .033, so I tore up the BA
19  slip and threw it out.'"
20      Is that true? Did you say that?
21  A. Yes, I did.
22  Q. Why did you throw the BA slip out?
23  A. Because of my inexperience at the time.
24  Q. How long had you been a police officer?
25  A. Two years maybe.

65

1   it, I was not aware of it.
2   Q. And is it true that -- let me ask you this.
3   What do you think about Corporal Schneider? Is
4   he still there?
5   A. No, he's not.
6   Q. Was he your supervisor for a period of time?
7   A. He was one.
8   Q. He was a sergeant, wasn't he?
9   A. Corporal.
10  Q. Corporal?
11  A. Yes, sir.
12  Q. How long was he your supervisor?
13  A. Couple months.
14  Q. Did you ever get sanctioned by him or receive
15  any type of disciplinary measure, whether it was
16  an action, form, written, or otherwise?
17  A. That is the only thing I recall.
18  Q. Okay. This particular form?
19  A. Yes, sir.
20  Q. Is it true when he says that you made a traffic
21  stop and conducted a DUI investigation on
22  Mr. Salvador?
23  A. That is correct.
24  Q. Is it true that when you turned in the charges,
25  there was no charge for a DUI?

67

1   Q. And this was as of 12/16/06; right?
2   A. Okay. So just under two years.
3   Q. And be fair to say that you lacked a lot of
4   experience in 2008 as well?
5   A. No, sir.
6   Q. You had a lot more experience in those two
7   years?
8   A. Yes, sir.
9   Q. Did you make any mistakes in 2008 in regard to
10  violating department policy?
11  A. Say that again, now.
12  Q. Did you violate any department policies in the
13  year 2008?
14  A. You've got them right there, sir. Yes, sir.
15  Q. And this is an example that we have marked as
16  Plaintiff's Exhibit 2, a violation of policy in
17  2006; correct?
18  A. According to Corporal Schneider, yes, sir.
19  Q. Do you agree or disagree that it was a violation
20  of policy to throw out the BA slip?
21  A. It actually wasn't a violation of policy. It
22  was a violation of evidence, so it has nothing
23  to do with policy.
24  Q. Tell me about the violation of evidence. What
25  does that mean?

17  (Pages 64 to 67)

Toon v. City of Hopkinsville, et al                                          Jay Phelps

---

68

1   A. My ignorance on it was I didn't realize that the
2       actual slip was considered as evidence. This
3       wasn't engrained in my brain at that time until
4       it was specifically explained to me, I guess is
5       the best way to put it.
6   Q. Okay. Who explained it to you?
7   A. Corporal Schneider did and Captain Meyers.
8   Q. You say in this case on 12/16/06 that
9       Mr. Salvador failed your horizontal gaze
10      nystagmus test; correct?
11  A. Correct.
12  Q. But, in fact, when you got him down to the
13      police station, he only blew a .033; correct?
14  A. That's what it says.
15  Q. You gave him the test. Was it a .033?
16  A. I didn't remember exactly what he blew.
17  Q. You wouldn't have thrown it away if it was a
18      .08, would you?
19  A. Do what, sir?
20  Q. You wouldn't have thrown away the slip if it was
21      a .08, would you?
22  A. Probably not. No, sir.
23  Q. Tell me what presumption, if any, is there if a
24      subject blows a .05?
25  A. .05, they're under the per se.

---

69

1   Q. They're presumed not under the influence;
2       correct?
3   A. Correct. It's up to the officer to provide
4       evidence to prove they are.
5   Q. So would it be fair to say that the horizontal
6       gaze nystagmus test you gave Mr. Salvador, your
7       conclusion that he failed it was inaccurate when
8       considered in conjunction with his blood alcohol
9       level of a .033, which indicates he was not
10      under the influence?
11  A. No, sir. HGN is only there to detect the
12      presence of alcohol, not the actual level of
13      alcohol.
14  Q. And would you agree with me that that test is
15      less than 70 percent effective anyway?
16  A. I'm not a scientist or chemist or kept up with
17      the statistics. I just go with what the HGN is
18      supposed to detect.
19  Q. You would agree with me that it's not a perfect
20      test?
21  A. That's correct.
22  Q. Okay. What was his urine test? Did you find
23      any drugs in his urine or blood? I see here
24      where you took him there for that at the request
25      of Mr. Schneider.

---

70

1   A. I never got the results back. Or if we did, it
2       never went to court.
3   Q. Okay. Says, "Officer Phelps' work ethics were
4       very poor during this incident, not to include
5       that he has violated parts of the HPD policy."
6       And it lists 2-21-14 through 2-21-19.
7       Do you admit violating those policies?
8   A. I'd have to refer to them.
9   Q. Okay. "Officer Phelps also violated 500 KAR 8
10      010(5a) as a trained certified breath test
11      operator and has violated KRS 524.100(a) in
12      which we arrest violators for."
13      Is that true or untrue?
14  A. I would have to refer to it.
15  Q. Says here, "Officer Phelps has prior experience
16      as a BTO before coming to this department and
17      has gone through our department's FTO training
18      and has passed"; correct?
19  A. That is correct.
20  Q. So basically what they're saying there is you
21      knew what you were doing was wrong, and you did
22      it anyway; correct?
23  A. It was a mistake.
24  Q. Did you know it was wrong to do that?
25  A. No, sir. At the time, I didn't.

---

71

1   Q. Says, "Officer Phelps put not only himself at
2       risk, but the department for a possible lawsuit
3       with this kind of conduct."
4       Do you recall Officer Schneider counseling
5       you in that regard?
6   A. Verbally, yes, sir.
7   Q. Did you ever receive a copy of this form?
8   A. No, sir, I did not.
9   Q. Did you know it was in your personnel file?
10  A. No, sir, I did not.
11  Q. Do you have access to your personnel file?
12  A. Going through our supervisors is the only --
13      yes, sir.
14  Q. I would assume that if I were a police officer,
15      like a lawyer or whatever else, I would want to
16      check every now and then. And if I did
17      something wrong, I would want to make sure it
18      made it in there. If there was something bad, I
19      would want to check it, and, you know, make sure
20      nobody else put anything else bad in there. Do
21      you ever do that?
22  A. Well, because the department is pretty good
23      about giving you copies of either good or bad,
24      so --
25  Q. You don't worry about looking at it too often?

18  (Pages 68 to 71)

Toon v. City of Hopkinsville, et al                                    Jay Phelps

72

1   A. I figured if there is something in there I need
2      to know, they will let me know.
3   Q. Okay. Now, it says here -- how long after
4      12/16/06 did Corporal Schneider leave
5      Hopkinsville Police Department?
6         MR. COLE: Here's the deal. But for it being
7      a deposition, I'd allow you-all to help each
8      other out. I just need to know what he knows.
9         MS. BLANKENSHIP: Just say you don't know if
10     you don't know.
11  A. I don't know. Couple months.
12  Q. Did anybody take the place of Corporal Schneider
13     in regard to following up on this disciplinary
14     action form after Corporal Schneider left?
15  A. No, sir.
16  Q. Okay. Did anybody come to you and say, hey --
17     another person either at your same rank or
18     higher and say, hey, Officer Schneider or
19     someone else in the Hopkinsville Police
20     Department wanted me to kind of come in here and
21     talk to you about the Salvador incident and make
22     sure you do right in the future?
23  A. No, sir.
24  Q. Are you aware that he indicated in his report
25     that he talked to you about it a great deal

73

1      about the policy for a DUI arrest? Is that
2      correct?
3   A. Correct.
4   Q. And then as shift corporal, he indicated that he
5      was going to monitor you and all of your DUI
6      investigations to make sure you understood the
7      correct course of action to take and to follow
8      in regard to the Hopkinsville Police Department
9      policy regarding the DUI investigations and
10     arrests.
11  A. He did for a short period, yes, sir.
12  Q. For a couple months, then he left.
13  A. Yes, sir.
14  Q. And nobody else followed up with you?
15  A. I believe at that point they didn't have to, no,
16     sir.
17  Q. You actually prepared two reports in regard to
18     this Salvador arrest?
19  A. I don't recall, sir.
20  Q. Is it unusual to prepare two reports, if you did
21     so?
22  A. Not necessarily reports. It might be an add-on
23     charge.
24  Q. Okay.
25  A. So it's not too uncommon to go back to the jail

74

1      and add charges.
2   Q. This is the first report here, what appears to
3      be a second report. Once you've had an
4      opportunity to review them, let me know and I'll
5      resume the questioning.
6   A. These are the same des- -- or the same
7      citations, sir.
8   Q. Okay. Why are there two of them?
9   A. Because I had to go back and add on after
10     Corporal Schneider spoke to me in relation to
11     it.
12  Q. Add the DUI fourth -- the DUI second as Charge
13     Number 4?
14  A. Yes. Yes.
15  Q. So the first one you left it off. The second
16     one you did it on there?
17  A. Correct.
18  Q. So they're two separate reports, same incident?
19  A. This one got -- and this one stayed.
20  Q. Gotcha.
21        MS. BLANKENSHIP: You may want to explain for
22     the record what you did.
23  A. Oh. One's voided out when -- when you go down
24     to the --
25        MS. BLANKENSHIP: Which one was voided out?

75

1         THE WITNESS: The original one.
2         MS. BLANKENSHIP: Which had the three charges
3      on it?
4         THE WITNESS: Correct. And then the one with
5      the four stayed or was processed.
6   BY MR. COLE:
7   Q. Says here that you on this Salvador arrest, that
8      you stated this, Hopkinsville Police Department
9      field notes, that he had bloodshot eyes; right?
10  A. Correct.
11  Q. Apparently, that didn't have much to do with his
12     alcohol level, did it?
13  A. The majority of the time it does.
14  Q. But he was a .033. You and I can agree he's not
15     under the influence; right?
16        MS. BLANKENSHIP: I'm going to object. Under
17     the influence is drugs or alcohol. So I think
18     that that's --
19  Q. Let's just talk about alcohol. We don't have,
20     to your knowledge, any blood or urine tests back
21     on him, do we?
22  A. As far as I know, he pled guilty on it.
23  Q. As far as you know, he pled innocent to it and
24     was found not guilty.
25  A. I would probably have been to trial for that or

Toon v. City of Hopkinsville, et al                                      Jay Phelps

---

76

1   been to court for that if that was the case. I
2   don't know.
3   Q. Maybe they just amended. Do they normally make
4       people plead to a .033?
5       Let's be fair about it.
6       You don't have any idea as to the final
7       disposition of this case; correct?
8   A. That's correct.
9   Q. And so for you to say it could be marijuana in
10      the system, sure. There could be heroin in the
11      system. We just don't know; right?
12  A. Could go on both of our assumptions, yes, sir.
13  Q. Would you say that bloodshot eyes are oftentimes
14      associated with somebody who's drank alcohol in
15      an excessive amount?
16  A. I wouldn't say an excessive amount. It depends
17      on the person.
18  Q. Is one of the things you look for bloodshot eyes
19      when you are doing a DUI investigation?
20  A. It's an indicator.
21  Q. Indicator. That's the right language. In this
22      case, it wasn't an indicator of his blood
23      alcohol level, was it?
24  A. No, sir. It was an indicator whether or not
25      they're under the influence.

---

77

1   Q. Okay. But in Sergeant Toon's case, you
2       indicated he had bloodshot eyes, and that was an
3       indicator of being under the influence.
4   A. Correct, but I didn't say what level he was.
5   Q. Right. But under the influence of alcohol?
6   A. Under the influence, yes, sir.
7   Q. This case, you said that Salvador had bloodshot
8       eyes, would not keep his head still. You
9       thought those were both indicators that he was
10      under the influence of alcohol; right?
11  A. Correct.
12  Q. And it turns out that he wasn't?
13  A. No one ever said he wasn't under the influence
14      of alcohol. He just wasn't under the per se by
15      law, but he's still under the influence of
16      alcohol.
17  Q. Were you trained in regard to what a .05 means
18      in regard --
19  A. Yes, sir and a .08.
20  Q. What does .05 mean?
21  A. With .05 they're not per se, but you have to
22      provide proof in reference to their SFSTs to
23      whether or not they're under the influence of
24      alcohol or not.
25  Q. You-all have a different book. It looks

---

78

1       different than this one, but it's basically
2       Kentucky Criminal Law; right?
3   A. Yes, sir.
4   Q. Something like that?
5       Are you aware it provides in there that .05,
6       you're presumed not under the influence of
7       alcohol?
8   A. As long as you can provide evidence in regards
9       to their driving, their, like I said, SFSTs --
10  Q. I understand that. But just in regard to the
11      Kentucky Criminal Statute, you're aware that
12      189A provides that if a person's blood alcohol
13      level is .05 or less, they are presumed to be
14      not under the influence of alcohol. Are you
15      aware of that?
16  A. Presumption of guilt is -- or presumption is
17      pushed onto myself as the arresting officer to
18      prove that that individual is under the
19      influence of alcohol.
20  Q. Will you answer my question, please, sir?
21      Are you aware that that's what the statute
22      says?
23  A. Correct.
24  Q. You made mistakes in numerous DUI arrests in
25      2007 and 2008; is that true or untrue?

---

79

1   A. I'm not aware of any mistakes I made.
2   Q. Did you make a mistake in the Salvador case by
3       throwing out the Breathalyzer?
4   A. You said "numerous mistakes."
5   Q. We're going to go through the rest of them here
6       in a second.
7       MS. BLANKENSHIP: You said 2007, 2008. This
8       is '06.
9       MR. COLE: I apologize. Let's talk
10      about 2006.
11  Q. Are you aware that you made numerous mistakes
12      and -- let's say -- "numerous" is a hard word to
13      define. Let's say more than one.
14      Are you aware that you made more than one
15      mistake -- or made mistakes in more than one
16      case as a police officer in 2006, 2007, and 2008
17      in DUI arrest cases?
18  A. It's possible.
19  Q. Would it be fair to say that sometimes you
20      violate policy in an effort to get a bust, to
21      get a conviction?
22  A. No, sir.
23  Q. When you were trained -- looks here like you did
24      a good job February 16, 2009, one of your more
25      recent trainings on how to operate the

---

20  (Pages 76 to 79)

Toon v. City of Hopkinsville, et al                                          Jay Phelps

---

80

1    Breathalyzer; right?
2    A. Okay.
3    Q. Do you recall getting congratulations and
4        successfully being recertified in 2009?
5    A. Yes, sir.
6    Q. Do you recall being recertified in 2008?
7    A. Yes, sir.
8    Q. So in 2008, you knew how to properly operate a
9        Breathalyzer, and you knew how to do so in 2006
10       too; right?
11   A. Correct, sir.
12   Q. Did you take a course on tactical options for
13       patrol in 2007 in Richmond?
14   A. Yes, sir.
15   Q. And tell me, tactical options for patrol, is
16       that -- what does that teach you?
17   A. How to do traffic stops. Taught a little bit
18       about gangs. Just basically tactical options
19       for patrol.
20   Q. How to maintain control over a subject?
21   A. Not necessarily a subject, but how to approach
22       vehicles.
23   Q. Okay.
24   A. If you get into a shootout, how to take defense;
25       how to clear buildings as an officer.

---

81

1    Q. Let's talk about this. I've been a little
2        critical on you. I'm going to give you the
3        opportunity to tell me the good things about
4        you.
5            Because I've looked through your file, and
6        you've had a lot of training, and it appears to
7        me -- while I may have some disagreement in
8        regard to some of the things City of
9        Hopkinsville does, it does appear that they
10       trained you, doesn't it?
11   A. Yes, sir.
12   Q. Trained you on how to use force, make DUI stops
13       and how to operate a Breathalyzer and all those
14       things; right?
15   A. I wouldn't say Hopkinsville taught me how to do
16       DUI stops, no, sir.
17   Q. Okay. Who taught you how to do DUI stops?
18   A. I would say my FTOs from Paducah, and the
19       academy taught me the most.
20   Q. Okay. Who taught you about the use of force?
21   A. The academy teaches it.
22   Q. Anybody else teach you about it?
23   A. We do like follow-ups, like the tactical options
24       or patrol for --
25   Q. What about Hopkinsville? Any of your

---

82

1    supervisors? Mr. Felts over here or --
2    A. They go over the policy.
3    Q. Or your supervisor, Mayberry, did they ever
4        teach you anything about use of force?
5    A. I would say, once again, they reiterate and go
6        over the department policy and --
7    Q. Who does that?
8    A. We do it annually. And when we talk about the
9        taser training or get recert in taser and/or OC
10       spray.
11   Q. Okay. Prior to the date of this inci- --
12       incident, if I can speak, March 7th of 2008,
13       when was the last time you were recertified in
14       regard to the use of a taser?
15   A. Been every year, so I first got issued a
16       taser --
17   Q. It should be in your personnel file, shouldn't
18       it? Because I don't see it.
19   A. I would suspect it would be. We got initial --
20       for me it was '07, I believe, when I got initial
21       training for the taser.
22   Q. What month?
23   A. And certified.
24   Q. I'm sorry.
25   A. That I can't recall.

---

83

1    Q. I don't see it in your personnel file. I've
2        looked all through it.
3    A. I have no idea, sir. It should be on the list.
4        I guess the taser instructor would have it.
5    Q. Who's the taser instructor at the Hopkinsville
6        Police Department?
7    A. Officer Finley, Officer Hyde.
8    Q. Hod?
9    A. Hyde, H-Y-D-E.
10   Q. And who was the -- such an officer when you were
11       allowed to start carrying a taser in 2007?
12   A. If I recall correctly, it was those two that
13       taught the class.
14   Q. And if I misstate something, let me know. Was
15       it 2007 when you were allowed to start carrying
16       a taser?
17   A. Yes.
18   Q. And --
19   A. Recertified in '08 and '09.
20   Q. So you'd been carrying a taser less than a year
21       when you -- when Officer -- I'm sorry, when
22       Sergeant Toon was arrested; correct?
23   A. That's correct.
24   Q. Did Officer Felts give you any training on the
25       use of a taser?

21  (Pages 80 to 83)

Toon v. City of Hopkinsville, et al                                    Jay Phelps

---

84

1   A. No, sir.
2   Q. Any disciplinary actions against you, whether
3      written or not, in any form while you were
4      employed by Paducah Police Department that
5      you've not told me about?
6   A. I cannot recall.
7   Q. Same question for Warren County Regional Jail.
8   A. I definitely don't recall. That was 14, 15
9      years ago.
10  Q. Same question for Warren County Sheriff's
11     Department.
12  A. My best answer would be, no, I don't recall, but
13     I don't believe so.
14  Q. Do you recall anybody at Hopkinsville Police
15     Department doing an investigation or obtaining
16     records from your prior employers prior to you
17     being employed as a Hopkinsville City police
18     officer?
19  A. Yes, sir.
20  Q. What did they tell you, if anything, they found?
21  A. Okay. Can you re- --
22  Q. Did they go and say, "Hey, you've got some
23     problems in Paducah here"? Did they say
24     anything about your problems in Paducah?
25  A. Yeah. They sat down with me and went over what

---

85

1      they had. Because at first Paducah wouldn't
2      release my personnel file.
3         So at that point, I contacted Andrew Coiner,
4      and Mr. Coiner got all my files from Paducah and
5      provided them to Detective Chuck Inman. And
6      once he received them, he reviewed them, called
7      me in and went over each and every one of them
8      with me.
9   Q. Okay.
10  A. Did some more investigation, I guess, into it,
11     and that was the end of it.
12  Q. You admit that you've had multiple violations of
13     policy at Paducah and at Hopkinsville Police
14     Department?
15        MS. BLANKENSHIP: I'm going to object to the
16     term "multiple."
17  Q. More than one violation of policy at Paducah;
18     correct?
19  A. Yes, sir.
20  Q. More than one violation of policy at
21     Hopkinsville?
22  A. Yes, sir.
23  Q. You're 6'2"; is that right?
24  A. Correct.
25  Q. Weigh 195 pounds?

---

86

1   A. Roughly, yes, sir.
2   Q. You received an honorable discharge from the
3      Marine Corps.
4   A. Active duty, yes, sir.
5   Q. I apologize. When you were active duty, you got
6      an honorable discharge. Now you're in The
7      Reserves --
8   A. That's correct.
9   Q. -- or not?
10        What was your MOS in the Marine Corps?
11  A. I had a couple of them.
12  Q. Tell me.
13  A. 0369, 0311.
14  Q. MP at any time?
15  A. No, sir. Well, with an MP unit for a couple of
16     months.
17  Q. Okay. What did you do in the Marine Corps other
18     than being rifleman? Other than that, what did
19     you do?
20  A. Small unit leader.
21  Q. Okay. Did you have combat training?
22  A. Yes, sir.
23  Q. Tell me about your combat training.
24  A. In reference --
25  Q. What did they teach you to do in terms of

---

87

1      protecting yourself or injuring others?
2   A. We have what's called the Marine Corps Martial
3      Arts Program. And teach -- it's MCMAP, and it's
4      martial arts. It's a variety of numerous
5      disciplines brought together and used for --
6   Q. Judo?
7   A. Judo, Jujitsu. It used to be called the old
8      LINE program, but we took out a lot of things
9      that weren't applicable to today's society. Now
10     it's called MCMAP.
11  Q. When you were active-duty Marine Corps, were you
12     ever deployed to any type of conflict?
13  A. Yes, sir, I was.
14  Q. Where were you deployed?
15  A. Fallujah, Iraq.
16  Q. Would it be fair to say that you're well trained
17     in self-defense and in regard to inflicting
18     injury upon others when appropriate?
19  A. I think that every individual in the military is
20     trained that way.
21  Q. But you've got actual combat experience; right?
22  A. Yes, sir.
23  Q. So to me -- I mean, would you say you're at a
24     higher level than those who do not? Would that
25     be fair to say?

22  (Pages 84 to 87)

88

1    A. That doesn't have combat experience?
2    Q. Yeah.
3    A. Yes, sir.
4    Q. Okay. How long have you known Officer Felts?
5    A. Three and a half years.
6    Q. Does he have any problem defending himself?
7    A. Not that I've seen.
8    Q. You-all have done more than one arrest together,
9       based on my review of the use-of-force reports;
10      correct?
11   A. Yes, sir.
12   Q. You've had more than one situation prior to
13      2008, March of 2008 where you-all made arrests
14      together; correct?
15   A. Yes, sir.
16   Q. And have you made any arrests before 2008 with
17      Officer Tedford?
18   A. I'm sure I have. We were on a shift together a
19      long time ago.
20   Q. Any problem with Officer Tedford protecting
21      himself?
22   A. No, sir.
23   Q. Any problem with him effectuating an arrest?
24   A. None that I've seen, no, sir.
25   Q. Okay. To your knowledge, was Officer Tedford in

89

1       the military?
2    A. Yes, sir.
3    Q. What branch of the military was he in?
4    A. I believe the Army, now the National Guard or
5       Reserves.
6    Q. Okay. And Officer Felts was in the military;
7       correct?
8    A. Same thing.
9    Q. Tell me this, sir. When is it proper under
10      Hopkinsville Police Department policies for you
11      to use force on a subject?
12   A. Can you define "force"?
13   Q. Any force, use of physical force.
14   A. You've got various types of physical force.
15   Q. This is not deadly physical force. This is use
16      of force and self-protection and -- use of force
17      for self-protection, how much force are you
18      allowed to use?
19   A. Either that force which is being used against
20      you or one step higher.
21   Q. Anything else?
22   A. I'm pretty sure that's what it is.
23   Q. Would you be surprised to learn it says such
24      force as necessary to protect yourself?
25   A. Correct. And the use of -- I'm talking about

90

1       the use-of-force continuum as either one step or
2       one step above the force that's being used
3       against you.
4    Q. Tell me what the use-of-force continuum is for
5       the Hopkinsville Police Department.
6    A. Can you give me a specific.
7    Q. Just use-of-force continuum you-all have. I
8       assume you-all were taught one.
9       MS. BLANKENSHIP: I'm going to object. He
10      already answered, and they use that. That's
11      what the use-of-force continuum states.
12   Q. You don't have a use of form continuum that has
13      a list of each thing and its level at the
14      Hopkinsville Police Department?
15   A. Like I said, I believe it's one -- the force
16      being used against you plus one.
17      So if somebody's coming at me, for example,
18      with a hard fist, okay, at that point I can go
19      to my taser or to my asp or OC. Or if I can't
20      with a fist, I can go one step higher which
21      would be one of those three.
22   Q. Gotcha. Tell me some other examples so I can
23      kind of understand. I'm trying to follow you
24      here. You gave me one there, someone coming at
25      you with a fist. Someone's coming at you with

91

1       a knife.
2    A. I'm probably not going to pull a knife out. I'm
3       going to pull my handgun out.
4    Q. Gotcha. Somebody doesn't follow a command, what
5       do you do?
6    A. Depends on the situation.
7    Q. Well, you tell me, you indicated that someone
8       comes at you with a fist, it would be
9       appropriate to use a taser or your asp or your
10      fist.
11   A. Okay. For example, if I'm going to effect an
12      arrest on somebody and they're refusing or
13      making any kind of bodily motion to pull away
14      from me, at that point, if necessary, I'm going
15      to use my taser, or I'm going to use OC or
16      whatever means I have that are within limits to
17      effect the arrest on that individual.
18   Q. Okay. Have you ever seen in the use-of-force
19      continuum or have you ever talked about starting
20      off with officer presence?
21   A. Correct.
22   Q. Do you have something like that at Hopkinsville
23      that mentions officer presence?
24   A. I believe we already substantiated that. When
25      we show up on the scene, we have officer

23 (Pages 88 to 91)

Toon v. City of Hopkinsville, et al                                      Jay Phelps

92

1    presence.
2    Q.  But do they train you on that?
3    A.  Do they train it?
4    Q.  Yes.
5    A.  They follow up training on that, sir.
6    Q.  What's next after officer presence?
7    A.  Verbal commands.
8    Q.  Okay.
9    A.  And then from verbal, it's physical.
10   Q.  Maybe escort?
11   A.  Escort.
12   Q.  Number 3 is escort. Number 4 after that is
13       empty hand tactics; right?
14   A.  Correct. And then that's soft hand, empty hand,
15       hard hand.
16   Q.  Either one?
17   A.  Yes, sir.
18   Q.  Empty hand, no weapon in it. And then we go --
19           MS. BLANKENSHIP: Wait a minute. I'm going
20       to object for a minute. You're -- you're not
21       reading from anything.
22           MR. COLE: No, I'm not. I'm asking the
23       question. I'm not required to read from
24       anything.
25           MS. BLANKENSHIP: I agree, but you're asking

93

1    him to agree to -- I think that empty hand, soft
2    hands are two different techniques. He's trying
3    to explain that. And you're saying it's
4    basically the same.
5        MR. COLE: No, I'm not saying that at all.
6    Q.  He and I agree completely. We talked about open
7        hand meaning that you can -- open hand includes
8        soft hand or hard hand or grabbing. Doesn't
9        include any of those things. It's not -- open
10       hand doesn't mean the hand has to be open. It
11       means there's nothing in the hand.
12   A.  To answer your original question. There is
13       different levels of the continuum use of force,
14       yes, sir.
15   Q.  And so we go from open hand, which includes soft
16       hand, hard hand, grabbing, to the use of force,
17       which would include your OC spray, your Mace,
18       your taser, or your --
19   A.  Firearm.
20   Q.  -- or baton?
21   A.  Baton. But also the use of force --
22   Q.  Asp. I'm sorry.
23   A.  -- go from one step to the other. It goes based
24       on what you're presented with.
25   Q.  Right.

94

1    A.  So if an individual is jerking away or doing
2        something to not allow me to effect an arrest on
3        him, I'm not going to start out with the
4        simplest because I've already given him verbal
5        commands. Obviously, I've already given him
6        officer presence because he knows that I'm there
7        and that I'm effecting this arrest on him.
8    Q.  You're talking about Toon's case?
9    A.  I'm just saying in general, sir.
10   Q.  Let's talk about Toon's case.
11   A.  Okay.
12   Q.  Did you think you did that in Toon's case, too?
13   A.  I believe he pulled away when I stepped out --
14   Q.  You said you obviously gave him commands. You
15       said these type of cases you would obviously
16       have given him commands.
17   A.  I told him to turn around.
18   Q.  Okay. Let's talk about that. We're going to
19       play the video here, if we can in just a second.
20       Let's go on memory. Were you able to see it
21       okay there?
22   A.  Yes, sir.
23           MS. BLANKENSHIP: I don't think he --
24   A.  I didn't see it today, no, sir.
25   Q.  We'll let you look at the video.

95

1        But would you agree with me that it would be
2        proper police procedure for you to tell somebody
3        that they're under arrest before grabbing them?
4    A.  No, sir.
5    Q.  Even when the person has been compliant
6        throughout the whole time you've been giving
7        them your field sobriety tests?
8    A.  No, sir.
9    Q.  So that would be contrary to Hopkinsville Police
10       Department policies for you to tell the person
11       they're under arrest?
12   A.  I don't recall that it says in the policy that
13       you verbally tell them they're under arrest
14       before you place them under arrest.
15   Q.  Okay. What does the policy say? Forget about
16       what it says. What policy did you use when you
17       arrested Mr. Toon on or about March 7th or
18       March 8th, 2008?
19   A.  I used officer safety and common sense.
20   Q.  Officer safety and common sense. Okay.
21       And tell me why that necessitated you
22       grabbing him and slinging him around and
23       slamming his face against the hood of the car.
24           MS. BLANKENSHIP: Wait. I'm objecting to the
25       term that you've used. Obviously, we disagree

24  (Pages 92 to 95)

Toon v. City of Hopkinsville, et al

Jay Phelps

96

1    with that.
2       MR. COLE: I know. And that's fair. I will
3    make sure the record is clear on that. We've
4    got your objection noted. The video speaks for
5    itself. Let me just say that. Maybe the jury
6    will look at it a different way.
7    Q. But based upon -- and your lawyer's made the
8    objection. You grab him. You spin him around.
9    You tell him you're tired of this. You take
10   him, and you slam his face against the hood of
11   the car. Yes or no? And explain all you wish.
12   A. Well, you got four different questions there, so
13   which one do you want me to answer first, sir?
14   Q. All right. Let's start off with when you're
15   giving him the PBT --
16   A. Yes, sir.
17   Q. -- as your lawyer indicated earlier, were you
18   obviously upset?
19   A. I was upset from -- once I got there and I asked
20   for Mr. Toon to come to the door, and as he even
21   stated, took forever to come to the door. So,
22   yes, that kind of upset me because I knew he was
23   deliberately staying inside to stay away from
24   talking to me.
25   Q. We'll get into all that later. I'm asking about

97

1       after the PBT. Were you upset then?
2    A. At that point?
3    Q. Yeah.
4    A. Somewhat upset.
5    Q. We'll go back to all of this. I just want to
6    stick right here. Because if I don't, I'll get
7    all confused.
8    A. I understand.
9    Q. And I'll forget to go back to it.
10      So after you gave him the PDT -- you kept
11   saying, "Blow, blow," and you believe he was not
12   making a full effort; right?
13   A. That's correct.
14   Q. And so you're mad about that?
15   A. Not mad, just knew he wasn't doing a complete
16   effort.
17   Q. You said you were upset.
18   A. There's a difference between being upset and
19   being mad.
20   Q. Help me understand that. Explain that to the
21   jury.
22   A. Just upset, I just wasn't happy with his
23   performance and what he was not doing.
24   Q. Upset kind of suggests a lack of control,
25   doesn't it?

98

1    A. No, sir.
2    Q. Do you ever get upset and lose control?
3    A. Only if I allow it. And at that point, I wasn't
4    out of control.
5    Q. So when you -- if you'd picture it here for me.
6    You've seen the video. You were there holding
7    his arms that night. Think back, think about
8    watching the video. You finished the PBT test.
9       At that point in time, you tell him to turn
10   around; is that correct? Do you give that
11   command?
12   A. That is correct.
13   Q. Does he turn around at that point in time?
14   A. No, sir, he doesn't.
15   Q. Did you watch the video earlier today where he
16   turned?
17   A. He turned away from me. Yes, sir, I seen that.
18   Q. Turned away from you?
19   A. Yes, sir.
20   Q. At any time prior to that, did he fail to follow
21   any of your commands?
22   A. Yes, sir.
23   Q. Tell me which ones he failed to follow.
24   A. When I was giving the HGN, he would not keep his
25   head still after being instructed several times

99

1       to do so. And this is even after the fact I
2    asked him several times to come out of the
3    residence and come out in front of my car so I
4    could have the whole thing on videotape. So
5    this was the third or fourth incident that he
6    has not followed instructions.
7    Q. So this is at the doorway when you're asking him
8    to come outside?
9    A. Well, I'm asking, actually, through his friend
10   to have him come outside.
11   Q. Okay. So he did disobey your order then?
12   A. He was aware I was there.
13   Q. But you didn't give him an order. You're in the
14   military. You're in the police. You know what
15   an order is. We talked about these disciplinary
16   forms.
17   A. That's different -- an order between military
18   and police.
19   Q. Well, if you give an order to Mr. Shepard, is
20   that an order to Mr. Toon?
21   A. If I give an order to Mr. Shepard?
22   Q. Yes.
23   A. No.
24   Q. But you didn't give an order to Mr. Toon when he
25   was --

25  (Pages 96 to 99)