UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:09-CV-37

**STEVEN GLEN TOON**                                                                      **PLAINTIFF**

v.

**THE CITY OF HOPKINSVILLE;**
**JAY R. PHELPS; MIKE FELTS;**
**and BRANDON TEDFORD**                                                           **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (Docket #36). Plaintiff has responded (Docket #48). Defendants have replied (Docket #55). For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On the evening of March 7, 2008, Plaintiff Steven Glen Toon was invited to his friend Tim Shepard's house. He arrived at Shepard's house in his red Dodge truck sometime between 7:00 and 8:00 p.m. The timing of the events taking place after his arrival is in dispute.

Toon and Shepard assert that they played video games and talked for approximately an hour to an hour and a half, and they did not consume any alcohol during this time.[1] Toon and Shepard then decided to go out into a field near Shepard's house. It was snowing and snow covered the ground. They took Toon's truck to the field without using any headlights. Shepard estimates that they drove a distance of approximately a hundred meters down Sivley Road to a dead end before entering the field, a drive that takes approximately fifteen seconds. Both Toon and Shepard acknowledge that they were trespassing on the field. They assert they were not

---

[1] Toon acknowledges that he consumed two beers at approximately 12:00 p.m. that day. Toon Depo., DN 45, p. 10.

drinking at this time. They drove around in the field without headlights on looking for deer tracks. Both estimate that they returned to Shepard's house at approximately 10:00 p.m. Both Toon and Shepard then consumed two beers and a mixed drink each.

Defendants assert that a 911 call from James Connor was received at 11:12 p.m. Connor reported a red Dodge pickup truck driving up and down Sivley Road with its headlights off.[2] According to police records, Officer Jay Phelps arrived on the scene at 11:35 p.m. Officer Phelps claims that he observed a red Dodge pickup truck driving down Sivley Road and pulling into a driveway. He saw two individuals exit the truck and enter the house through a door in the garage. Officer Phelps approached the door in the garage and knocked. Shepard and Toon both deny that Officer Phelps saw them on Sivley Road because they had been at the house for an hour to an hour and a half before Officer Phelps knocked on the door.[3]

Shepard answered the door and Officer Phelps asked to speak to the driver of the truck. According to Shepard, he relayed this information to Toon, who told him that he was on the phone and didn't want to talk to Officer Phelps.[4] Shepard returned to Officer Phelps, who insisted that Toon come to the door or he would get an arrest warrant. Toon did not exit the

---

[2]Connor's deposition indicates that he drove out to meet Toon and Shepard on the road prior to calling 911. He told them they needed to go park their truck. When they failed to do so, he called 911 and waited for the cops to arrive. He claims that he saw the pickup enter the driveway and an officer park across the driveway, head to the garage door and yell something like "I know you're in there." Connor Depo., DN 44, p. 8-9.

[3]Toon acknowledges that he ventured out to his truck a couple of times after returning from the field because he was charging his phone. He also notes that he went to the garage to smoke. Toon Depo., DN 45, p. 15-16.

[4]There is considerable debate about whether Toon was actually engaged in a phone call at this time. Copies of Toon and Shepard's cell phone records indicate that no calls were placed after 10:16 p.m. Chart of Phone Records, DN 36-11, p. 1.

2

house until 11:50 p.m., fifteen minutes after Officer Phelps arrived. At this time, Officer Phelps activated his audio and video.[5] The Court has viewed the video of the incident.

Officer Phelps suspected Toon was intoxicated, so he began to administer field sobriety tests. First, he administered the horizontal gaze nystagmus test (HGN). Next, Officer Phelps asked Toon to perform the walk-and-turn test. Around this time, Officers Brandon Tedford and Michael Felts arrived on the scene. Finally, Toon was asked to do a one-legged-stand test. Officer Phelps asserts that Toon did not perform these tests in a satisfactory manner. The Court notes that it was raining or snowing, snow completely covered the ground, and it appeared to be very windy. Toon repeatedly rubbed his eyes and asked for the eye drops he had been using since he had recent eye surgery.

Following administration of the field sobriety tests, Toon stood in front of Officer Phelps's vehicle, as directed, for a minute or two with his hands in his pockets. Shepard came out to speak with him briefly and returned to the house. Toon told Officer Phelps that he drank two beers earlier in the day and two beers at Shepard's house, although he did not disclose having a mixed drink. Shepard returned and stood in front of Officer Phelps's vehicle a few feet away from Toon. Officer Phelps attempted to administer a breathalyzer test several times, but Toon was unable to breathe long enough for a reading. After several attempts at the breathalyzer, Officer Phelps grabbed Toon's right wrist and told Toon to turn around. Toon turned the wrong way and asked "why?" Officer Phelps then directed him to turn around again. Officer Phelps applied some force to Toon's right arm and Toon took his left hand out of his

---

[5]A copy of this audio and video recording has been submitted for the Court's consideration. *See* DN 62.

pocket. Officer Phelps then walked Toon toward the driver's side hood of the vehicle. Officer Tedford stepped in to grab Toon's left arm. At this point, Toon put out his right hand on the hood of the vehicle. Toon says that he did this to prevent Officer Phelps from slamming his head into the hood of the car. Officer Phelps grabbed this arm and held it behind Toon's back and Toon was pushed down onto the hood of the vehicle by Officer Phelps and Officer Tedford. Toon's face clearly touched the hood of the car, although the parties dispute whether it merely touched or was "slammed" into the hood. Toon's torso was pulled back up off the hood of the car, although it remains unclear if this was because of his own actions or if the officers pulled him back. At no point was Toon told he was under arrest or directed to place his hands behind his back. Officer Tedford testified that he had control of Toon's left wrist the whole time.

Officer Felts came around to the front of the vehicle with his taser ready to fire. At this point, one of the officers asked, "Do you want to get tased?" Although Toon states that he never made this comment, Defendants assert that Toon responded, "If you want to fucking tase me, tase me." Officer Felts then shot Toon with the taser in his chest around the sternum area. Toon fell to the ground and out of view of the police vehicle's camera. Officer Phelps commanded Officer Felts to tase Toon again. Officer Phelps asserts that he gave this direction because Toon was still being noncompliant and would not allow the officers to secure his hands behind his back. Shortly after tasing Toon the first time, Officer Felts drive stunned Toon by applying the taser directly to his body. The parties dispute how long Toon was tased each time and where Toon was tased the second time. Toon asserts that he was stunned in the chest again, while Officer Felts states that the second time he tased Toon in the leg. After Toon was tased a second time he was handcuffed and taken into custody.

After the officers handcuffed Toon, he was transported to Christian County Jail where he was again asked to submit to a breathalyzer. Toon provided an insufficient sample. Officer Phelps then transported Toon to Jennie Stewart Medical Center for a blood test. Toon refused to give a sample there. Toon alleges that Officer Phelps slammed him up against a wall at the hospital. Toon was taken back to the jail and spent approximately two days in jail before he was released.

According to Officer Phelps's citation, Toon was arrested for driving under the influence, resisting arrest, and disorderly conduct. A jury found Toon not guilty on all counts. Plaintiff filed suit in this Court on March 6, 2009. Defendants filed their motion for summary judgment on November 15, 2010. This matter is currently set for trial on August 9, 2011.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

**DISCUSSION**

Plaintiff's Complaint asserts four counts against Defendants: (I) Assault and/or Battery; (II) Tort of Outrage/Intentional Infliction of Emotional Distress; (III) Punitive Damages;[6] and (IV) Statutory Violation of 42 U.S.C. § 1983. Specifically, Plaintiff alleges that the City of Hopkinsville and Officers Phelps, Felts, and Tedford violated Plaintiff's Fourth and Fourteenth Amendment rights. Plaintiff asserts claims against the officers in their individual and official capacities.[7] Defendants believe summary judgment should be granted as to all of Plaintiff's claims.

**I.  Section 1983 Claims**

Plaintiff alleges that Defendants, acting under color of state law, deprived Plaintiff of his constitutional rights, and can therefore be held liable under 42 U.S.C. § 1983. There is no

---

[6]A claim for punitive damages is not a separate cause of action, but rather an available remedy. *See, e.g.*, *Salisbury v. Purdue Pharma, L.P.*, 166 F. Supp. 2d 546, 548, n. 1 (E.D. Ky. 2001).

[7]A § 1983 "'action against a city official in his or her official capacity is treated as an action against the City entity itself.'" *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003) (quoting *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992)). As official capacity suits are treated as suits against the municipality, in order to impose § 1983 liability against on a city official the municipality's policy or custom must have played a part in the alleged violation of law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, the same analysis employed for the City of Hopkinsville applies to Plaintiff's claims against the officers in their official capacities.

dispute that Defendants were at all times acting under color of state law. Therefore, the Court's analysis focuses on whether Plaintiff was deprived of his constitutional rights. Plaintiff has alleged that Defendants used excessive force in violation of the Fourth Amendment and deprived him of life and liberty without due process of law in violation of the Fourteenth Amendment.

    *A.*     *Excessive Force*

In order to state a claim for use of excessive force in violation of the Fourth Amendment, the Court applies the "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The Court should carefully balance the suspect's Fourth Amendment rights against the "governmental interests at stake." *Id.* The Court considers "the perspective of a reasonable officer on the scene" in order to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396-97. "Fourth Amendment protection has been incorporated into the Due Process Clause of the Fourteenth Amendment and thereby made applicable to the States." *New v. Perry*, No. 2:07-cv-723, 2009 WL 483341, at *3 (S.D. Ohio Feb. 25, 2009) (citing *Wolf v. Colorado*, 338 U.S. 25 (1949), *overruled on other grounds*, *Mapp v. Ohio*, 367 U.S. 643 (1961)).

Plaintiff alleges that Officers Phelps, Felts, and Tedford used excessive force by tasing him twice even though he was not resisting arrest. In contrast, Defendants argue that Plaintiff was resisting arrest and the use of force was not excessive. Defendants also argue that the officers are entitled to qualified immunity.

7

Viewing the evidence in a light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exists as to whether the officers in this case applied excessive force in arresting Plaintiff. The video of the incident leaves questions concerning, among other things, the duration and placement of the tasings, whether Plaintiff's actions were affected by weather conditions, and whether Plaintiff was noncompliant. It can be reasonably inferred from Plaintiff and Shepard's accounts of the incident that Plaintiff was not resisting arrest. Therefore, whether Plaintiff was resisting arrest and whether the use of the taser was objectively reasonable remain questions for the jury.

In addition, Defendants are not entitled to qualified immunity. "According to the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ewolski v. City of Brunswick*, 287 F.3d 492, 500-01 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether Defendants are entitled to qualified immunity, the Court applies a two-step inquiry:

> First, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. If the court finds a constitutional violation, it must then consider whether the violation involved "'clearly established constitutional rights of which a reasonable person would have known.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir. 1995)); *see also Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "Although it need not be the case that 'the very action in question has been previously held unlawful, . . . in light of pre-existing law, the unlawfulness must be apparent.'" *Id.* (quoting

*Anderson*, 483 U.S. at 640, 107 S. Ct. 3034).

*Id.* at 501. The Court has already noted that a genuine issue of material fact exists as to whether a constitutional violation occurred. In addition, the Court believes this case involves clearly established constitutional rights. The Sixth Circuit has previously held that police officers "should have known that the gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008); *see also Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010). Accordingly, summary judgment as to Plaintiff's excessive force claims against Officers Phelps, Felts, and Tedford is DENIED.

   B.   *Municipal Liability*

Plaintiff also alleges that the City is liable for failure to properly train its employees, and should be held liable under § 1983.

> "[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Respondeat superior or vicarious liability will not attach under § 1983." *Id.* "Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998). Only where a municipality's failure [ ] to train or supervise its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

*Fultz v. Whittaker*, 261 F. Supp. 2d 767, 780 (W.D. Ky. 2003). In this case, Plaintiff alleges that the City's deliberate indifference was a matter of policy and/or custom and caused Plaintiff's

9

injuries. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris*, 489 U.S. at 390. Instead, the focus should be on the adequacy of the training program, and determining whether "the identified deficiency in a city's training program [is] closely related to the ultimate injury." *Id.* at 391.

Plaintiff has failed, however, to identify any custom or policy relating to training which the City endorsed that resulted in the alleged constitutional violations occurring that night. Plaintiff has also failed to identify any deficiency in the training program. Moreover, Plaintiff may not argue that there should have been "better or more training," because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program . . . ." *Id.* Deliberate indifference is a stringent standard, *see Fultz*, 261 F. Supp. 2d at 780, and Plaintiff has failed to create a genuine issue of material fact that such deliberate indifference existed in regards to training.

Plaintiff also raises claims for failure to supervise. Plaintiff's expert, Dr. Terry Cox, examined the disciplinary histories of various police officers and concluded that the City was deliberately indifferent to these concerns. The Court agrees with Defendants that the nine incidents of discipline examined by Dr. Cox (occurring prior to the incident in question) are insufficient to establish a custom or policy of deliberate indifference. There is no evidence that the City condoned the activities of these police officers. Instead, in each instance the police officers were disciplined for their actions. This does not amount to deliberate indifference. *See Doe*, 174 F. App'x at 969 ("Doe neither identifies any policy or custom that she challenges, nor alleges that the fiscal court affirmatively condoned sexual abuse."). Nor has Plaintiff established

10

a persistent pattern of excessive force, as required to state a claim under an "inaction" theory. *Id.* (requiring the existence of a pattern, notice, tacit approval, and a causal link to the constitutional deprivation). "Simply having experts restate general facts and announce legal conclusions without any analysis does not create a genuine issue of material fact." *Id.* at 974.

Finally, Plaintiff alleges that the City should be held liable for its negligent hiring. Plaintiff bases these arguments on personnel records obtained from the police department. In order to impose municipal liability on the basis of hiring decisions, "the plaintiff must demonstrate (1) sufficient fault in the form of "deliberate conduct" and (2) a causal link between the alleged policy or custom and the injury." *Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962, 967 (6th Cir. 2006) (citing *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). The Court notes that these negligent hiring cases concern only the hiring of the particular officers involved in the resulting constitutional injury, and thus, the Court's inquiry of hiring practices is limited to Officers Phelps, Tedford, and Felts.

Plaintiff presents evidence that the City was aware of the officers' pre-questionnaire answers regarding their prior wrongful conduct, yet these officers were still hired. Officer Felts' admissions indicate that he engaged in two instances of theft and "showed deception on his polygraph in regard to the issue of whether he ever trafficked in illegal drugs." Pl.'s Resp. to Mot. to Exclude, DN 54-1, p. 13. This conduct does not indicate, however, that Officer Felts was likely to inflict the particular injury suffered by Plaintiff. *See Brown*, 520 U.S. at 412 ("The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong."). Officer Tedford's history, as summarized by Plaintiff, indicates that he has anger issues while intoxicated, spied on an ex-girlfriend once, and got into a

fight with another soldier. Pl.'s Resp. to Mot. to Exclude, DN 54-1, p. 14. Again, this conduct does not demonstrate that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* (emphasis in original).

Officer Phelps' history demonstrates that he had several disciplinary problems with the Paducah Police Department prior to his employment with the City of Hopkinsville. As far as the Court can discern, these incidents primarily concerned administrative matters (putting evidence in proper containers, completing reports on time, etc.). Officer Phelps testified that he never received any complaints in regard to excessive force while with the Paducah Police Department or Warren County Regional Jail, where he worked prior to becoming a police officer. There is nothing in Officer Phelps' history indicating a high likelihood that he would use excessive force upon Plaintiff. Accordingly, Plaintiff's negligent hiring claim against the City must fail.

Summary judgment is GRANTED as to all § 1983 claims against the City and the officers in their official capacities for failure to train or supervise and negligent hiring.

  C.  *Fourteenth Amendment*

It is unclear whether Plaintiff also asserts an independent Fourteenth Amendment due process claim against Defendants. Plaintiff's response brief indicates that Defendants violated Plaintiff's Fourteenth Amendment rights by depriving Plaintiff of his liberty by placing him in jail for crimes he did not commit. The Due Process Clause of the Fourteenth Amendment protects individuals from physical abuse by officials where the Fourth or Eighth Amendment does not apply. *See Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010). In cases involving warrantless arrests, the Sixth Circuit has held that the dividing line between the Fourth and Fourteenth Amendment zones of protection is set at the probable-cause hearing. *Id.* at 867;

*accord Albright v. Oliver*, 510 U.S. 266, 274 (1994) (noting that the Fourth Amendment governs matters of pretrial deprivations of liberty). In this case, it is undisputed that all incidents, including Plaintiff's detention, occurred prior to Plaintiff's probable-cause hearing or arraignment. Thus, a separate Fourteenth Amendment claim is foreclosed here and summary judgment is GRANTED as to any independent Fourteenth Amendment claims.

**II.     State Law Claims**

   *A.     Assault and/or Battery*

"Assault is a tort which merely requires the threat of unwanted touching of the victim, while battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). "[An] officer may use such force as [is] necessary or reasonably appear[s] to him to be necessary to take into custody the person he is seeking to arrest." *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973). In this case, Plaintiff has established an actual unwanted touching in that he was tased twice by police officers. For the same reasons cited in the Court's discussion of excessive force, the Court finds there is a genuine issue of material fact as to whether the officers applied more force than reasonably appeared to be necessary to arrest Plaintiff.

According to Kentucky law, official immunity is "immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions." *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, (2) in good faith, and (3) within the scope of the employee's authority."

13

*Id.* at 522 (internal citations omitted). There is no question that the officers' actions were discretionary acts taken within the scope of their authority as police officers. Thus, Plaintiff must establish that such actions were not "in good faith." *See Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). "Bad faith exists if either a public employee violated a constitutional, statutory, or other clearly established right of which a reasonable person would have known or if the public employee 'willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.'" *Id.* (quoting *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001)). As the Court has already noted, there is a genuine issue of material fact as to whether the officers violated Plaintiff's clearly established constitutional rights. This is enough to create an issue of fact as to bad faith, and thus, qualified immunity does not bar Plaintiff's assault and battery claims. Summary judgment as to these claims is DENIED.

   B.  *Intentional Infliction of Emotional Distress*

Plaintiff's second count seeks to recover under a theory or intentional infliction of emotional distress ("IIED"), or outrage. A prima facie case of IIED requires that Plaintiff show: (1) that the wrongdoer's conduct was intentional or reckless; (2) that the conduct was outrageous and intolerable and offends against the generally accepted standards of decency and morality; (3) a causal connection between the wrongdoer's conduct and the emotional distress; and (4) that the emotional distress was severe. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004) (citing *Humana of Ky., Inc. v. Seitz,* 796 S.W.2d 1, 2-3 (Ky. 1990)). The Court must determine "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 788-89 (citing Restatement (Second) of Torts § 46(1) cmt. h (1965)).

Plaintiff's response brief fails to address his claim for IIED.  Further, the Court has reviewed Plaintiff's deposition testimony and notes that Plaintiff fails to present a genuine issue of material fact that he suffered *severe* emotional distress.  For instance, although Plaintiff notes that he sought professional help to get checked for PTSD, he acknowledges that he did not seek help until a couple of days prior to his December 17, 2009, deposition, over a year and a half after the tasing incident.  In addition, he states that his PTSD is related to both being shipped overseas and the incident presently before the Court.  While severe emotional distress may include reactions such as shock, embarrassment, anger, and worry, "[i]t is only where it is extreme that the liability arises."  Restatement (Second) of Torts, § 46, comment j.  "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  *Id.*  Plaintiff describes his emotional injury as follows: "Well, just getting tased, mentally, I mean, I don't forget it, and I won't, and it hurt.  And I just don't understand what happened."  Toon Depo. DN 45-1, p. 10.  The Court finds that Plaintiff's emotional distress is not severe and that summary judgment on this claim should be GRANTED.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.